UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA CIVIL LIBERTIES UNION, *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 1:00-cv-00811-SEB-VSS ) |
| MIKE BRAUN, | ) ) |
| Defendant. | ) ) |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF FROM
THE FINAL JUDGMENT AND PERMANENT INJUNCTION**

In 2000, the Indiana Civil Liberties Union (ICLU) and its co-plaintiffs brought this suit to prevent the Governor of Indiana from erecting on Statehouse grounds a monument inscribed with the Bill of Rights, the Preamble to the Indiana Constitution, and the Ten Commandments. This monument was designed to replace an earlier monument inscribed with the Ten Commandments that one of the plaintiffs in this case had vandalized. This Court and the Seventh Circuit, however, held that erecting the new monument on the Statehouse grounds would violate the Establishment Clause, as that clause had been construed by *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and enjoined the Monument's placement on the Statehouse grounds.

Whatever the injunction's validity when entered, intervening changes in Supreme Court precedent make clear that it can no longer stand. Not long ago, the Supreme Court expressly rejected *Lemon*'s view of the Establishment Clause and held that public monuments like the one here must be evaluated by reference to history and tradition. The Supreme Court has also ruled that our Nation's history and tradition do not forbid the placement of monuments inscribed with

1

the Ten Commandments on public property. And the Supreme Court's rejection of *Lemon* fatally undermines the "offended observer" standing theory on which the plaintiffs in this case relied.

The Court should vacate its permanent injunction under Federal Rule of Civil Procedure 60(b)(5) and modify its final judgment accordingly.

## BACKGROUND

### I. Factual Background

During the 1950s, the Fraternal Order of Eagles donated monuments inscribed with the Ten Commandments to communities across the United States. *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 768 (7th Cir. 2001). The campaign's visionary thought that the monuments could help address a perceived "need for juveniles to have a 'code of conduct'" by exposing them "'to one of mankind's earliest codes of conduct.'" Dkt. 21 at 5.[1] In 1958, the Governor of Indiana placed a seven-foot-tall monument inscribed with the Ten Commandments and donated by the Eagles on the Statehouse lawn. Dkt. 18 ¶¶ 24–25. The monument stood on the Statehouse lawn, alongside other monuments and markers, for over three decades, until Steven Schroeder (one of the plaintiffs in this case) vandalized the monument in 1991. Dkt. 18 ¶¶ 24, 26; *see* Dkt. 18 at Ex. 3. Indiana officials promised to replace the monument; at some point, however, the Eagles repaired the monument and relocated it to one of their lodges. Dkt. 21 at 6.

In 1996, Indiana Representative Brent Steele arranged for the placement of a new monument ("Monument"), gifted by the Indiana Limestone Institute, on the Statehouse lawn "near the site of the former monument." Dkt. 18 ¶¶ 17, 28; Dkt. 16 at 7–9. The new monument consists of two pieces, a base and an upper portion, weighing approximately 11,500 pounds in total. Dkt.

---

[1] Though docket entries are cited by docket number, copies of the relevant entries are being filed as exhibits for the Court's convenience.

2

18 ¶¶ 7–10. The base is a rectangular block of limestone that is six feet, seven inches wide, four feet, seven inches deep, and two feet, eight inches long. *Id.* ¶ 8. On top of the base sits a four-sided block with two large faces, each measuring four feet, four inches in height by three feet, seven inches in width, while the smaller faces are triangular, also four feet, four inches tall, but tapering from a width of approximately two feet, six inches at the base to six inches at the top. *Id.* ¶ 9. One of the larger faces of the Monument contains a list of the Ten Commandments "identical to that on the former monument." *Id.* ¶¶ 11, 27. The opposing face contains the federal Bill of Rights. *Id.* ¶ 14. The smaller sides contain the Preamble to the 1851 Indiana Constitution and a dedication showing the monument is a gift of the Indiana Limestone Industry. *Id.* ¶¶ 17, 19; *see* Ex. 7, Broadwell Decl. ¶¶ 4–8.

Then-Governor Frank O'Bannon accepted the Monument as a gift in 2000 and issued a press release announcing that the Monument would be placed on the Statehouse lawn. Dkt. 18 at Ex. 1. "For more than three decades," Governor O'Bannon said, "a monument inscribed with the 10 Commandments stood on the Statehouse lawn as a reminder of some of our nation's core values." *Id.* "Soon those words will stand alongside the abiding principles of our form of government, especially its protections of individual rights." *Id.* "They're ideals we all need to be reminded of from time to time." *Id.* "The new monument," Governor O'Bannon added, "will be an integral part of the Statehouse setting, which honors the history of our state and our nation." *Id.*

## II.   District Court Proceedings

In May 2000, the ICLU and its co-plaintiffs sued Governor O'Bannon over the Monument. Dkt. 1. It alleged that the Monument's placement on the Statehouse lawn would constitute an unlawful establishment of religion and offend ICLU members who would come into "unwelcome

contact with the monument." *Id.* ¶¶ 1, 36. The ICLU also moved for a preliminary injunction blocking the Monument's placement, Dkt. 9, which this Court granted, Dkt. 21 at 1.

In considering the ICLU's Establishment Clause claim, this Court evaluated the claim under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Dkt. 21 at 13. Under *Lemon*, a governmental action is constitutional only if (1) the action has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive governmental entanglement with religion. *Id.* at 14; *see also Lemon*, 403 U.S. at 612–13. The ICLU conceded that the Monument did not implicate the third prong of the *Lemon* test regarding "excessive entanglement," so this Court only considered the first two prongs. Dkt. 21 at 15.

Regarding the first prong, the Court concluded that the State's purpose in erecting the Monument was not a valid secular purpose but was instead religious in nature. Dkt. 21 at 20–21, 23. The Court rejected the State's argument that the Monument would "provide a reminder of our nation's core values and ideals," saying that it was "not enough to say that our nation's framers personally believed in the Ten Commandments" and "offer that as proof that our country has incorporated those principles into the structures of government and adopted those values into the life of the republic." *Id.* at 21–22. The Court also deemed it significant that the "Ten Commandments are not physically linked to the other texts," that a person looking at the side of the Monument displaying them would not see its other historical texts, and that no disclaimer would state that the "Ten Commandments are displayed for their historical significance." *Id.* at 23.

This Court also held that the Monument's placement violated *Lemon*'s second prong. Dkt. 21 at 32. Under that prong, if a court finds that a "reasonable person could perceive that the government action conveys the message that religion or a particular religion is favored or preferred, the Establishment Clause has been violated." *Id.* at 24 (quoting *Freedom from Religion*

4

*Found., Inc. v. City of Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000)). The Court stated that the Monument constituted an endorsement of religion because the Ten Commandments are "prominently located" on one side of the Monument, "a person would have to walk completely around the monument" to "understand the 'historical context,'" no marker explains the texts' historical relationship, the Monument would "stand out" from other displays on the Statehouse lawn, and the Monument would be a permanent display near "the seat of governmental power." Dkt. 21 at 33–36. Accordingly, the Court enjoined the State from "taking any further steps to erect the proposed monument containing the Ten Commandments, the Bill of Rights, and the Preamble to the Indiana Constitution on the Statehouse grounds." *Id.* at 39.

### III.     Appellate Proceedings

On appeal, a divided panel of the Seventh Circuit affirmed under the *Lemon* test. *See Ind. Civil Liberties Union*, 259 F.3d at 766, 768, 770. Considering *Lemon*'s first prong, the majority held that the State's "purposes are not secular ones." *Id.* at 772. It recognized that courts must "generally defer to the purpose offered by the state"—here, that the "monument is intended to honor our history by reminding society of its core values and to honor our legal tradition." *Id.* at 771. But the majority stated that, while the Ten Commandments can undoubtedly "be presented by the government as playing . . . a role in our civic order," the Ten Commandments are "still an inherently religious text" and the State had not done enough to "obviate" their religious nature. *Id.*

As for *Lemon*'s second prong, the majority held that the Monument's primary effect on a reasonable observer would be to endorse religion. 259 F.3d at 772. The majority conceded that the Statehouse grounds are "somewhat akin to a museum" displaying a variety of "statues and monuments." *Id.* at 772–73. But the majority thought that a reasonable observer would think that "this monument . . . occupies [a] location" on the Statehouse grounds "with the support of the state

5

government," and that "this monument conveys a religious message." *Id.* at 772. The majority also observed that the Ten Commandments are displayed in larger lettering than the other texts, that an observer standing on one side of the Monument would not see the other texts, and that nothing in the Monument's surrounding area would mitigate the religious message. *Id.* at 772–73. And though the majority noted that the appeal arose in the context of a preliminary injunction, it was "hard-pressed to believe that a trial on the merits" would change its analysis. *Id.* at 773.

Judge Coffey dissented. He agreed that the Seventh Circuit was "bound to apply *Lemon*." 259 F.3d at 774–75 (Coffey, J., dissenting). In his view, however, the State had a valid secular purpose, and the Monument's primary effect would not be to endorse religion. *Id.* at 775–79.

In 2002, the U.S. Supreme Court denied the Governor's petition for certiorari. *O'Bannon v. Ind. Civil Liberties Union*, 534 U.S. 1162 (2002).

### IV. Subsequent Proceedings

On remand, in light of the Seventh Circuit's decision and the denial of certiorari, the parties stipulated that "current governing precedent" prevented the Governor "from erecting the proposed monument . . . on the Statehouse lawn" and that the preliminary injunction should be made permanent. Dkt. 51 ¶¶ 4–5. The Governor, however, "reserve[d] the right to file a motion under Rule 60" should the law change. *Id.* ¶ 5. Shortly thereafter, the Court entered a final judgment permanently enjoining the Governor from "taking any steps to erect, on the grounds of the Indiana Statehouse, the proposed monument containing the Ten Commandments." Dkt. 52.

In January 2025, a new Indiana Governor, Mike Braun, took office. He determined the Monument, which is currently located in Bedford, Indiana, should be placed on the Statehouse grounds alongside the other monuments, markers, and displays. *See* Ex. 7 ¶ 3; Ex. 8, Renner Decl.

¶¶ 3–4 & Attachment. Accordingly, the Governor is filing this motion for relief from the permanent injunction under Federal Rule of Civil Procedure 60(b)(5).

## ARGUMENT

The Court's permanent injunction blocking the Monument's placement on Statehouse grounds should be vacated. Under Federal Rule of Civil Procedure Rule 60(b)(5), relief from a final judgment is warranted where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). One situation in which prospective application is inequitable is where "a significant change either in factual conditions or in law" renders continued enforcement "detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009) ((quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)); *see Agostini v. Felton*, 521 U.S. 203, 238 (1997) (explaining an injunction must be vacated if "it rests upon a legal principle that can no longer be sustained"). A district court "abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini*, 521 U.S. at 215).

Since the permanent injunction was entered in 2002, Establishment Clause jurisprudence has changed so significantly that the permanent injunction cannot be maintained. The Supreme Court has discarded the *Lemon* test that this Court and the Seventh Circuit applied, upheld the placement of a Ten Commandments monument on another State's capitol grounds, and explained that the Establishment Clause does not bar traditional acknowledgments of religion on public property. Under the law that now governs, there is no constitutional problem with the State installing a donated monument that reflects the historical, legal, and cultural significance of the Ten Commandments, the Bill of Rights, and the Indiana Constitution's Preamble.

Nor does current doctrine support a theory under which offended observers can ask a federal court to block the State from placing such a monument on its own property. In rejecting

7

*Lemon*'s understanding of the Establishment Clause, the Supreme Court also rejected the legal theory on which the Seventh Circuit and other lower courts have held that offended observers can sue over putative Establishment Clause violations. The upshot is that the ICLU and its members no longer have standing to challenge the State's placement of the Monument.

Simply put, this Court's permanent injunction rests upon "legal principle[s] that can no longer be sustained." *Agostini*, 521 U.S. at 238. The injunction should be vacated.

I.  **Significant Changes in Establishment Clause Jurisprudence Render Continued Enforcement of the Injunction Detrimental to the Public Interest**

When this Court granted the preliminary injunction that was later made permanent, the Court ruled for the ICLU under *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Dkt. 21 at 13. The Seventh Circuit upheld the injunction under the same standard. *See Ind. Civil Liberties Union*, 259 F.3d at 766, 768, 770. Although much criticized, *Lemon* was "governing" law. Dkt. 21 at 13; *see Ind. Civil Liberties Union*, 259 F.3d at 775 (Coffey, J., dissenting) ("we are bound to apply *Lemon*"). Today, however, *Lemon* is no longer the law. The Supreme Court has discarded *Lemon*, rejected its premises, and adopted a new history-and-tradition test under which there is no doubt that States can have displays like the Monument.

A.  **The Supreme Court has abrogated *Lemon* and adopted a new standard that requires examining history and tradition**

In *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), the Supreme Court announced that it had "abandoned *Lemon* and its endorsement test offshoot." *Id.* at 534; *see Groff v. DeJoy*, 600 U.S. 447, 460 (2023) (recognizing *Lemon*'s abrogation). It held that the "Establishment Clause must be interpreted by 'reference to historical practices and understandings'" rather than by reference to a government action's putative purposes or a hypothetical observer's sensibilities. *Kennedy*, 597 U.S. at 535–36 (quoting *Town of Greece v.*

*Galloway*, 572 U.S. 565, 576 (2014)). *Lemon*'s demise, however, did not occur in a single stroke. Three Supreme Court decisions are particularly relevant here.

One significant decision is *Van Orden v. Perry*, 545 U.S. 677 (2005). In that decision, which produced no majority opinion, the Court rejected an Establishment Clause challenge to the "display of a monument inscribed with the Ten Commandments on the Texas State Capitol grounds." *Id.* at 681 (plurality op.). Observing that the Court had not consistently applied *Lemon* in Establishment Clause challenges, a plurality of the Court declined to apply it to Texas's monument. *Id.* at 686. "Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence," the plurality explained, "we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation's history." *Id.*

Applying this framework, the plurality ruled that displaying the Ten Commandments on state capitol grounds comports with the Establishment Clause. 545 U.S. at 691–92 (plurality op.). The plurality observed that the Ten Commandments have "undeniable historical meaning," observing that "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America." *Id.* at 678, 688. The U.S. Supreme Court building, the U.S. Capitol, the Library of Congress, the National Archives, the Department of Justice, the Ronald Reagan Building, the courthouse for the Court of Appeals and District Court for the District of Columbia, and the chamber of the United States House of Representatives all have Ten Commandments displays. *Id.* at 689. Of course, the plurality acknowledged, the Ten Commandments have religious meaning. *Id.* at 694. But "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* at 690.

*Lemon* suffered yet another blow in *American Legion v. American Humanist Ass'n*, 588 U.S. 29 (2019). In that case, the Court rejected an Establishment Clause challenge to a 32-foot-tall Latin cross erected on public land as a memorial to local soldiers who died serving in World War I. *Id.* at 36–38, 43–45. Justices again criticized *Lemon*, observing that, "[f]or at least four reasons, the *Lemon* test presents particularly daunting problems in cases . . . that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* at 51 (plurality op.). When evaluating "longstanding monuments, symbols, and practices," they explained, courts should not only decline to apply *Lemon* but embrace a "presumption of constitutionality." *Id.* at 52 (plurality op.).

In *American Legion*, the Court cited monuments inscribed with the Ten Commandments as an example of longstanding monuments that are troublesome to evaluate under *Lemon*. Though religious in origin, the Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital." *Am. Legion*, 588 U.S. at 53 (majority op.). "Just as depictions of the Ten Commandments in these public buildings were intended to serve secular purposes, the litigation in *Van Orden* and *McCreary* showed that secular motivations played a part in the proliferation of Ten Commandments monuments in the 1950s." *Id.* "Even if the original purpose of a monument was infused with religion, the passage of time may obscure that sentiment. As our society becomes increasingly religiously diverse, a community may preserve such monuments, symbols, and practices for the sake of their historical significance or their place in a common cultural heritage." *Id.* at 54.

Despite *Van Orden* and *American Legion*, "*Lemon* [proved] a durable creature." *Woodring v. Jackson Cnty.*, 986 F.3d 979, 995 (7th Cir. 2021). In *Kennedy*, however, the Court finally made

10

explicit what its decisions and individual Justices' separate writings had long foreshadowed: *Lemon* has been "abrogated." *Groff*, 600 U.S. at 460; *see Kennedy*, 597 U.S. at 534. The Court rejected the argument that a school had to fire a high school football coach who said a personal prayer on the field after games to avoid violating the Establishment Clause under "*Lemon* and its progeny." *Kennedy*, 597 U.S. at 534. In rejecting the argument, the Court emphasized the "'shortcomings' associated with [*Lemon*'s] 'ambitiou[s],' abstract, and ahistorical approach to the Establishment Clause." *Id.* (quoting *Am. Legion*, 588 U.S. at 49 (plurality op.)). The Court also observed that *Lemon* had "invited chaos in the lower courts, led to differing results in materially identical cases, and created a minefield for legislators." *Id.* at 534 (cleaned up). Besides, the Court added, the Establishment Clause does not include anything like a "modified heckler's veto" where "religious activity can be proscribed" based on "perceptions" or "discomfort." *Id.* (cleaned up). It does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id.* at 535 (cleaned up).

"In place of *Lemon* and the endorsement test," the Court ruled "that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576). "The line that courts and governments must draw between the permissible and impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* at 535–36 (cleaned up). That means a court cannot declare that an action or practice violates the Establishment Clause if the historical "evidence cannot sustain it," *Lemon* notwithstanding. *Id.* at 536. As the *Kennedy* dissent summarized, *Kennedy*'s effect was to "overrule[] *Lemon*" and replace it with a "new 'history and tradition' test." *Id.* at 546–47 (Sotomayor, J., dissenting); *see St. Augustine Sch. v. Underly*, 78

11

F.4th 349, 353 (7th Cir. 2023) ("*Lemon* has been abrogated by the U.S. Supreme Court"); *Firewalker-Fields v. Lee*, 58 F.4th 104, 121 (4th Cir. 2023) ("*Lemon* [is] finally dead").

**B.  Under the history-and-tradition test that now governs, the Monument's placement does not violate the Establishment Clause**

Under the history-and-tradition test that now governs, placing the Monument on the Statehouse grounds is constitutional. As a Supreme Court plurality recognized in *Van Orden*, "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America." 545 U.S. at 688 (plurality op.). The Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in [the Supreme Court] courtroom and in other prominent public buildings in our Nation's capital." *Am. Legion*, 588 U.S. at 53. For example, the U.S. Capitol, the Library of Congress, the National Archives, and other public buildings in the Nation's capital have depictions of the Ten Commandments. *Van Orden*, 545 U.S. at 689 (plurality op.). Other States have monuments depicting the Ten Commandments as well. *See Am. Legion*, 588 U.S. at 53–54; *Van Orden*, 545 U.S. at 690 (plurality op.). The Ten Commandments' inclusion on Indiana's Monument is "merely an acknowledgment of the historical fact that the Ten Commandments served as an integral part of the foundation for our country's legal system." *Ind. Civil Liberties Union*, 259 F.3d at 780 (Coffey, J., dissenting); *see* Dkt. 18 at Ex. 1 (explaining the Monument would "honor[] the history of our state and our nation" and remind us of our "ideals").

The mere fact that this Court and the Seventh Circuit majority deemed the Ten Commandments to have religious significance does not condemn the Monument. Even apart from the fact that the Monument references the Ten Commandments for their *non*-religious significance, the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious."

12

*Kennedy*, 597 U.S. at 535 (cleaned up). In *Town of Greece,* the Supreme Court explained that the question under its history-and-tradition test is not whether a challenged practice partakes in the religious in some way. 572 U.S. at 577. Rather, the "Court's inquiry . . . must be to determine whether the [challenged] practice . . . fits within the tradition" established within our country. *Id.* As the Ten Commandments' widespread display in government settings attests, no history or tradition condemns displays like the Monument. Even this Court noted in its original opinion that the "south wall of the Supreme Court chambers contains a frieze that includes a depiction of Moses holding the Ten Commandments that presents no constitutional violation." Dkt. 21 at 16 n.8.

Indiana's tradition of displaying the Ten Commandments alongside other monuments to the State's and Nation's history and traditions reinforces that there is no constitutional issue. As the Supreme Court explained in *American Legion*, a presumption of constitutionality attaches to "longstanding monuments, symbols, and practices." 588 U.S. at 52; *see Woodring*, 986 F.3d at 994. And here, the Monument is not only part of a longstanding American tradition of recognizing the historical, cultural, and legal significance of the Ten Commandments. *See Van Orden*, 545 U.S. at 688–90 (plurality op.). It also is part of an Indiana-specific tradition of having a marker on the Statehouse grounds that recognizes the Ten Commandments' significance. For thirty-three years, Indiana had a display of the Ten Commandments on the Statehouse grounds until one of the plaintiffs in this case vandalized the prior monument in a criminal act that led to its removal. Dkt. 18 ¶¶ 24, 26; *see also Am. Legion,* 588 U.S. at 53 (observing that "secular motivations played a part in the proliferation of Ten Commandments monuments in the 1950s"). Placing the Monument on the Statehouse grounds would be consistent with the established practice of recognizing formative legal documents, including the Ten Commandments, at the Statehouse.

In view of these significant changes in Establishment Clause precedent, there can be no question that placing the Monument on the Statehouse grounds is constitutional. The Court therefore should vacate its injunction. As the Supreme Court has held, an injunction must be vacated if "it rests upon a legal principle that can no longer be sustained." *Agostini*, 521 U.S. at 238; *see Horne*, 557 U.S. at 450 (explaining that authority should be "returned promptly to the State and its officials" (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004))).

## II. Significant Changes in Standing Doctrine in Establishment Clause Cases Render Continued Enforcement of the Injunction Detrimental to the Public Interest

Although the Supreme Court's abandonment of *Lemon* alone warrants relief under Rule 60(b)(5), changes in standing doctrine provide a second, independent basis for granting relief. The ICLU and its co-plaintiffs brought this case on the theory that they would be injured by coming into regular, direct, and "unwelcome contact" with the Monument, Dkt. 1 ¶¶ 1, 36, and when the parties stipulated to final judgment in this case, Seventh Circuit precedent established that a plaintiff who alleged he would come into "direct and unwelcome contact with [a] Ten Commandments monument" placed on public property could sue for an Establishment Clause violation, *Books v. City of Elkhart*, 235 F.3d 292, 300 (7th Cir. 2000). But the standing theory on which plaintiffs relied to challenge the Monument can no longer be reconciled with current law.

To establish Article III standing, a plaintiff must prove an injury-in-fact that is fairly traceable to the challenged conduct and redressable by a favorable judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Proving an injury-in-fact requires proving the "invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). "'[G]eneralized grievances' about the conduct of Government" do not suffice. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, (1974) (citing *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). That is why, in *Valley*

14

*Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 464–65 (1982), the Supreme Court held that Americans United for Separation of Church and State lacked standing to challenge a conveyance from the federal government to a religious college. The Court explained that the organization had failed to identify any injury other than a "psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485. "That," however, "is not an injury sufficient to confer standing." *Id.*

Despite the Supreme Court's decision in *Valley Forge* and the general rule that generalized grievances do not confer standing, various courts of appeals relaxed standing requirements "for Establishment Clause cases in the 1970s in response to th[e Supreme] Court's decision in *Lemon*." *Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring). They endorsed an "offended observer" standing theory under which a plaintiff who alleged he would "'regularly' come into 'unwelcome direct contact'" with a putative religious symbol could sue. *Id.* at 70–80 (citation omitted). For example, around the time that this Court granted a preliminary injunction, the Seventh Circuit held that persons who claimed they would come into "unwelcome direct contact" with a monument inscribed with the Ten Commandments placed on municipal property could sue for an Establishment Clause violation. *Books*, 235 F.3d at 299. But that approach to standing on which plaintiffs relied in this case no longer provides a viable route to establishing an injury-in-fact.

Even before *Lemon*'s demise, the Seventh Circuit had begun to question the offended observer theory. It rejected the argument that plaintiffs who felt "unwelcome" had standing to challenge President Obama's National Day of Prayer proclamation, explaining that "hurt feelings differ from legal injury." *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011). "If a perceived slight, or a feeling of exclusion, were enough," the Seventh Circuit explained, *Valley Forge* and other cases would have had to come out differently. *Id.* In so ruling,

15

the Seventh Circuit did not revisit *Books* and other decisions sanctioning suits by "persons who are obliged to view religious displays in order to access public services." *Id.* But the Seventh Circuit frankly acknowledged that it "may need to revisit the subject of observers' standing in order to reconcile" its own decisions and harmonize them with the Supreme Court's intervening decision in *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004). *Id.* at 805–07.

Fourteen years on, it is even clearer that the offended observer theory cannot be sustained. That theory rested on the logic that, "if the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion," then "such an observer must be able to sue." *Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring). "But if that logic ever made sense, it no longer does." *City of Ocala v. Rojas*, 143 S. Ct. 764, 765 (2023) (statement of Gorsuch, J., respecting the denial of certiorari). In *Kennedy* and *Groff*, the Supreme Court "put to rest any question about *Lemon*'s vitality." *Id.* The Court "held that claims alleging an establishment of religion must be measured against the Constitution's original and historical meaning, not the sensitivities of a hypothetical reasonable observer." *Id.* So no excuse "now remains 'for the anomaly of offended observer standing.'" *Id.* at 87 (quoting *Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring)); *see id.* at 765–66 (Thomas, J., dissenting from denial of certiorari) (explaining that offended observer standing must give way now that "*Lemon* is no longer good law").

With *Lemon* and its reasonable-observer test now officially abrogated, there is simply no basis to find Article III standing merely because an individual might be "offended" by seeing a monument containing the Ten Commandments. It may be that *Books* remains on the books for now, since no other litigant has yet asked the Seventh Circuit to clarify that *Books* cannot be squared with the Supreme Court's intervening decisions. If this Court determines that those decisions are in conflict, however, it must follow governing Supreme Court precedent. *See Cameo*

*Convalescent Ctr., Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986). And even if this Court concludes that any conflict is not so clear as to allow it to hold in the first instance that *Books* is no longer good law, nothing prevents this Court from explaining why intervening Supreme Court precedent undermines *Books* and requires its reconsideration. *See Agostini*, 521 U.S. at 209, 217–18, 222–23, 228–29 (recognizing a party can use Rule 60(b)(5) to effectuate a change in law if a controlling precedent's logic has been undermined by intervening decisions).

### III.  No Other Consideration Warrants Denial of Relief

In view of the significant changes to Establishment Clause and standing doctrine, relief under Rule 60(b)(5) is warranted. The only limit that Rule 60 places on motions for relief from judgment under Rule 60(b)(5) is that they be made within a "reasonable time." Fed. R. Civ. P. 60(c)(1). In the context of public litigation and injunctions that bind States, Rule 60(b)'s reasonable-time standard is especially "flexible." *Shakman v. City of Chicago*, 426 F.3d 925, 935 (7th Cir. 2005). The Supreme Court and Seventh Circuit have "ma[d]e clear" that "the public interest and 'concerns of federalism' should guide the court's analysis." *Id.* at 936; *see, e.g.*, *Horne*, 557 U.S. at 450; *Rufo*, 502 U.S. at 392. Thus, "once a party carries [its] burden" of showing that there has been a significant change of fact or law, a court "abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini*, 521 U.S. at 215).

As a result, time alone is not enough to deny a motion. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Wisconsin*, 769 F.3d 543, 548 (7th Cir. 2014) ("often the passage of time renders [injunctions] obsolete, so that the case for modification or rescission actually grows with time"). Two cases illustrate the point. In 1985, the Supreme Court applied *Lemon* to hold that New York City could not send public school teachers to parochial schools to

17

provide remedial education to disadvantaged children. *See Aguilar v. Felton*, 473 U.S. 402, 410 (1985), *overruled by Agostini v. Felton*, 521 U.S. 203 (1997). Ten years later, municipal and private parties sought Rule 60(b)(5) relief. *Agostini*, 521 U.S. at 214. The Supreme Court agreed that relief was proper because, while the "general principles . . . use[d] to evaluate whether government aid violates the Establishment Clause ha[d] not changed," decisions issued in 1986 and 1993 had undermined the Supreme Court's original "assumptions." *Id.* at 222–23.

So too in *Shakman*, where the City of Chicago filed a Rule 60(b)(5) motion in 2002 for relief from a 1983 consent decree based on an intervening 1992 Supreme Court decision. 426 F.3d at 928–29. The district court denied the motion as untimely. *Id.* at 929. But the Seventh Circuit reversed. It held that the "'reasonable time' for filing a Rule 60(b) motion with respect to the 1983 Consent Decree must take into account the nature of that litigation as well as the resulting prejudice, if any, to the present elected officials and the public they represent." *Id.* at 934. Or as the Seventh Circuit stated elsewhere in its decision, "when considering a Rule 60(b) motion with respect to public litigation, the nature of that litigation must factor into the district court's decision-making process; the public interest and 'concerns of federalism' should guide the court's analysis." *Id.* at 936 (quoting *O'Sullivan v. City of Chicago*, 396 F.3d 843, 868 (7th Cir. 2005)).

Both the public interest and federalism considerations favor vacatur here. "[C]ontinued enforcement of a consent decree regulating the operation of a governmental body depend[s] on the existence of a substantial claim under federal law." *Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993) (en banc). As discussed above, however, this Court's injunction cannot be reconciled with current Establishment Clause and standing doctrine. Continuing to enforce the injunction, moreover, would raise "sensitive federalism concerns." *Horne*, 557 U.S. at 448. The injunction improperly dictates which monuments the Governor may place on Statehouse grounds

18

in recognition of legal norms that have shaped the State, its citizens, and its institutions. That renders it imperative for the Court to "promptly" return responsibility for managing the Statehouse grounds to the Governor now that the original justification for federal intervention in the State's messaging and management of its property has faded. *Id.* at 450 (quoting *Frew*, 540 U.S. at 442).[2]

## CONCLUSION

The Court should vacate the permanent injunction and modify its judgment accordingly.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

Office of the Attorney General
Indiana Government Center-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Defendant*

---

[2] Under the cases that govern Rule 60(b) motions involving public litigation, this Court need not consider any other factors. But it bears noting that plaintiffs can claim no cognizable prejudice from vacatur of an injunction that is no longer supported by a substantial federal claim. *See Evans*, 10 F.3d at 480. Nor does the mere fact that a prior Governor might not have initiated litigation immediately after the Supreme Court expressly abrogated *Lemon* provide a reason for denying relief. Denying relief on such a theory would allow a past official to "improperly deprive" the current Governor of "executive powers." *Horne*, 557 U.S. at 449 (quoting *Frew*, 540 U.S. at 441).

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2025, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served upon counsel who are registered CM/ECF users.

I also certify that on December 29, 2025, a copy of the foregoing was served upon the following persons by U.S. Mail and a courtesy copy was provided by email to the same:

>Kenneth J. Falk
>ACLU of Indiana
>1031 E. Washington St.
>Indianapolis, IN 46202
>kfalk@aclu-in.org
>
>*Counsel for the Indiana Civil Liberties Union*

>/s/ James A. Barta
>James A. Barta
>Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov