UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA CIVIL LIBERTIES UNION, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:00-cv-00811-SEB-MKK |
| MIKE BRAUN, | ) ) ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR RELIEF FROM
THE FINAL JUDGMENT AND PERMANENT INJUNCTION**

There is no dispute that the governing law has significantly changed since this Court invoked *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to enjoin the Governor from placing the Monument on the Statehouse grounds. As the ICLU concedes, *Lemon* has indisputably met its "demise." Resp. 17. Now, a history-and-tradition standard governs the public display of monuments with religious inscriptions or symbols. And under that historically rooted standard, there can be no real question that the Governor may install the Monument on the Statehouse grounds. Not only does the ICLU fail to identify any history or tradition forbidding the public display of monuments containing inscriptions of the Ten Commandments and other historically significant documents, but also such displays have been common throughout our Nation's history.

Faced with this reality, the ICLU principally argues that the Governor—who moved for relief from the injunction within a year of taking office and within two and a half years of the Supreme Court decision announcing *Lemon*'s demise—waited too long to seek relief. But the ICLU admits that it has not suffered "any prejudice." Resp. 12. And equally important, Seventh Circuit precedent establishes that timeliness in public litigation is not a pure matter of calculating

1

the earliest date at which a public official could have sought relief. Rather, what matters is the public interest and federalism. Both factors decisively militate against continuing to enforce a federal decree against the State's Governor that is no longer supported by a valid federal claim.

## ARGUMENT

### I.    The Governor Moved for Relief Within a Reasonable Time

The Governor sought relief from this Court's final judgment and permanent injunction within a "reasonable time." Fed. R. Civ. P. 60(c)(1). He acted within a year of taking office and within two and a half years of the Supreme Court's announcement that *Lemon* is no longer good law—well within the window in which the Supreme Court and Seventh Circuit have entertained motions seeking relief from decrees binding public officials. *See* Mot. 6–7, 10–12, 17–18.

The ICLU would have this Court focus almost entirely on whether the Governor conceivably could have moved for relief sooner, observing that *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), said that *Lemon* had been "long ago abandoned." Resp. 9 (quoting *Kennedy*, 597 U.S. at 534). But *Kennedy*'s observation about *Lemon* cannot mean what the ICLU seems to think it means—that it was evident to all after *American Legion v. American Humanist Association*, 588 U.S. 29 (2019), and *Town of Greece v. Galloway*, 572 U.S. 565 (2014), that *Lemon* no longer had any role to play in Establishment Clause challenges. As the Seventh Circuit has observed, neither *American Legion* nor *Town of Greece* "formally overruled *Lemon*." *Woodring v. Jackson Cnty.*, 986 F.3d 979, 988 (7th Cir. 2021). That is why the Ninth Circuit applied *Lemon* in *Kennedy*, 991 F.3d 1004, 1017, 1020–21 (9th Cir. 2021), prompting *Kennedy* to announce *Lemon*'s abandonment, and why the Seventh Circuit has identified *Kennedy* as the decision "abrogat[ing]" *Lemon*. *St. Augustine Sch. v. Underly*, 78 F.4th 349, 353 (7th Cir. 2023); *see Firewalker-Fields v. Lee*, 58 F.4th 104, 121 (4th Cir. 2023) (similar).

To be sure, *American Legion*, *Town of Greece*, and other Supreme Court decisions weakened *Lemon* before *Kennedy* announced its demise. *See* Mot. 9–10. But it would be odd to construe Rule 60—a rule that allows parties to move for relief *after* a substantial change in the law—to require parties to seek relief *before* the Supreme Court formally overrules one of its decisions. *See Crow Tribe of Indians v. Repsis*, 74 F.4th 1208, 1217–18 (10th Cir. 2023) (rejecting argument that a litigant was required to move for Rule 60(b) relief after an intervening Supreme Court decision weakened but did not formally overrule controlling precedent). As the Supreme Court has stated, the "'prerogative of overruling its own decisions'" belongs to it. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). So a party should not be penalized for seeking Rule 60(b)(5) relief only after the Supreme Court declares one of its decisions "obsolete." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Wisconsin*, 769 F.3d 543, 548 (7th Cir. 2014) (observing that the passage of time can strengthen an argument under Rule 60(b)(5)). The ICLU's insistence that relief should have been sought before *Kennedy* is not reasonable, especially given that the ICLU's insistence the law *still* has not changed enough to justify relief.

In applying Rule 60's reasonable-time standard, it is also important that the current Governor could not have sought relief before he took office in early 2025. *See* Mot. 6–7. The ICLU cites no authority for the notion that, outside of the context of "institutional reform litigation," it is permissible to let politicians who held office in past years "prevent their successors from charting a different course." Resp. 11. The same concerns that surround injunctions addressing prison conditions apply to injunctions governing the displays state officials may erect on state property. To deny the current Governor relief because past officials did not request it would allow a handful of former officials to "bind all future officers of the State," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 392 (1992), and "improperly deprive" current and "future officials of

3

their designated legislative and executive powers," *Horne v. Flores*, 557 U.S. 433, 450 (2009) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)). "And that . . . 'would be a perverse and undemocratic state of affairs.'" *Doe v. Briley*, 562 F.3d 777, 781 (6th Cir. 2009); *see David B. v. McDonald*, 116 F.3d 1146, 1150 (7th Cir. 1997) (similar).

Even if one accepts the ICLU's supposition that a past Governor could have sought relief from the injunction as early as 2014, the current motion is still timely. In public litigation, timeliness is a "flexible" concept. *Shakman v. City of Chicago*, 426 F.3d 925, 934 (7th Cir. 2005) (quoting *Rufo*, 502 U.S. at 381); *see Doe*, 562 F.3d at 781. The host of considerations on which the ICLU would prefer to focus—such as the "interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the ground relied upon, and the consideration of prejudice if any to other parties," Resp. 9 (quoting *Shakman*, 426 F.3d at 934)—inform timeliness "with respect to *purely private litigation*." *Shakman*, 426 F.3d at 934 (emphasis added). In *public* litigation, other considerations predominate. As the Seventh Circuit has emphasized, what "should guide the court's analysis" is "the public interest and 'concerns of federalism.'" *Id.* at 936 (quoting *O'Sullivan v. City of Chicago*, 396 F.3d 843, 868 (7th Cir. 2005)); *see id.* at 934 (courts "must take into account the nature of that litigation as well as the resulting prejudice, if any, to the present elected officials and the public they represent").

The upshot is that the motion is timely, whether the clock started in 2014 or 2025. The ICLU concedes it has not suffered "any prejudice." Resp. 12. And the ICLU identifies no reason why a generic interest in finality should not yield to the considerations that the Seventh Circuit deems most important in evaluating timeliness—the public interest and federalism concerns. To the contrary, the ICLU concedes that Rule 60 relief is "appropriate" where an injunction "'rests upon a legal principle that can no longer be sustained.'" Resp. 17 (quoting *Agostini*, 521 U.S. at

4

238); *see also Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993) (en banc) (plurality op.) ("[C]ontinued enforcement of a consent decree regulating the operation of a governmental body depend[s] on the existence of a substantial claim under federal law."). Thus, continuing to enforce the injunction would be improper if, as the Governor contends, its foundations have crumbled.

Other courts have granted relief from injunctions against state and local governments despite similar or greater passages of time. As the Governor observed—and the ICLU does not dispute—*Agostini* granted Rule 60(b)(5) relief on a motion filed *9 years* after one of the two intervening Supreme Court cases giving rise to the motion. Mot. 17–18. *Shakman* reversed a district court for denying a Rule 60(b)(5) motion filed *10 years* after the Supreme Court decision giving rise to the motion. Mot. 18. And in *Doe*, the Sixth Circuit held that a motion filed "some *30 years* after the Supreme Court decision" giving rise to the motion was timely. 562 F.3d at 781 (emphasis added). The mere fact that the 30-year delay caused the challenged injunction to "remain[] in place some 30 years longer than it probably should have" supplied "no reason to leave it in place forever." *Id.*; *see also Salazar ex rel. Salazar v. Dist. of Columbia*, 633 F.3d 1110, 1119 (D.C. Cir. 2011) ("In a complex and long-running institutional reform case such as this . . . it would be an abuse of discretion to rule that a Rule 60(b)(6) motion is not filed within a reasonable time without finding that the movant's delay has prejudiced the non-moving party."). The same is true here. The Governor sought relief from the injunction within a reasonable time.

II.   **Significant Changes in Establishment Clause Jurisprudence Render Continued Enforcement of the Injunction Detrimental to the Public Interest**

The ICLU identifies no other reason to deny the Governor relief. The ICLU asserts that the Governor must show "exceptional circumstances" to obtain relief under Rule 60(b)(5). Resp. 2 (quoting *FTC v. Credit Bureau Ctr., LLC*, No. 17 C 194, 2025 WL 3004581, at *2 (N.D. Ill. Oct. 27, 2025), a case discussing Rule 60(b)(6)). But the Supreme Court long ago rejected the argument

5

that Rule 60(b)(5) requires a showing of "extraordinary circumstances." *Agostini*, 521 U.S. at 239. To obtain relief under that rule, all that a party must show is that there has been a "significant change" in the law or facts. *Id.* at 215 (quoting *Rufo*, 502 U.S. at 384).

In the twenty-four years since this Court entered its permanent injunction, the ICLU cannot deny that "significant change[s]" in the law have occurred. The ICLU concedes that the Supreme Court abandoned *Lemon* and "the accompanying endorsement analysis" on which this Court's injunction rests, and held that the "'Establishment Clause must [now] be interpreted by reference to historical practices and understandings.'" Resp. 13, 17 (quoting *Kennedy*, 597 U.S. at 535); *see* Mot. 8–12. The ICLU also concedes that "acknowledgements of the role played by the Ten Commandments in our heritage are common in the United States." Resp. 15 (citing *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) (plurality op.)). It merely quibbles that the absence of a "Ten Commandments monument" at Indiana's Statehouse for "35 years" and the presence of "readable text" on the Monument setting forth the Ten Commandments means that the Monument cannot be upheld under Justice Breyer's concurrence in *Van Orden*. Resp. 14, 16.

As an initial matter, one need only refer to *Van Orden* to see that ICLU's argument falls short. In *Van Orden*, as here, the State sought to display a large monument in the shape of two tablets outside its seat of government that set forth the full Ten Commandments in clear, readable text. *See Van Orden*, 545 U.S. at 681; *id.* at 736 (Stevens, J., dissenting) (depicting monument). Although the dissenters would have held the monument unconstitutional, Justice Breyer saw no issues with it. He disagreed that "the text of the Commandments alone . . . resolve[d] th[e] case" and instead looked to "how the text is used." *Id.* at 701 (Breyer, J., concurring). He found it significant that the monument was donated by a non-religious group and sat "in a large park containing 17 monuments and 21 historical markers, all designed to illustrate the 'ideals' of those

6

who settled in Texas and of those who have lived there since." *Id.* at 701–02. That description could just as well apply to Indiana's Monument.

More important still, after *Kennedy*, *American Legion*, and *Town of Greece*, Justice Breyer's concurrence in *Van Orden*—which engaged in a "fact-intensive" analysis to decide whether a specific display conveyed a "predominantly secular" or sacred message, *Van Orden*, 545 U.S. at 700–03 (Breyer, J., concurring)—is no longer the law. *See Woodring*, 986 F.3d at 993 ("[E]ndorsement and purpose tests are no longer the appropriate framework for assessing the constitutionality of nativity scenes."). In *Town of Greece*, the Supreme Court explained that the question under the history-and-tradition test that now prevails is not whether a challenged practice partakes in the religious. 572 U.S. at 577. Rather, the "Court's inquiry . . . must be to determine whether the [challenged] practice . . . fits within the tradition" established within our country. *Id.* This requires courts to "focus[] on original meaning and history" rather than ask whether a challenged government action—for example, legislative prayer—is secular or sacred. *Kennedy*, 597 U.S. at 536; *see Woodring*, 986 F.3d at 995–97 (upholding nativity scene's constitutionality). Thus, as *Kennedy* makes clear, there must be evidence that a government action is not "consistent with a historically sensitive understanding of the Establishment Clause." 597 U.S. at 537.

In this case, the ICLU has no evidence that the Establishment Clause forbids public recognitions of seminal texts, such as the Bill of Rights and Ten Commandments. It argues that "no Ten Commandments monument has been present" at Indiana's Statehouse for "35 years." Resp. 14. But the question is not whether a specific monument has stood for a long time in a specific location. *See Woodring*, 986 F.3d at 995–97 (upholding a nativity scene despite no long history). The question is whether the Monument fits within a "*national* tradition." *Id.* at 996 (emphasis added); *see Kennedy*, 597 U.S. at 535–36; *Town of Greece*, 572 U.S. at 577. The

Monument does. As a plurality of the Supreme Court recognized in *Van Orden*, public "acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America." 545 U.S. at 688 (plurality op.); *see also* Greg Abbott, *Upholding the Unbroken Tradition: Constitutional Acknowledgment of the Ten Commandments in the Public Square*, 14 Wm. & Mary Bill Rts. J. 51, 61–65 (2005). So there is nothing wrong with installing the Monument at the Statehouse to acknowledge "the historical fact that the Ten Commandments served as an integral part of the foundation for our country's legal system." *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 780 (7th Cir. 2001) (Coffey, J., dissenting).

Besides, even if one examines local traditions, those support the Monument. Indiana's tradition of having a monument inscribed with the Ten Commandments at the Statehouse started in 1958, *see* Dkt. 18 ¶¶ 24–25—three years before the Fraternal Order of Eagles, the same group responsible for Indiana's original monument, donated a similar monument to Texas, *see Van Orden*, 545 U.S. at 701 (Breyer, J., concurring); *American Legion*, 588 U.S. at 53 (noting that "secular motivations played a part in the proliferation of Ten Commandments monuments in the 1950s"). That tradition was of course interrupted thirty-three years along. *See* Resp. 14. But the ICLU neglects to mention why—one of the plaintiffs vandalized Indiana's monument and then successfully sued to prevent the State from replacing the original monument with a display containing an "identical" depiction of the Ten Commandments. *See* Dkt. 18 ¶¶ 11, 24–27. His criminal action, however, cannot provide a basis for holding irrelevant Indiana's longstanding acknowledgment of the Ten Commandments' historical significance. The Establishment Clause does not include anything like a "modified heckler's veto." *Kennedy*, 597 U.S. at 534.

The ICLU also argues that *McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005), decided on the same day as *Van Orden*, establishes that

monuments "setting out the text of the Decalogue in large lettering" are unconstitutional. Resp. 16. To start, *Van Orden* refutes the ICLU's gloss—Justice Breyer saw no problem with a monument on public land setting forth the Decalogue in clear, readable text. *See* 545 U.S. at 700, 703–04 (2005) (Breyer, J., concurring) What is more, *McCreary*, which Justice Breyer joined, specifically disclaimed that "a sacred text can never be integrated constitutionally into a government display on the subject of law, or American history." 545 U.S. at 874. Rather, *McCreary* held that *Lemon* required an examination as to whether two displays had a "secular purpose." *Id.* at 850–51; *see id.* at 859 ("Ever since *Lemon v. Kurtzman* . . . , looking to whether government action has a 'secular legislative purpose' has been a common, albeit seldom dispositive, element of our cases."). For obvious reasons, however, *Lemon*'s "purpose" analysis no longer controls. *See Kennedy*, 597 U.S. at 535–36.

Given the ICLU's concession that the Supreme Court has abrogated *Lemon* and its direct offshoot, the endorsement test, and that our Nation has a long tradition of acknowledging the Ten Commandments' role in public life, there is no basis for continuing to forbid the Monument's installation on the Statehouse grounds. The Monument simply reflects that the Ten Commandments—like the other legal texts it displays—occupy an important place in Indiana's history and traditions. Forbidding the State from recognizing that historical, cultural, and legal reality would be contrary to current law and an "abuse[] [of] discretion." *Horne*, 557 U.S. at 447.

III.    **Significant Changes in the Law Render the ICLU's "Offended Observer" Standing Theory No Longer Tenable**

The Supreme Court's abandonment of *Lemon* provides a second, independent reason for granting Rule 60(b)(5) relief—the ICLU's theory of standing is no longer tenable. There is no dispute that the ICLU claims standing on the theory that members would be offended by seeing the Monument. *See* Mot. 14; Resp. 17–18. As the Supreme Court has held, however, an

9

organization failing to identify any injury other than a "psychological consequence presumably produced by observation of conduct with which one disagrees" has "not [shown] an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). That principle should go double after *Kennedy*, which makes clear that the Establishment Clause does not allow offended parties to proscribe public displays with religious overtones based on "perceptions" or "discomfort." 597 U.S. at 534.

The ICLU's principal response is that the Seventh Circuit declined "to ditch 'offended observer standing'" in *Woodring*. Resp. 19 (quoting *Woodring*, 396 F.3d at 986). Critically, however, *Woodring* was decided *before* the Supreme Court had fully and formally abandoned *Lemon*. *See Woodring*, 986 F.3d at 988, 995 (observing that "the Court has never formally overruled *Lemon*" and that "*Lemon* is a durable creature"). In *Kennedy*, decided a year after *Woodring*, the Supreme "Court put to rest any question about *Lemon*'s vitality." *City of Ocala v. Rojas*, 143 S. Ct. 764, 765 (2023) (Gorsuch, J., respecting the denial of certiorari). It "held that claims alleging an establishment of religion must be measured against the Constitution's original and historical meaning, not the sensitives of a hypothetical reasonable observer." *Id.* (citing *Kennedy*, 597 U.S. at 534). So no excuse "now remains 'for the anomaly of offended observer standing.'" *Id.* (quoting *American Legion*, 588 U.S. at 87 (Gorsuch, J., concurring)).

Nor does the Supreme Court's resolution of *American Legion* on the merits imply that offended-observer standing can survive *Lemon*'s demise. *Contra* Resp. 18. In *American Legion*, the majority addressed the merits without discussing standing. And the Supreme Court has specifically cautioned against reading anything into decisions that "assume[]" jurisdiction "without discussion." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). Further, the Supreme Court decided *American Legion* several years before *Kennedy* "put to rest any question

10

about *Lemon*'s vitality." *City of Ocala*, 143 S. Ct. at 765 (Gorsuch, J., respecting the denial of certiorari). Thus, like *Woodring*, *American Legion* does not resolve the question this Court must confront—whether offended-observer standing remains valid today. It is not.

Alternatively, the ICLU argues that changes in standing doctrine do not provide an "independent ground to terminate the injunction." Resp. 18 (citing *O'Sullivan*, 396 F.3d at 868). That is not what *O'Sullivan* says. *O'Sullivan* explains that jurisdictional arguments must be analyzed through "the equitable standards embodied in Rule 60(b)(5)"—which require a party seeking relief to show a substantial change in the law or facts—rather than as freestanding arguments for vacatur. 396 F.3d at 868. Far from holding that changes in standing law cannot provide a basis for relief under Rule 60(b)(5), however, *O'Sullivan* instructed the district court to "consider [whether] the significant changes in the law of voter standing since the entry of the 1983 Consent Decree" justified the decree's modification. *Id.*; *see Shakman*, 426 F.3d at 936 (similar). Thus, either changes to Establishment Clause or standing doctrine can provide a basis for relief.

If nothing else, all parties agree that the ICLU's standing is a relevant "equitable factor." Resp. 18. Whether the Court thinks *Lemon*'s demise severs the cord of offended-observer standing or leaves it hanging just by a thread, that development should weigh in the Governor's favor.

## CONCLUSION

The Court should vacate the permanent injunction and modify its judgment accordingly.

11

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

Office of the Attorney General
Indiana Government Center-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served upon parties whose counsel are registered CM/ECF users.

I also certify that on February 6, 2026, a copy of the foregoing was served upon the following persons via U.S. Mail:

>       Stephen M. Schroeder
>       112 South Beatty Street
>       Columbus, IN 47201
>
>       *Pro Se*

>                               /s/ James A. Barta
>                               James A. Barta
>                               Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

13