UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA CIVIL LIBERTIES UNION, INC., *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:00-cv-00811-SEB-MKK |
| MIKE BRAUN, in his official capacity as Governor of the State of Indiana, | ) | |
| Defendant. | ) | |

**EXPERT REPORT BY STEVEN K. GREEN, J.D., Ph.D.**

Steven K. Green, J.D., Ph.D., being duly sworn says as follows:

1. I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious Studies and History at Willamette University in Salem, Oregon.[1] In the College of Law (my primary appointment), I teach courses in Constitutional Law, First Amendment Law, Legal History, Jurisprudence (legal philosophy), Education Law, and Criminal Law. In Willamette College, the undergraduate school, I occasionally teach courses in Constitutional History and American Religious History. In addition to holding a J.D., I have a M.A. in American Religious History and a Ph.D. in American Constitutional History. A copy of my curriculum vita is attached to this report.

2. My scholarship pertains almost exclusively to the intersection of law, religion, and history. I am the author of eight books and more than sixty scholarly articles and book chapters in the area.[2] My chapters and articles appeared in leading anthologies and law reviews including

[1] The expert opinions expressed below are my own and do not reflect the views of Willamette University or any other institution.

[2] My published books include: *American Infidelity: The Gilded Age Battle Over Freethought, Free Love, and Feminism (*Oxford University Press, 2026*);* *The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (Univ. of Virginia Press, 2024); *Separating Church and State: A History*



PLAINTIFF'S EXHIBIT 5

the *Oxford Research Encyclopedia of American History*, *Oxford Handbook on Church and State in the United States*, *Yale Biographical Dictionary of American Law*, *Cornell Law Review*, *Notre Dame Law Review*, *Emory Law Journal*, *Boston College Law Review*, *Syracuse Law Review*, *Hastings Constitutional Law Quarterly*, *Journal of Church and State*, *First Amendment Law Review*, and the *Oxford Journal of Law and Religion*. I am a member of the Constitutional Law Section of the Association of American Law Schools, a member of the American Academy of Religion, and I serve on the editorial advisory board of the *Journal of Church and State*.

3. I have examined the particular issue of a relationship between the law and the Ten Commandments in three writings, most comprehensively in "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 *Journal of Law and Religion* 101(2000). See also *The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010); "'Bad History:' The Lure of History in Establishment Clause Adjudication," 81 *Notre Dame Law Review* 101 (2006). Finally, in 2005, I authored an amicus curiae brief in *McCreary County v. ACLU* on behalf of approximately twenty leading legal historians and law scholars.

4. The foregoing report is based on my knowledge, research, and study in this area and on the work of other reputable scholars. The opinions expressed below are my own and do not reflect the views of Willamette University or any other institution. In preparing this report, I reviewed the Amended Complaint in this case that contains the photographs of the Ten Commandments monument in question, as well as the sources cited in the report below. I am

(Cornell Univ. Press, 2022); *The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford Univ. Press, 2019); *Inventing a Christian America: The Myth of the Religious Founding* (Oxford Univ. Press, 2015); *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford Univ. Press, 2012); *The Second Disestablishment: Church and State in Nineteenth-Century America* (Oxford Univ. Press, 2010); and *Religious Freedom and the Supreme Court* (Baylor Univ. Press, 2008) (with Ronald Flowers and Melissa Rodgers).

receiving $250 per hour for my work on this case. In the past four years, I have served as an expert in the following cases: *Roake v. Brumley*, Civ. No. 24-517-JWD-SDJ (M.D. La. 2024) (testified); *Stinson v. Fayetteville School District No. 1*, Civ. No. 5:25-cv-05127-TLB (W.D. Ark. 2025) (testified); *Nathan v. Alamo Heights Independent School District*, Civ. No. 25-cv-00756-FB (W.D. Tex. 2025) (testified); *Cribbs Ringer v. Comal Independent School District*, Civ. No. 25-cv-1181-OLG (W.D. Tex. 2025); *Ashby v. Schertz-Cibolo-Universal City Independent School District*, Civ. No. 5:25-cv-01613-FB (W.D. Tex. 2025) and *Wilberforce Academy v. Knox County Board of Education*, Civ. No. 3:25-cv-584 (CEA) (DCP) (E.D. Tenn. 2026) (deposed, with testimony pending).

## I. Methodology

5. In preparing this report I relied on my graduate school training in history, which included extensive instruction in methodology.[3] Accordingly, I applied standard and well-accepted methodologies used by historians. This methodology involves several steps: research involving both primary and secondary sources; examining the relevant content and contextualizing it; integrating the relevant material into text and synthesizing it with other material; and then providing analysis of the material.

6. Initially, I identified both primary and secondary sources for review. I identified these sources as relevant to the issues raised in this case. I was careful to identify a variety of potential primary and secondary sources so that my ultimate conclusions would not rely only on sources that may have reflected only one viewpoint or otherwise limited perspectives.

7. Next, I reviewed those sources closely and analyzed them to determine what role and weight, if any, they should be given in my overall study and analysis. Analysis of a primary

[3] This included a year-long course in methodology and historiography and a course in dissertation design. Additional training in methodology is otherwise integrated into most graduate courses.

source involves reviewing the source, determining how reliable the source is, and evaluating how consistent it is with other evidence. First, I considered the conditions and context under which each source originated: where the source was produced, by whom it was produced, when it was produced, the intentions of the author, and other historical context and circumstances at the time it was produced (*i.e.,* its provenance). Second, I considered the extent to which each source is consistent with other sources, and the extent to which the sources complement each other. Third, I also considered how the plain language of the source would have been interpreted at the time of its writing, and I avoided applying modern interpretations to documents that were centuries old.[4] As to secondary sources, I relied on books and articles about the relevant topics and considered their analyses of the primary sources. I considered the perspective of the authors, the information available to them, and any motivations they may have had to distort their interpretations in any way.

8. The penultimate step was to integrate the material into written text, synthesizing it with other material and providing analysis. In reliance on all sources, I sought to provide a basis for a reliable narrative about the past. Only after completing the above steps do I offer an expert opinion and conclusion.

9. In carrying out this methodology and reaching my conclusions in this report, I applied the same degree of rigor that I apply in preparing my books and scholarly articles for publication.

[4] For the accepted methodological standards for historians, *see* https://www.historians.org/resource/statement-on-standards-of-professional-conduct/. According to the American Historical Association, "the professional practice of history means respecting the integrity of primary and secondary sources while subjecting them to critical scrutiny and contributing in a fair-minded way to ongoing scholarly and public debates over what those sources tell us about the past and also what they fail to illuminate." Additionally, "the practice of history requires awareness of one's own biases and a readiness to follow sound method and analysis wherever they may lead**.** Historians should document their findings and be prepared to make available their sources, evidence, and data, including any documentation they develop through interviews. Historians should not misrepresent their sources. They should report their findings as accurately as possible and not omit evidence that runs counter to their own interpretation. They should not commit plagiarism. They should oppose false or erroneous use of evidence, along with any efforts to ignore or conceal such false or erroneous use." I have followed these rules of professional conduct in preparing this report and in all of my work as a historian.

Proper historical analysis is necessarily analytical. As a historian, I seek to provide context to historical writings and events. The methodology I have described above is consistent with the methodology ordinarily expected of historians.

## II. <u>Summary</u>

10. This expert report is being filed on behalf of the plaintiffs in *Indiana Civil Liberties Union v. Braun*, a challenge to the constitutionality of the placement of a Ten Commandments monument on the grounds of the Indiana Statehouse. The purpose of this report is explain the ahistorical basis for the arguments that are made that the Ten Commandments serves as a foundational principle to American law and the nation's governing documents, and to explain the lack of historic support for the placement of Ten Commandments monuments on public property.

11. This report addresses five points. First, courts of law should approach historical evidence with caution, particularly when its advocates make broad claims about its conclusive ability to resolve current legal disputes. History informs and provides context; it does not direct legal conclusions. History is most salient when it addresses specific practices approved by the Framers of the First Amendment; thus, general assertions about a religious milieu at the time of the nation's founding, or the practice of erecting religious symbols as war memorials, for example, have little relevance to the pedigree of Ten Commandments monuments.

12. Second, the religious rhetoric that coincided with the nation's founding can easily be misinterpreted and misconstrued. Although religious language can be found in many of the speeches and writings of the era, there is no basis for assuming that the leading political figures relied on religious principles to any significant degree when drafting the nation's governing documents or establishing the nation's legal system. More important, there is an absence of any evidence that the Framers relied on, or considered, the Ten Commandments to undergird either

the political or legal systems.

13. Third, relatedly, there is a dearth of legal commentary and case law in the nineteenth century to indicate that judges, lawyers, and legal scholars believed that the Ten Commandments served as a basis for American law generally, much less for specific substantive areas of the law. The primary places where judges mentioned any connection between the Ten Commandments and the law were in discussions concerning Sunday law enforcement and suits over adultery. Even then, in these dozen or so cases, the references to the Ten Commandments were allegorical.

14. Fourth, publicly-erected and publicly-owned Ten Commandments monuments lack the historical pedigree of other forms of government religious expression, such as with legislative chaplains, *see Marsh v. Chambers*, 463 U.S. 783 (1983).

15. Lastly, courts have recognized – as they must – that the Ten Commandments is first and foremost a religious document, exclusive to Jewish and Christian traditions. More important, there are multiple versions of the Ten Commandments, with the differences in ordering and phrasing breaking down along sectarian lines. As a result, any Ten Commandments monument will invariably track the recognized phrasing of one religious tradition over others, placing the government in the position of making theological choices and showing favoritism of one faith over others.

## III. <u>Relevant Historical Methodology</u>

16. The Supreme Court has relied on historical evidence to assist its understanding of the purposes and context of constitutional language, *see, e.g., Everson v. Board of Education*, 330 U.S. 1 (1947) (interpreting the religion clauses); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (interpreting the Second Amendment). And most recently the Court has stressed that the Establishment Clause must be interpreted by "'reference to historical practices and

understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). That said, courts should approach historical data with caution and apply it judiciously. While history serves as an indispensable source of information for some Establishment Clause controversies, its role and effectiveness in Supreme Court adjudication is necessarily limited. History can never provide specific answers to modern controversies; neither can history tell us what the Founders may have thought about future church-state conflicts or, in many instances, even about the church-state conflicts they faced. The historical record is too amorphous and too easily misread or manipulated to resolve modern controversies. At best, history can only inform; it cannot resolve legal controversies.[5]

17. In particular, courts should resist drawing conclusions about particular practices based on general observations about the past. The fact that one religious practice has been deemed constitutional (e.g., legislative chaplains), does not mean that a completely different manifestation (e.g., a Ten Commandments monument) must also be constitutional because both involved government religious speech. This runs counter to the historical approach used in certain cases by the Supreme Court.

18. In two recent decisions, members of the Supreme Court have addressed the proper methodology to be applied to historical data. *Town of Greece v. Galloway*, 572 U.S. 565 (2014), involved a challenge to a town's practice of inviting local clergy to deliver invocations at monthly town council meetings. In upholding the prayers, the Court considered the historical

---

[5] See Ethan Bercot, "Forgetting to Weigh: The Use of History in Supreme Court's Establishment Clause," 102 *Geo. L.J.* 845, 863 (2014) ("[H]istorical analysis focuses the Court's attention on the minutiae of antiquated practices rather than on the broad principles that can be deprived from them."); Christopher L. Eisgruber, "The Living Hand of the Past: History and Constitutional Justice," 65 *Ford. L. Rev.* 1611 (1997) ("History should figure in constitutional interpretation as an aid to the pursuit of justice, not a constraint upon it."); Cass R. Sunstein, "The Idea of a Useable Past," 95 *Colum. L. Rev.* 601, 602 (1995) ("[A]ny historical account, offered by someone in a particular time and place, will reflect current preoccupation and potentially controversial assumptions. To say the least, it is hard to avoid forms of selectivity when dealing with the past."); Green, "Bad History," at 1728-1734.

pedigree of prayers being delivered in legislative assemblies, as it had done in *Marsh v. Chambers*, 463 U.S. 783 (1983). Justice Kennedy described the Court's measured use of history to resolve the dispute, stating that while the "Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" that approach "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U.S. at 576. History rises in relevance, Justice Kennedy wrote, and has greater saliency on interpretations of the Establishment Clause, "where history shows that the *specific* practice is permitted." Ibid. at 577 (emphasis supplied). The principal dissent agreed with that approach in principle, noting that history is relevant where the specific practice has "a long history" and "a distinctive constitutional warrant by virtue of tradition." Ibid. at 622 (Kagan, J., dissenting).

19. Five years later, the Court upheld the constitutionality of a concrete Latin cross erected as a war memorial following World War I. *American Legion v. American Humanist Association*, 588 U.S. 29 (2019). Commenting on the Court's historical methodology, Justice Alito noted that it had taken a "modest approach that focuses on the particular issue at hand and looks to history for guidance." Ibid. at 32. But notably, the portions of Justice Alito's opinion that proposed that courts "look[] to history for guidance"—Parts II-A and II-D—failed to garner a majority. [6] The majority opinion in *American Legion* (Parts I, II-B, II-C, III, and IV) held that: (1) certain longstanding monuments should be scrutinized with a presumption of

[6] *American Legion*, 588 U.S. at 48-52, 60-63. Justice Kagan disagreed with these sections. *Ibid.* at 73. Justices Thomas and Gorsuch only concurred in the judgment. *Ibid.* at 73-89. Justice Breyer wrote that "I do not understand the Court's opinion today to adopt a 'history and tradition' test that would permit *any newly constructed religious memorial* on public land." *Ibid*. at 68 (Breyer, J. concurring) (emphasis supplied). Justice Kagan also urged a measured approach, noting that while she "too 'look[s] to history for guidance,'" she preferred "to do so case-by-case, rather than to sign on to any broader statements about history's role in Establishment Clause analysis." She commended the plurality opinion's emphasis on "longstanding monuments." *Ibid*. at 73 (Kagan, J., concurring).

constitutionality; and (2) the Bladensburg Cross was constitutional because its purpose and meaning were predominantly secular—that the cross had been erected as a war memorial and was perceived as such—a conclusion that was tethered to the specific role of the Latin cross in World War I and the fact that that particular cross was nearly a century old. See ibid. at 63 (the Bladensburg Cross "carries special significance in commemorating World War I"); ibid. ("the symbol took on an added secular meaning when used in World War I memorials").[7]

20. Consequently, what is relevant historically for determining the constitutionality of Ten Commandments monuments, and consistent with the methodological approach endorsed by the Supreme Court, would be evidence of a long-standing practice of government erected and maintained Ten Commandments monuments. Additional salient evidence would be that the Framers understood there to be a direct relationship between the Ten Commandments and those foundational principles of republican governance and law.

## IV. The "Religious Milieu of the Founding Period

21. It can be anticipated that the defendant will invite the Court to participate in the longstanding scholarly debate over the original understanding of religious disestablishment at the state and federal levels and the meaning of the Establishment Clause. This scholarly debate is ongoing and will likely not be resolved in our lifetimes. Although courts occasionally opine on the historical understanding of church-state separation, it is not necessary for this Court to engage in this debate to decide the instant controversy, let alone to resolve which side is correct. Nonetheless, this report will respond to two general claims that are frequently made in this area by proponents of the posting of religious displays.

[7] As noted above, the Court has more recently affirmed that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings'" *see Kennedy*, 597 U.S. at 535, although it did not apply that approach in reaching its decision there.

22. Religious Discourse. Scholars from across the ideological spectrum acknowledge the prevalence of religious rhetoric during the founding period, often appearing in the form of references to scripture, allusions to Old Testament Israel, and assertions of interposing Providence, among others. Members of the founding generation were biblically literate—particularly by today's standards—and religious imagery infused public discussions about revolution, politics, and cultural norms.[8] This fact is unremarkable for several reasons. First, the Bible was the most common and widely read book in colonial America; if a colonial household had only one book, it was the Bible. As a result, it was the source of common idioms, phrases, and analogies. People from all walks of life with varying degrees of religiosity utilized religious terminology, including religiously heterodox figures such as Benjamin Franklin, Thomas Jefferson, and Thomas Paine.[9] Consequently, "[t]he mere fact that the founding generation frequently quoted from and alluded to the Bible reveals little about the American founding or the Bible's influence on late eighteenth-century political thought, except that the Bible was a familiar and useful literary source."[10] In fact, "[t]he language of the English Bible so permeated the vernacular that some speakers and writers may not always have been conscious of the fact that a popular phrase or image had biblical origins."[11]

23. Second, political and religious leaders understood the power of religious rhetoric to inspire and unify colonists as they embarked in a rebellion against the most powerful nation on

---

[8] Gordon Wood, "Religion and the American Revolution," in Harry S. Stout and D. G. Hart, eds., *New Directions in American Religious History* (New York: Oxford University Press, 1997), 182-187; James F. Byrd, *Sacred Scripture, Sacred War: The Bible and the American Revolution* (New York: Oxford University Press, 2013); Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers* (New York: Oxford University Press, 2018), 5, 29-37.
[9] Steven K. Green, *Inventing a Christian America: The Myth of the Religious Founding* (New York: Oxford University Press, 2015), 110-130.
[10] Dreisbach, *Reading the Bible with the Founding Fathers*, 7.
[11] Ibid., 76.

earth. Contemporaries understood the significance of comparing Great Britain to ancient Egypt and the American colonists to the fleeing Children of Israel. Similarly, political and religious leaders claimed that military successes—when they finally materialized—were a sign of God's blessing or the works of his providential hand. Like Americans today, colonists wanted to believe that God was on their side when confronting seemingly insurmountable odds.[12] Understanding the risks and challenges the colonialists faced, it would have been surprising if they had not engaged in religious rhetoric. That rhetoric, however, needs to be considered within its context, and not used as a proof-text for arguing that the Framers intended to infuse religious principles into the nation's governing systems. In essence, the commonality of religious rhetoric tells us little about the ideological foundations of the nation's political or legal systems.

24. The overarching reality is that members of the founding generation initiated and witnessed a significant transformation in church-state relations. While some people remained wedded to old practices and customs, the fact is that the new nation embarked down a path never-before taken. The rate of transformation was truly remarkable. In 1776, when the Continental Congress invited the colonial governments to reorganize as republican states, nine of thirteen colonies maintained religious establishments, meaning the forced taxation to support houses of worship and the imposition of civil disabilities on the basis of religious affiliation. In a brief fifteen years, by the time of the ratification of the First Amendment in 1791, that number had been reversed, with religious establishments being either abolished or rendered inoperable in eleven of fourteen states. And in those three New England states that retained public support for religion, the establishments were a source of political and religious controversy until they were

[12] Green, *Inventing a Christian America*, 115, 119, 189-190.

ultimately abolished in the early nineteenth century.[13] This is the overarching fact that must not become lost in the minutia—all of the states moved toward abolishing religious establishments and separating state and church, some faster than others. At a minimum, this indicates the dynamic nature of the founding period and that people's perspectives toward church-state matters were not static but evolving.[14] At a maximum, it shows that the end of that evolution was a clear separation of church and state.

25. <u>James Madison's involvement in the First Amendment.</u> The importance of James Madison in the drafting of the First Amendment and in infusing it with meaning cannot be overlooked. Prevailing scholarly consensus assigns him an instrumental role.[15] On June 8, 1789, Madison introduced into the House of Representatives a series of proposed amendments to the Constitution, in part to fulfil a promise to those state conventions that had ratified the new constitution on the condition that the First Congress would draft amendments to protect individual rights. According to biographer Irving Brant, Madison's amendments relied heavily on various state proposals, Virginia's in particular; however, his amendments concerning religion and rights of conscience "came from Madison alone. . . . Religious freedom was Madison's first concern."[16] Madison proposed two amendments that dealt expressly with religion, both of which indicated his strong commitment to religious freedom and church-state

[13] Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford University Press, 1986), 134-222. Vermont was an enigma. Even though it's 1786 constitution abolished forced taxes for religious worship, several towns continued to extract assessments based on an unrepealed 1783 law, a practice that continued sporadically until that law's repeal in 1807. Ibid., 188-190.
[14] Green "A Spacious Conception," at 456-480.
[15] Jack N. Rakove, *Beyond Belief, Beyond Conscience: The Radical Significance of the Free Exercise of Religion* (New York: Oxford University Press, 2020), 66-110; Richard Labunski, *James Madison and the Struggle for the Bill of Rights* (New York: Oxford University Press, 2006), 178-240; Irving Brant, *James Madison: Father of the Constitution* (Indianapolis: Bobbs-Merrill Co., 1950), 264-268; Ralph Ketcham, *James Madison* (Charlottesville: University Press of Virginia, 1990), 289-292.
[16] *Daily Advertiser*, June 9, 1789, in *Complete Bill of Rights*, 57. See also *Annals of Congress* (June 8, 1787), 1:448. Labunski, *James Madison and the Struggle for the Bill of Rights*, 187-194, 198-200; Brant, *James Madison: Father of the Constitution*, 264-266, 268.

separation. The first, which would evolve into the First Amendment, was to be inserted into Article I, section 9 of the Constitution which limits powers of Congress. It provided:

> The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed.[17]

Madison's second proposed religious amendment, to be inserted in Article I, section 10 which limits the powers of the states, provided that "No State shall violate the equal rights of conscience, or the freedom of the press, or the trial by jury in criminal cases."[18] These two proposed amendments demonstrated Madison's strong commitment to religious freedom and church-state disestablishment.[19]

26. After much delay, on August 15, 1789, the House, acting as a committee of the whole, took up Madison's first proposed amendment.[20] The Committee on Amendments had revised Madison's proposal to read: "no religion shall be established by law, nor shall the equal rights of conscience be infringed." Three representatives questioned the propriety of the amendment, with two—Peter Sylvester of New York and Benjamin Huntington of Massachusetts—expressing concern that the disestablishment clause could be interpreted as expressing hostility toward religion. (The third, Roger Sherman of Connecticut, moved that the amendment be struck "insomuch as congress had no authority whatsoever . . . to make religious establishments.") Other members suggested changes to the proposed language, most involving phrasing rather than substance. In one substantive proposal, Elbridge Gerry of Massachusetts offered narrowing language to read that "no religious doctrine shall be established by law." This

[17] *Annals*, 1:451.
[18] Ibid., 1:452
[19] Noah Feldman, *The Three Lives of James Madison: Genius, Partisan, President* (New York: Random House, 2017), 66.
[20] Congress's consideration of what would become the First Amendment is examined in detail in Green, *The Grand Collaboration*, 144-154.

language, if adopted, would have authorized non-preferential establishments at the federal level, consistent with the New England practice of multiple establishments. The House did not approve Gerry's proposal or other language that would have narrowed the scope of the clause to prohibit only the establishment of a "national religion." Instead, the House adopted language proposed by Samuel Livermore of New Hampshire that "congress shall make no laws touching religion, or infringing the rights of conscience." After being submitted to a committee on style, the House adopted a motion by Fisher Ames of Massachusetts that read "Congress shall make no law establishing religion, or to prevent the free exercise thereof, or to infringe the rights of conscience." The language was likely written by Madison, who employed a common technique of having a colleague submit a proposal—Ames being from a state with a religious establishment—to garner wider support.[21]

27. From there, the amendment went to the Senate for consideration. Records of the Senate debates do not exist, so any meaning must be gleaned from the various proposals listed in the Senate Journal. Unidentified senators offered a handful of substitutes that would have narrowed the scope of the amendment: preventing establishing "one religious sect or society in preference to others," "a particular denomination," or "any Religious Sect or Society." All of these proposals would have forbidden only an exclusive establishment, thereby authorizing a multiple religious establishment at the national level. Each of the substitutes failed to garner a majority vote. On September 9, 1789, the Senate finally adopted language providing "Congress shall make no law establishing articles of faith, or a mode of worship, or prohibiting the free exercise of religion," language slightly broader than the other Senate proposals but still narrower

[21] *Annals*, 1:757-759 (August 15, 1789); ibid., 1:796 (August 20, 1789); Brant, *James Madison: Father of the Constitution*, 271; Labunski, *James Madison and the Struggle for the Bill of Rights*, 223-224. The House also passed Madison's second proposed amendment restricting state infringements on rights of conscience, but that provision died in the Senate. Green, *The Grand Collaboration*, 148.

than the House version.[22] The House objected to the Senate's revisions of several amendments, including the religious amendment, and called for a conference committee to resolve the differences. Madison, Roger Sherman of Connecticut and John Vining of Delaware represented the House while the Senate appointed Oliver Ellsworth of Connecticut, William Paterson of New Jersey and Charles Carroll of Maryland, meaning that two of the six members hailed from states with religious establishments. Before the committee met the Senate "recede[d]" from their language for the religion clauses, deferring to the House. The committee then drafted that familiar language that would become the First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Although the exact author of this final language is unknown, two factors suggest that Madison was responsible for the ultimate phrasing. First, the final language closely tracked the House proposal (likely written by Madison) to which the Senate had already acceded. Second, Madison led the House committee delegation, and according to Brant, his associates Vining and Sherman "had shown no interest in the clause on religion." Whether Madison rightly deserves the appellation of "Father of the Constitution," he is entitled to the designation as "Father of the First Amendment." As Professor Feldman concludes, "[w]ithout Madison, the bill of rights would not have been enacted."[23]

28. There is no dispute that James Madison believed that the First Amendment required a separation of the authority and functions of the church and the state. In his *Memorial and Remonstrance* (1785), Madison wrote that civil government lacked authority or "jurisdiction" over religious matters. He analogized to the concept of separation of powers, praising "the metes

[22] Senate Journal (September 3, 1789), 1:70; Complete Bill of Rights, 3-6.

[23] House Journal, 146, in *Complete Bill of Rights*, 6; Senate Journal, 142, ibid., 7-8; Brant, *James Madison: Father of the Constitution*, 271; Brant, "Madison: On the Separation of Church and State," 16; Labunski, *James Madison and the Struggle for the Bill of Rights*, 239; Feldman, "*Three Lives of James Madison*," 276.

and bounds which separate" each entity. In his First Inaugural Address, Madison declared his obligation "to avoid the slightest interference with the rights of conscience, or with the functions of religion so wisely exempted from civil jurisdiction." Later as President, Madison vetoed two congressional bills that would have awarded land and privileges to churches. And in later letters and writings, Madison employed the exact language of "separation" to indicate the proper relationship between religion and government,[24] with him remarking that "the number, the industry, and the morality of the priesthood, and the devotion of the people have been manifestly increased by the total separation of the Church from the state."[25] Accordingly, members of the Supreme Court have been on a firm footing by relying on James Madison for interpreting the Religion Clauses and in aligning that interpretation with church-state separation. *See Everson v. Board of Education*, 330 U.S. 1, 11-13 (1947); ibid. at 33-43 (Rutledge, J., dissenting); *Engel v. Vitale*, 370 U.S. 421, 431 n.13 (1962); *Abington School District v. Schempp*, 374 U.S. 203, 213-214 (1963); *Wallace v. Jaffree*, 472 U.S. 38, 54 n.38 (1985); *McCreary County v. ACLU*, 545 U.S. 844, 878 (2005).

## V. **The Historical "Pedigree of the Ten Commandments"**

29. Proponents of Ten Commandments monuments commonly justify the public posting on grounds that the commandments serve as a leading basis for American law. The Fraternal Order of Eagles has justified the public placement of their monuments on similar grounds: "Th[e] secular significance of the ten commandments, and their role in the foundation of our legal system is undeniable. Their place in the history of our legal system renders them a powerful

---

[24] First Inaugural Address, March 4, 1809, at https://avalon.law.yale.edu/19th_century/madison1.asp; Veto Messages (1811), in *James Madison on Religious Liberty*, ed., Robert S, Alley (Buffalo: Prometheus Books, 1985), 79-80; Detached Memoranda (1817?), ibid., 89-94.

[25] James Madison to Robert Walsh, March 2, 1819; see also James Madison to Edward Livingston, July 10, 1822 (decrying an "alliance or coalition between Government and Religion," and advocating "a perfect separation between ecclesiastical and civil matters."), *James Madison on Religious Liberty*, 80-83.

symbol of the rule of law."[26] Members of the Supreme Court have made similar claims; according to Justice Alito, the Ten Commandments "have historical significance as one of the foundations of our legal system." *American Legion*, 588 U.S. at 53. While this premise is widely embraced, it lacks a historical basis. As addressed above, this author has examined this claim in several published works, as has Professor Paul Finkelman, and both of us have concluded that there is lack of historical evidence that the Framers and later political and legal figures considered the Ten Commandments to be a basis for either American law or government.[27]

30. The sources of law for the American colonies and later the United States are broad and varied. The principal early sources are the common and statutory law of England, but also influential was the law of the non-common law courts of England, such as equity, chancery, admiralty, and ecclesiastical courts. Most legal historians consider Magna Carta of 1215 to be a seminal source of modern English and American law. Magna Carta addressed various legal subjects, including: inheritance; land ownership and sale; taxation; jury trials and trial procedure; proportionality in punishment; and the taking of property without compensation. Magna Carta contains principles that are central to our legal culture today, including assertions that no person can be "seized or imprisoned, or stripped of his rights or possessions … except by the lawful judgment of his equals or by the law of the land." Magna Carta made no reference to either the Ten Commandments as a whole or any particular one of the Commandments.[28]

31. Colonialists were also influenced by the 1689 English Bill of Rights, which made the monarchy subject to the laws of Parliament and established legal rights and relationships for

[26] See Brief of Fraternal Order of Eagles as Amicus Curiae in Support of Respondents in Van Orden v. Perry, at 12.
[27] Green, "The Fount of Everything Just and Right," passim; Paul Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 *Fordham L. Rev.* 1477 (2005).
[28] *See* Bernard Bailyn, *The Ideological Origins of the American Revolution* (Cambridge: Harvard University Press, 1967), 22-54; Neil H. Cogan ed., *Contexts of the Constitution* (New York: Foundation Press,1999), 657-666.

British citizens (e.g., freedom of speech; excessive bail and fines; cruel and unusual punishment; and the right to a jury trial). Like Magna Carta, the English Bill of Rights was highly influential in the colonies; many of the colonies incorporated liberties guaranteed by Magna Carta and the English Bill of Rights directly into their laws and governing documents. Like Magna Carta, the English Bill of Rights did not mention the Ten Commandments. It made passing references to "God," but these references were highly formalistic and bore no relationship to the substance of the document.[29]

32. A highly influential source for late colonial and early American law was Sir William Blackstone, whose *Commentaries* (1769) were more popular on this side of the Atlantic Ocean than in Great Britain. Even though the *Commentaries* contained a section on "Offenses Against God and Religion"—not surprising since Blackstone defended England's religious establishment—and Blackstone asserted that the ultimate authority for the law was "divine law" as revealed in the scriptures, he recognized that a high proportion of legal matters were controlled by a secular body of "municipal or civil law." Despite his discussions about ecclesiastical and religious influences on British law, which of course were based on the integration of the canon law of the established Church of England, Blackstone did not claim that the Ten Commandments served as a basis for the law. Tellingly, when Blackstone turned to discussing "profanation of the lord's day, or *sabbath-breaking*," he did not mention any connection to the fourth commandment; rather, he endorsed Sabbath laws for promoting "a time of relaxation and refreshment as well as for public worship" and as being "of admirable service to a state, considered merely as a civil institution."[30]

[29] *Contexts of the Constitution*, 686-692.
[30] William Blackstone, *Commentaries on the Laws of England* (Buffalo: William Hein & Co., 1992, originally published: Oxford: Clarendon Press, 1765-1769), 2: 38-45; 4: 41-63.

33. Unlike other colonies that relied on secular sources for the law, the early legal codes of the New England colonies (Massachusetts Bay, New Haven, Connecticut, and Plymouth), relied in part on biblical law, with the *Lawes and Libertyes* of Massachusetts Bay citing to scriptural authority for several offenses and behavioral rules. Yet, even in those colonies, reliance on the Ten Commandments (as opposed to reliance on biblical law as a whole) was proportionately insignificant and largely limited to particular criminal and domestic laws, such as blasphemy and adultery. Thus, even though many early Puritan leaders believed in the supremacy of biblical law, they relied primarily on other secular sources for the bulk of their laws. Furthermore, these colonies' reliance on biblical principles was relatively short-lived. The Glorious Revolution of 1688-89 brought about a new charter in Massachusetts Bay, ending the "experiment" of this most-religious-of-all-the-colonies. The new charter removed almost all references to biblical law and replaced them with common law practices and procedures.[31]

34. During the founding period, one finds occasional references to the Ten Commandments or Mosaic law, most commonly in sermons where clergy drew parallels to Old Testament Israel.[32] But even though Calvinist clergy saw Old Testament Israel as a model, they generally believed that Christians were not bound by the Old Testament, including by the Ten Commandments. Considering political writings rather than sermons, there is a general dearth of references to Mosaic law, the Decalogue, or the Ten Commandments. Of the central legal documents, the Declaration of Independence contains four natural law/rights allusions to God, but no reference to the Bible or biblical law. Rather, when asserting the authority for the new

[31] Bradley Chapin, *Criminal Justice in Colonial America, 1606-1660* (Athens, GA: University of Georgia Press, 1983), 4-15; George Lee Haskins, *Law and Authority in Early Massachusetts* (New York: Macmillan Co., 1960), 136-162.

[32] *See* Samuel Langdon, "The Republic of Israelites an Example to the American States" (Exeter, CT: Lamson and Ranlet, Printers,1788).

nation the Declaration declares that "Governments are instituted among Men, deriving their just powers from the consent of the governed."[33] In contrast, the Constitution and the Bill of Rights did not include even a perfunctory or formalistic reference to God. Rather than relying on divine authority, the Constitution is "ordained" by "the People of the United States." None of the documents reference the Ten Commandments.[34]

35. As a result, it comes as no surprise that the Ten Commandments and biblical law received nary a mention in the debates and publications surrounding the founding documents. In the wide-ranging debates—reprinted in Madison's *Notes*, the *Annals of Congress*, Farrand's *Records*, Elliot's *Debates*, and elsewhere—the Founders mentioned Roman law, European Continental law, British law, and various other legal systems, but as can best be determined, no delegate ever relied on the Ten Commandments or the Bible as a source of authority. The only serious discussion of religion led to the clause prohibiting religious tests for office-holding, clearly not an endorsement of the legal status of Judeo-Christianity. Similarly, neither the "Bible" nor "scripture" nor the "Ten Commandments" appears in the index of the *Federalist Papers*, which are generally considered to contain the most important discussions of the meaning of the United States Constitution at the time of ratification. The authors of the *Federalist Papers* made a handful of passing references to "God" and "gods," the "Almighty," "Heaven," and to religion; in one place (*Federalist* 43), Madison refers to "the transcendent law of nature and of nature's God," but this reference suggests Enlightenment natural law views rather than of an Old Testament God. Rather than asserting a connection between biblical law and the new nation,

---

[33] Thomas Jefferson, for one, doubted the authenticity and authority of the Ten Commandments. In a letter to John Adams, Jefferson wrote that "the whole history of [the Ten Commandments] is so defective and doubtful that it seems vain to attempt minute enquiry into it; and such tricks have been plaid with their text … that we have a right, from that cause, to entertain much doubt what parts of them are genuine." Jefferson to Adams, Jan. 24, 1814, *The Adams-Jefferson Letters,* Lester J. Cappon ed. (Chapel Hill, University of North Carolina Press, 1959), 421.
[34] Green, *Inventing a Christian America*, 178-182.

most references to religion in the *Federalist Papers* denounce religious factions and intolerance and the mixing of church and state.[35]

36. Admittedly, a handful of later legal commentators made vague claims that could possibly be interpreted as asserting a relationship between the Ten Commandments and the law. For example, Justice Joseph Story, influential among early American lawyers through his numerous legal treatises, including his *Commentaries on the Constitution*, wrote an article in 1836 on "natural law" in which he referred to God as "our Lawgiver and Judge, [to whom] we owe an unreserved obedience to his commands." However, this assertion was aspirational; it did not suggest that Justice Story believed that the law was derived from God's Commandments. In his three-volume *Commentaries*, he placed no emphasis on religious influences. Story never mentioned the Ten Commandments in his treatise, while his single mention of the Bible came in a discussion of Freedom of the Press (§ 1875) with him merely noting that some governments have regulated the printing of the Bible and its translation.[36] Also, in his widely read *A Course of Legal Study* (1836), University of Maryland professor David Hoffman wrote that "[t]he purity and sublimity of the morals of the Bible have at no time been questioned; it is the foundation of the common law of every christian nation." Although Hoffman maintained the law had a philosophical debt to the Bible, referring to the biblical books of Leviticus, Numbers, and Deuteronomy as containing the "ritual, moral, and civil law of the Jews," he, like Story, stopped short of claiming that Anglo-American law was derived from the Decalogue or Pentateuch. In fact, Hoffman cautioned his readers against drawing parallels between scripture and the law, noting that the Bible's "figurative [and] symbolic language" presented a "most serious

---

[35] *See generally* The Federalist Papers (Clinton Rossiter ed., 1961).
[36] Joseph Story, *Natural Law, in* Encyclopedia Americana 9:150-158 (Francis Lieber ed., rev. ed. 1836); Joseph Story, *Commentaries on the Constitution of the United States* (Cambridge, MA: Brown, Shattuck, and Co., 1833), §§ 1864-1873;

impediment" to applying biblical principles to the law.[37]

37. In addition to the lack of references to the Ten Commandments in the founding documents, there also is no significant reliance on the Commandments in early American case law.[38] References to the Ten Commandments appear chiefly in a dozen or so early nineteenth century cases where judges drew parallels to the fourth commandment when validating the enforcement of Sunday laws. In a few other cases, judges made rhetorical references to the Decalogue when interpreting rules governing labor or judicial activity on Sundays. Finally, in a smaller number of suits alleging adultery, judges referenced the seventh commandment. For the most part, however, early judicial discussions of the Ten Commandments were not detailed, with most allusions being illustrative or oratorical, and with the courts not relying on the Decalogue as authority for their holdings.[39] In essence, the biblical references were hortatory, with the holdings generally resting on secular legal grounds.[40]

38. For example, in one early case, *Pearce v. Atwood*, 13 Mass. 324 (1816), the Massachusetts Supreme Judicial Court upheld a Sunday law as based on "common practices." Referring to the fourth commandment, the court noted that "it may be inferred, that one day in

---

[37] David Hoffman, *A Course of Legal Study* (Baltimore: Joseph Neal, Pub., 1836), 1:65-78.

[38] This conclusion is based on my Ph.D. dissertation research of more than 400 church-state cases of the nineteenth century. See Steven K. Green, *The Second Disestablishment: Church and State in Nineteenth-Century America* (New York: Oxford University Press, 2010), 182-190; Green, "The Fount of Everything Just and Right," 553-558.

[39] See Commonwealth v. Wolf, 3 Serg. and Rawle 48 (Pa., 1817); Fox v. Abel, 2 Conn 541, 554 (1818); City Council v. Benjamin, 2 Strob 508 (S.C., 1845); Neal v. Crew, 12 Ga. 93, 100 (1852); State v. Boyle, 9 La. Ann. 371 (1854); People v. Hoym, 20 How. Prac. 76 (N.Y. Super, 1860); Kountz v. Price, 40 Miss 341 (1866); State v. O'Rourk, 35 Neb. 614 (1892); Moore v. Strickland, 46 W.Va. 515 (1899).

[40] In a 2009 article in the Liberty University Law Review, John A. Eidsmoe, claims to have identified roughly 1,000 judicial citations to the Ten Commandments in American court opinions over the past two centuries. See John A. Eidsmoe, "The Use of the Ten Commandments in American Courts," 3 *Liberty Univ. L. Rev*. 15-46 (2009). Eidsmoe wrote the article based on a Lexis word search of the words "Commandments" and "Decalogue" in judicial decisions, but even he acknowledges the unreliability of those figures. The figures include multiple uses of the terms within the same case and do not account for uses of the common, non-biblical term "commandment." Then, as the article also acknowledges, when judges referred to one of the Ten Commandments, it was often done figuratively or allegorically, not as binding on the judicial decision. In other instances, judges referred to one of the Commandments to distinguish it from the *civil* basis of statutory or common law offenses such as murder, theft, or Sunday work (or were merely repeating the religious-based claims of one party before rejecting those claims). Ibid., 16-18.

seven was, according to divine will, to be set apart as a day of rest from labor." But, the court continued, "it is not necessary to resort to the laws promulgated by Moses, in order to prove that the Christian Sabbath ought to be observed by Christians, as a day of holy rest and religious worship." The court viewed the authority for Sunday laws as arising from the "uniform usage" among the Christian citizens of the state, not from any religious basis for the law. In another Sunday law enforcement case, the West Virginia Supreme Court of Appeals opined that the "re-enactment of the Sabbath on Mount Sinai among the commandments of the moral law was designed not for Jews alone, but for all who should receive the word of God," declaring that "the decalogue [was] a permanent and universal obligation." *Raines v. Watson*, 2 W. Va. 371, 387 (1868). Despite such language, the court did not declare that the Ten Commandments was a basis for American law generally. In many instances, the judicial references to a commandment appear to reflect the judge's own religious inclination and not any consensus judicial finding.

39. Court decisions pertaining to the Sabbath and other subject matter addressed in the Ten Commandments represent a small subset of the areas of decisional law; aside from those decisions, the vast majority of church-state decisions—both from the early American period and today—make no mention whatsoever of the Commandments or biblical law. The conclusion is that members of the founding generation and later generations did not view the Ten Commandments as underlying or necessarily informing American law.[41] In sum, there is a lack of historical support for the proposition that the Ten Commandments serve as a basis for American law or that early Americans thought so. While the Ten Commandments have influenced various notions of right and wrong, a wide variety of other documents have played a more dominant and central role in the development of American law. No scholar who has

[41] Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 *Fordham L. Rev.*, *passim*.

seriously studied this issue can assert that the Ten Commandments has played a dominant role, or even a significant role, in the development of American law as a whole.

## VI. Public Displays of Ten Commandments are of Recent Invention and Lack the Historical Pedigree of Other Religious Symbols

40. Any historical pedigree that might exist with the public display of other religious symbols, such as the Bladensburg Cross in *American Legion*, does not apply to Ten Commandments monuments, which were chiefly an invention of the mid-twentieth century. Numerous court decisions have discussed the advent of modern Ten Commandments monuments in the 1950s. See *Card v. City of Everett*, 520 F.3d 1009, 1012-1013 (9th Cir. 2008).[42] Ten Commandments monuments, like the one the Governor seeks to place on the grounds of the Indiana Statehouse, are of recent invention and do not possess "a long history" or "a distinctive constitutional warrant by virtue of tradition." Because there is a lack of a historical pedigree for erecting Ten Commandments monuments on public property, the Ten Commandments Monument Display Act would appear to run counter to the Court's directive that such uses of religious symbolism are permitted "where history shows that the specific practice is permitted." *Town of Greece*, 572 U.S. at 577.

## VII. Any Public Ten Commandments Monument is Inevitably Religious-Specific and Sectarian

41. It is indisputable that the Ten Commandments originated as, and remain, a religious text. "[T]he Ten Commandments is a religious and sacred text that transcends secular ethical or moral concerns.… [I]ts very text commands the reader to worship only the Lord God, to avoid idolatry, to not use the Lord's name in vain, and to observe the Sabbath. These particular

[42] See also Books v. City of Elkhart, 235 F.3d 292, 294 (7th Cir. 2000) (discussing the same origins of Ten Commandment monuments). See Kevin M. Kruse, *One Nation Under God* (New York: Basic Books, 2015), 140-148.

commandments are wholly religious in nature, and serve no conceivable secular function." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770-71 (7th Cir. 2001). Jews and Christians believe the Ten Commandments was one of those rare instances when God spoke directly to humankind writ-large, rather than through the medium of prayer or a prophet. For many believers, it is sacred script.

42. Courts have uniformly recognized the religious nature of the Ten Commandments, that it is "'an instrument of religion.'" *Stone v. Graham*, 449 U.S. 39, 41, n.3 (1980). *See also Van Orden v. Perry*, 545 U.S. 677, 689 (2005) ("Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain."); *McCreary County v. ACLU*, 545 U.S. 844, 859 (2005). As the Supreme Court observed in *Stone v. Graham*:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12–17; Deuteronomy 5: 16–21. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1–11; Deuteronomy 5: 6–15.

449 U.S. at 41-42.[43]

43. In that the Ten Commandments represent a sacred text of the Jewish and Christian traditions, it is not recognized as such by other faith communities. Many religions do not accept the Ten Commandments as authoritative doctrine and/or do not consider it to be a part of their religious tradition, including but not limited to Eastern religions, such as Hinduism, Buddhism, Taoism, Jainism, and Sikhism, and earth-based and humanistic religions. Of non-Judeo-

---

[43] See also, *Glassroth v. Moore*, 335 F.3d 1282, 1295 (11th Cir. 2003); *Adland v. Russ,* 307 F.3d 471, 480 (6th Cir. 2002); *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770-71 (7th Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002); *Books v. City of Elkhart,* 235 F.3d 292, 302 (7th Cir. 2000); *Harvey v. Cobb County,* 811 F. Supp. 669, 677-78 (N.D. Ga. 1993), *aff'd mem.*, 15 F.3d 1097 (11th Cir. 1994

Christian faiths, Muslims make up one of the larger groups in the United States.[44] The Qur'an contains no listing of the Ten Commandants, and there is a lack of consensus among the various branches of Islam as to its authority. Because "[t]he Qur'an does not contain a passage commonly known as the Ten Commandments," many Muslims would likely not identify it as being part of their faith tradition.[45] Finally, among those faith traditions that consider the Ten Commandments to be authoritative as a religious matter, including Protestants, Catholics, and Jews, there are substantial differences with respect to religious teachings that pertain to the structure, content, and meaning of the commandments.[46]

44. The Ten Commandments are found in Chapter 20 of the Book of Exodus. They are later repeated (although not word-for-word) in Chapter 5 of Deuteronomy. As an initial matter, therefore, the creators of any Ten Commandments monument must choose between the two renditions (the monuments by the Fraternal Order of Eagles track the version from Exodus). Then, the language of any Ten Commandments monument must rely on a particular translation or version of the Bible; the language of the vast majority of Ten Commandments monuments is derived from the Protestant King James Bible. *Van Orden*, 545 U.S. at 708 (Stevens, J.

---

[44] *See, e.g.*, Muslim Population by State 2025, WORLD POP. REV., https://worldpopulationreview.com/state-rankings/muslim-population-by-state.

[45] Sabastian Gunther, "Oh People of Scripture! Come to a Word Common to You and to Us (Q. 3:64): The Ten Commandments and the Qur'an," *Journal of Qur'anic Studies* 9 (2007): 28-58, 29. The Qur'an obliquely refers to the Ten Commandments twice, without listing it. *See* Qur'an 2: 83-84, 7: 142-145. "As far as the Decalogue is concerned, the Qur'an does not cite details of any of the Commandments." Liyakat Takim, "The Ten Commandments and the Tablets of Shi'i and Sunni Tafsir Literature: A Comparative Perspective," *The Muslim World* 101 (Jan. 2011): 94-109. Even though some parallels exist between the Ten Commandments and precepts in the Qur'an, such as adherence to monotheism and honoring one's parents, "there are differences between the catalogues of religious-ethical precepts in the Bible and in the Qur'an. These differences relate to the emphasis and wording of certain commandments. Moreover, there are other commandments in the Qur'anic lists that are entirely absent from the Biblical lists, just as particular Biblical commandments are not included in the Qur'an. . . . These findings make it impossible to speak of *one* code common to and equally binding on all three monotheistic religions." Gunther, "The Ten Commandments and the Qur'an," *supra*, at 45.

[46] "Ten Commandments," *The Oxford Companion to the Bible* (New York: Oxford Univ. Press, 1993), 737 ("The enumeration of the commandments varies among the religious communities."); Finkelman, *supra* n.27, at 1498-1499 (analyzing version of Ten Commandments nearly identical to version mandated by S.B. 10).

dissenting).

45. The text of the Ten Commandments contained on the Indiana Statehouse monument is indisputably based on an abridged version from Exodus 20 of the Protestant King James Bible. The text is Protestant in its *structure*: The ordering system is associated with, and derives from, the Protestant King James version of the Bible. As discussed below, the numbering of the commandments differs between Protestant, Catholic, and Jewish versions.[47] Further, the version of the Ten Commandments on the monument is Protestant in its *content*, again being drawn from the Protestant King James translation of the Bible.[48] To illustrate this, the attached Appendix shows an overlay of the monument's language (bolded) with the text of the first seventeen verses from Exodus 20 of the King James Bible. Aside from beginning with verse 3, the monument's abridged text is verbatim of that from Exodus 20 of the King James Bible. The decision to use a Protestant translation of the Ten Commandments has substantial theological implications; there are significant differences and religious disputes between the Jewish, Catholic, and Protestant traditions when it comes to the content and meaning of the commandments.[49]

46. As one example, the Hebrew Ten Commandments, and English translations followed by most Jews, explicitly exalt God's delivery of the Israelites from slavery: "I the LORD am your God who brought you out of the land of Egypt, the house of bondage." This is "a statement of faith that in itself is a Commandment."[50] For many Jews, this language is a critical recognition of their special relationship and covenant with God, and erasing this text may be considered deeply offensive to them as a spiritual matter. The version of the Ten

---

[47] *Ibid.* at 1492.
[48] *Ibid.*
[49] *Ibid.* at 1495
[50] *Ibid.* at 1486. *See generally*, Ben-Tsiyon Segal and Gershon Levy, *The Ten Commandments in History and Tradition* (Jerusalem: Magnes Press, 1990) (discussing the uniqueness of the Decalogue and its place in the Jewish tradition).

Commandments on the Statehouse monument omits this important declaration of God's role in bringing the Jewish people out of Egypt and slavery.[51] According to one commentary, for Jews, this prologue is "intimately connected to the first commandment ('You shall have no other gods before me'). . . . And the first commandment, together with the prologue, serves as the foundation upon which all the others stand. . . . Given the importance of the prologue to a correct understanding of the rest of the commandments [for Jews], excising it (for purposes of 'posting' the Decalogue in public places, for example) violates the intent of the commandments."[52]

47. Further illustrating the conflict between the Protestant text of the monument's Ten Commandments and Jewish beliefs about the commandments, it directs "Thou shalt not kill." The Jewish version, however, admonishes, "You shall not murder."[53] This "difference in translation is significant."[54] As another scholar in this area of study has explained, "There is a clear legal difference between to kill and to murder, and this difference has had, and continues to have, important theological implications."[55] Thus, both the Hebrew Bible (Tanakh), Jewish Publication Society (1917) and The Contemporary Torah, Jewish Publication Society (2006) use the same language: "Thou/You shall not murder."[56] According to Professor Marc Ziv Brettler, professor of Judaic studies at Duke University: "The Hebrew verb ר.צ.ח† means 'murder,' and the most significant way that the JPS differs from the KJV is that the former renders this law as 'Thou shalt not murder.' In theory, the text's retention of 'kill' could allow the commandment to be applied to issues such as banning capital punishment (even though the Bible repeatedly

[51] "Ten Commandments," *Oxford Companion*, *supra* n.86, at 737.
[52] "Ten Commandments," in *The Cambridge Dictionary of Christian Theology*, ed., Ian A. McFarland, et. al (Cambridge: Cambridge University Press, 2011), 106-107.
[53] Murder, *Oxford Companion*, 532.
[54] Finkelman, *supra* n.27, at 1495.
[55] *Ibid*.
[56] *See A Hebrew - English Bible*, Mechon Mamre, https://mechon-mamre.org/p/pt/pt0.htm; *Exodus 20,* Sefaria, https://www.sefaria.org/Exodus.20?lang=bi&aliyot=0.

prescribes it!)."[57] In sum, the state's decision to use the word "kill" instead of "murder" touches on a longstanding doctrinal controversy between religions that persists today and reemphasizes the Protestant character of the text.

48. The monument's Protestant version of the Ten Commandments is also at odds with the version followed by many Catholics. One notable example: drawing from the King James Bible, the monument warns, "Thou shalt not make unto thee any graven image." However, while some Catholic Bibles may include some language related to idols or graven "things,"[58] abridged versions of the Ten Commandments commonly omit that prohibition.[59] Catholic versions do not separate the first "three" commandments as in the King James Bible. Instead, Catholic versions traditionally combine verses 2-6 of Exodus 20 into one Commandment. Thus, the ordering and grouping, even without the explicit numbering, are simply different from the Protestant version.[60] When the Commandments are then listed in an abridged format (as with the monument), the separate Commandment against making "a graven thing" (or similar phrasing) typically falls away in Catholic versions. This is highlighted in the Baltimore Catechism. Although the Baltimore Catechism's introduction to "Lesson Twenty-Ninth: On the Commandments of God," lists a fuller version of the Ten Commandments that includes the phrase "Thou shalt not make to thyself a graven thing," when it turns to the catechism question and answer about the First Commandment, the answer is abridged: "The first Commandment is:

---

[57] *See* Marc Zvi Brettler and Jed Wyrick, *Ten Commandments in Every Classroom: The Texas Bill Version, The Torah* (Aug. 3, 2023), https://www.thetorah.com/blogs/ten-commandments-in-every-classroom-the-texas-bill-version.

[58] Although some Catholic Bibles, such as the 1899 Catholic Douay-Rheims version of Exodus 20, use the term "graven thing," which is close to "graven image," more recent versions of the Bible approved by the Vatican and the U.S. Catholic Conference of Bishops use a different phrase: "You shall not carve idols for yourselves in the shape of anything in the sky above or on the earth below or in the waters beneath the earth," New American Bible (Vatican ed., 1970, 2002), or "You shall not make for yourself an idol or a likeness of anything[in the heavens above or on the earth below or in the waters beneath the earth," New American Bible (USCC ed., 2010). *See Bible*, https://mycatholic.life/bible.

[59] Michael Coogan, *The Ten Commandments: A Short History of an Ancient Text* (New Haven: Yale Univ. Press, 2014), 134-135.

[60] *See Bible*, My Catholic Life, https://mycatholic.life/bible/.

I am the Lord thy God: thou shalt not have strange gods before Me."[61] Thus, as Professor Michael Coogan described his experience as a child in Catholic parochial school repeating the Baltimore Catechism, "[t]he commandment about graven images has simply been omitted."[62] These differences in abridged versions are "substantive" and "theological,"[63] and speak directly to which aspects of the Commandments each tradition emphasizes in day-to-day practice. A broad prohibition on "graven images" in day-to-day practice could, for some Catholics, call into question the faith's reliance on and adoration of various religious statues.[64]

Moreover, the ordering of Protestant and Catholic versions of the Ten Commandments is different. Because abridged Catholic versions commonly omit the prohibition on graven images, most Catholics consider the prohibition on taking the Lord's name in vain as being the second Commandment, rather than being the third as it is for most Protestants and as is listed on the monument.

49. The point is that it is impossible to have a theologically neutral version of the Ten Commandments. Any monument that contains the Ten Commandments must choose among a variety of numbering systems and terms, and in doing so will endorse one religion over others. Despite assertions of the Fraternal Order of Eagles and other monument proponents, Ten Commandments monuments are neither nonsectarian nor nondenominational.

---

[61] *The Baltimore Catechism,* 1891 (2005), pp. 64-76, questions 313 and 315, https://www.catechism.cc/catechisms/Baltimore_Catechism.pdf.

[62] Coogan, *The Ten Commandments*, *supra* n.99, 134-135.

[63] "Idolatry," *Cambridge Dictionary of Christian Theology*, 234 (comparing the different Jewish, Protestant, and Catholic understandings of the use of idols).

[64] *See* "Graven Image" and "Idols," *Oxford Companion*, 261-262, 297-298 (describing the interchangeability of the terms "graven image" and "idol" in Hebrew and noting that "[s]trict prohibition of idolatry is one of the most distinctive features of Israelite religion," whereas many Christian denominations interpret the commandment quite permissively to allow idols and icons: "there are significant differences in practice between Roman Catholic and Orthodox churches, on the one hand, and some Protestant churches, on the other.").

## VIII. Conclusion

50. Arguments that a Ten Commandments monument is justified because of a historical relationship between the commandments and American law are not supported by the historical record, nor is there a historical pedigree of erecting Ten Commandments monuments. In addition, the placement of the Ten Commandments monument on the grounds of the Indiana Statehouse would risk creating the impression the State is affiliating itself with the religious beliefs of a particular faith tradition.

Respectfully submitted.

**Verification**

I verify under the penalty of perjury that the foregoing is true and correct.

Executed on: 7/27/2026 | 3:50 PM EDT

Signed by:
Steve Green
29D90EE9ADD7406...

Steven K. Green, J.D., Ph.D.

**APPENDIX**

**King James Bible**
**Exodus 20**
1 And God spake all these words, saying,
2 I am the LORD thy God, which have brought thee out of the land of Egypt, out of
the house of bondage.
3 (1) **Thou shalt have no other gods before me**.
4 (2) **Thou shalt not make unto thee any graven image**, or any likeness of any thing that is
in heaven above, or that is in the earth beneath, or that is in the water under the earth:
5 Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am
a jealous God, visiting the iniquity of the fathers upon the children unto
the third and fourth generation of them that hate me;
6 And shewing mercy unto thousands of them that love me, and keep my commandments.
7 (3) **Thou shalt not take the name of the Lord thy God in vain**; for the LORD will not hold
him guiltless that taketh his name in vain.
8 (4) **Remember the sabbath day, to keep it holy**.
9 Six days shalt thou labour, and do all thy work:
10 But the seventh day is the sabbath of the LORD thy God: in it thou shalt
not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor
thy cattle, nor thy stranger that is within thy gates:
11 For in six days the LORD made heaven and earth, the sea, and all that in them is,
and rested the seventh day: wherefore the LORD blessed the sabbath day, and hallowed it.
12 (5) **Honor** Honour **thy father and thy mother**: **that thy days may be long in the** upon
the **land which the Lord thy God giveth thee**.
13 (6) **Thou shalt not kill.**
14 (7) **Thou shalt not commit adultery.**
15 (8) **Thou shalt not steal.**
16 (9) **Thou shalt not bear false witness against thy neighbor** neighbour**.**
17 (10) **Thou shalt not covet thy neighbors** neighbour's **house or ,** thou shalt
not covet thy neighbour's **wife**, nor his manservant, nor his maidservant, nor his ox, nor
his ass, n**or any thing that is thy neighbors** neighbour's.

**STEVEN KEITH GREEN**
Willamette University
900 State St., SE
Salem, OR 97301
503-370-6732
sgreen@willamette.edu

## CURRENT EMPLOYMENT

**The Fred H. Paulus Professor of Law** and **Affiliated Professor of History and Religious Studies,** Willamette University, 900 State St., SE, Salem, OR 97301, (503) 370-6405. Teaching areas: Constitutional Law, First Amendment, Legal History, Education Law, Jurisprudence, Religious History, and Criminal Law. (Professor rank since 2006).

**Associate Professor of Law** (2001-2005) Willamette University College of Law.

**Director**, Willamette Center for Religion, Law and Democracy, Willamette University (2007-2020). Directed interdisciplinary academic program in religion and public life.

## EDUCATION

**Ph.D.** in Constitutional History, University of North Carolina, Chapel Hill, 1997.

**M.A.** in American Religious History, University of North Carolina, Chapel Hill, 1987.

**J.D.**, University of Texas School of Law, 1981.

**B.A.** in History and Political Science (Religious Studies minor), Texas Christian University, 1978. *Magna Cum Laude*, Phi Beta Kappa.

Additional graduate study at Duke Law School and Duke Divinity School, 1986-1987.

## OTHER TEACHING EXPERIENCE

**Visiting Assistant Professor**, Vermont Law School, 1988-1991. Taught courses in Church and State, Wills and Estates, Criminal Law, Lawyering (civil procedure, ethics and jurisprudence), Appellate Advocacy, and Legal Writing and Analysis.

**Guest Lecturer**, Georgetown University Law Center and Washington College of Law at American University, 1994-2001. Regular guest lecturer in church-state and First Amendment classes.

**Graduate Teaching Fellow**, University of North Carolina, 1986-1988. Lectured, led discussion groups, and graded papers and examinations in undergraduate history courses in American survey (both sections), American constitutional history, and military history.

**AWARDS**

Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2026
Religious Liberty Award, Northwest Religious Liberty Association, 2016.
Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2014.
Religious Liberty Award, United Sikhs of Oregon, 2010.
Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2006.
Professor of the Year Award for Teaching, Willamette College of Law, 2003.

**PUBLICATIONS**

**Books**

*American Infidelity: The Gilded Age Battle Over Freethought, Free-Love, and Feminism* (Oxford University Press, 2026).

*The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (University of Virginia Press, 2024).

*Separating Church and State: A History* (Cornell University Press, 2022).

*The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford University Press, 2019).

*Inventing a Christian America* (Oxford University Press, 2015).

*The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford University Press, 2012).

> Finalist, Oregon Book Award (2013); Nominated for the John Philip Reid Book Award by the American Society for Legal History (2013); Nominated for the Philip Schaff Prize by the American Society of Church History (2013).

*The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010).

*Religious Freedom and the Supreme Court,* with Ronald B. Flowers and Melissa Rogers (Baylor University Press, 2008).

**Book Chapters**

"The Supreme Court and Religion," *Routledge Handbook of Politics and Religion in Contemporary America* (Routledge, 2024).

"The Bible in American Law, Politics, and Rhetoric," *The Bible in the American Experience* (Society for Biblical Literature, 2020).

"The Public Funding of Private Religious Schools," *The Oxford Handbook of Religion and American Education* (Oxford University Press, 2018).

"The Nineteenth-Century 'School Question': An Episode in Religious Intolerance or an Expansion of Religious Freedom?" *The Lively Experiment: The Story of Religious Toleration in America* (Rowman & Littlefield, 2015).

"The Separation of Church and State in the United States," *Oxford Research Encyclopedia of American History* (Oxford University Press, 2015).

"The First School Prayer Debate and its Impact on Modern Church-State Doctrine," *Religious Freedom in America* (University of Oklahoma Press, 2015).

"Separationism as an Organizing Principle," *The Wiley-Blackwell Companion to Religious Diversity* (Wiley-Blackwell Pub., 2013).

"Religion and Law," *The Wiley-Blackwell Companion to American Legal History* (Wiley-Blackwell Pub., 2013).

**<u>Articles</u>**

"New England's 'Slender' Seeds of Religious Disestablishment," *New England Quarterly* (forthcoming).

"303 Creative and the Corrosive Nature of Easly Decisions," *Univ. St. Thomas Journal of Law and Public Policy* 17 (2025): 534-554.

"The Indispensable Founders," *Liberty Magazine* (March-April, 2025): 10-13.

"First Amendment Imbalance: Kennedy v. Bremerton School District," *Notre Dame Law Review* 99 (2024): 101-120.

"Disrupted Symmetry: Assessing the Hazards of the Supreme Court's 'One-Sided' Separation of Church and State," *Liberty Magazine* (Nov.-Dec. 2023): 5-9.

"Religion Clause Chaos," *American Constitution Society Supreme Court Review* (2022).

"Requiem for State 'Blaine Amendments,'" *Journal of Church and State* 64 (2022): 437-457.

"The Supreme Court's Ahistorical Religion Clause Historicism," *Baylor Law Review* 73 (2021): 507-561.

"No Aid, No Agency," *William & Mary Bill of Rights Journal* 29 (2021): 1053-1096.

"The Legal Ramifications of Christian Nationalism," *Roger Williams Law Review* 26 (2021): 430-494.

"The Path No Taken: Reinhold Niebuhr, John Courtney Murray, and the Proposition of Church-State Separation," *Oxford Journal of Law and Religion* 7 (2019): 1-20.

"The Irrelevance of Church-State Separation in the Twenty-First Century," *Syracuse Law Review* 69 (2019): 999-1040.

"The Mixed Legacy of Magna Carta for American Religious Freedom," *Journal of Law and Religion* 32 (2017): 207-226.

**Reviews**

*The Religion Supported State: Piety and Politics in Early National New England*, by Nathan S. Rives. *New England Quarterly* (2024).

*Sincerely Held: American Secularism and Its Believers*, by Charles McCrary. *Fides et Historia* (2022).

*City on a Hill: A History of American Exceptionalism*, by Abram C. Van Engen. *Church History* (2021).

*The Religion Clauses: The Case for Separating Church and State*, by Erwin Chemerinsky, and *Beyond Belief, Beyond Conscience*, by Jack Rakove, SCOTUS Blog, September, 2020.

"Why Public Schools Should be Mindful of Meditation," *Religious Studies Review* 46 (June 2020): 169-170.

*Sacred Liberty: America's Long, Bloody, and Ongoing Struggle for Religious Freedom*, by Steven Waldman. *Church History* 88 (2019): 869-870.

*Taxing the Church: Religion, Exemptions, Entanglement, and the Constitution*, by Edward A. Zelinsky, *Reading Religion* (September, 2018).

*Religious Freedom: The Contested History of an American Ideal*, by Tisa Wenger, *Church History* (2018).

*Reading the Bible with the Founding Fathers*, by Daniel L. Dreisbach, *Church History* (2017).

*The Evangelical Origins of the Living Constitution*, by John Compton, *American Historical Review* 120 (Feb. 2015): 279-280.

**COMMENTARY AND BLOGS** (selected)

"From Augustine to Jefferson, the Idea of Separation of Church and State has Deep Religious and Secular Roots," *The Conversation,* July 2, 2026.

"What Jefferson and Madison Would Have Thought about 'Rededicating the US to God,'" *The Conversation*, May 19, 2026.

"Religious Freedom History" Podcast, National Museum of American Religion, Washington, DC, Feb. 27, 2026.

"We the People: Religious Liberty at the Supreme Court" Podcast, National Constitution Center, Washington, DC, May 1, 2025.

"How Jefferson's and Madison's Partnership – a Friendship Told in Letters – Shaped America's Separation of Church and State," *The Conversation*, June, 2024.

"Set to Privilege Christianity in Public Schools, Texas Sends a Message About Who is Welcome – And Who is Not," *Religion Dispatches*, April 28, 2023.

"We Must Still Defend Separation of Church and State: Here's How," *Church & State* (Sept. 2022): 10-11.

"What a Turn of the Century Anti-Abortion and Contraceptive Crusader Reveals about GOP Efforts to Ban Abortion Pills by Mail," *Religion Dispatches,* August 2, 2022.

"A 'Revolutionized Supreme Court Term," *Canopy Forum*, Emory University, August 1, 2022.

"Religious beliefs give strength to the anti-abortion movement – but not all religions agree," *The Conversation*, May 10, 2022.

"Most Favored Status: How the Supreme Court is Converting Religious Freedom into an Instrument for Discrimination and Preference," *Church & State*, June 2021, 20-21.

"How the Supreme Court Found its Faith and Put 'Religious Liberty' on a Winning Streak," *The Conversation*, April 2021.

"Religion and the Presidential Election," *Canopy Forum*, Emory University, October, 2020.

"The Supreme Court just expanded the 'ministerial exception' shielding religious employers from anti-bias laws," *The Conversation*, July 8, 2020.

"Using a 'Little Bad History' the Supreme Court Just Gutted Church-State Separation in 38 States," *Religion Dispatches*, July 6, 2020.

"Trump's Problem with Race and Religion," *Canopy Forum*, Emory University, July 2020.

"RIP State Blaine Amendments: Espinoza and the No-Aid Principle," SCOTUS Blog, June 30, 2020.

"No Higher Source than the Consent of the People," *Cato Unbound*, Cato Institute, June 24, 2020.

"Trump's Low-Hanging Fruit," *Berkeley Forum*, Georgetown University, February 2020.

"Blindsided by the Blitz," *Church & State*, May 2019, 20-21.

"Gorsuch's Religious Question," *The Conversation*, March 2017.

"Was America Founded as a Christian Nation?" *CNN Online*, March, 2015.

**SYMPOSIA, PRESENTATIONS, AND LECTURES**

"Religious Freedom Annual Review," BYU Law School, Provo, Utah, June 16, 2026.

"The Bible and Public Education: Current Issues," Religion and Education Section, American Academy of Religion, Northeast Region, Princeton Theological Seminary, Princeton, NJ, May 1, 2026.

Debate on the Establishment Clause, Federalist Society, Willamette University, April 8, 2026.

"Was America Founded as a Christian Nation" debate, Christian Legal Society of Oregon, Cannon Beach, OR, March 28, 2026.

"Faith Without Force" panel discussion, Roger Williams University Law School, Bristol, RI, March 23, 2026.

"History of the Fourteenth Amendment," Institute for Continued Learning, Willamette University, Salem, OR, Feb. 19, 2026.

Debate: "Resolved: The Constitution's religion clauses were intended primarily to protect the free exercise of religion." University of West Florida, Pensacola, FL, Jan. 22, 2026.

"Religious Freedom and the Public Schools," Interfaith Alliance Summit, Dallas, TX, Sept. 16, 2025.

"The Supreme Court's Term," State Solicitors General Conference, National Association of Attorneys General, Seattle, WA, July 16, 2025.

"The Grand Collaboration," Kansas First Amendment Foundation and Kansas State University – Olathe, Olathe, KN, June 17, 2025.

"The Supreme Court's 'Return' to History," Religious Freedom Summit, Alexandra, VA, April 6, 2025.

"The Grand Collaboration," Virginia Wesleyan University, Chesapeake, VA, March 13, 2025.

"Chaos in the Classroom," American Academy of Religion/Society for Biblical Literature, San Diego, CA, Nov. 24, 2024.

"Campus Speech," American Constitution Society, Portland Chapter, Pacific Northwest College of Art, Portland, OR, Sept. 20, 2024.

"Unfolding Our Shared Future: The British and American Judiciaries," University of East Anglia, Norwich, UK, April 26, 2024.

"First Amendment Imbalance: Kennedy v. Bremerton School District," Notre Dame Law School, Jan. 26, 2024.

"303 Creative and the Corrosive Nature of Easly Decisions," Univ. St. Thomas Law School, Minneapolis, Nov. 17, 2023.

"Religious Freedom Today," Smithsonian Folklife Festival, Washington, DC, July 8, 2023.

"Separating Church and State: A History," Harvard Divinity School, Oct. 13, 2022.

"Separating Church and State: A History," Christian Legal Society National Conference, Newport Beach, CA, Oct. 7, 2022.

"Re-establishing (Christian) America," Religion and Society Conference, University of Cordoba, Cordoba, Spain, June 9-10, 2022.

"The Supreme Court's Religion Clause Docket," Oregon State Bar Association CLE, May 19, 2022.

"Inventing a Christian America," Association for Lifelong Learning, Corvallis, OR, April 6, 2022.

"Teaching About Religion in Texas Public Schools: Historical and Legal Perspectives and a Case Study," the Religion and Public Schools and the Law, Religion, and Culture sections of the American Academy of Religion, San Antonio, TX, Nov. 20, 2021.

"Judging History: Espinoza and the Legal Interpretation of our Educational Past," History of Education Society, San Diego, CA, Nov. 3, 2021.

Constitution Day Lecture, University of Portland, Sept. 16, 2021.

"Religious Liberty at the Crossroads," Institute for Humane Studies, George Mason University, April 10 & 11, 2021.

Panel discussion on the Future of the Establishment Clause, Michigan State University Law School, April 6, 2021.

"COVID Restrictions and Religious Liberty," The Federalist Society, Willamette University College of Law, March 17, 2021.

Panelist, "The Decline of the Establishment Clause," ABA Section on Civil Rights and Social Justice, Oct. 8, 2020.

"The Legal Ramifications of Christian Nationalism," Roger Williams University Law School, Sept. 25, 2020.

"Religion in Strange Times," Religious Studies Symposium, Texas Christian University, Ft. Worth, TX, Feb. 20, 2020.

"The Supreme Court's Shadow Docket and Religion," Association of American Law Schools, Washington, DC, Jan. 5, 2020.

Commentator on *Teaching Mindfulness and Yoga in Public Schools*, American Academy of Religion, San Diego, CA, Nov. 25, 2019.

Respondent on *The Third Disestablishment*, American Academy of Religion, San Diego, CA, Nov. 23, 2019.

"Espinoza and State No-Aid Provisions," National Organization of Lawyers for Education Associations Conference, Seattle, WA, Oct. 10, 2019.

"Impeachment," American Constitution Society, Willamette University, Oct. 9, 2019.

Church-State Workshop, Georgia State University Law School, Atlanta, Aug. 8-9, 2019.

"The Irrelevance of Church-State Separation," Religion in American Life Conference, University of East Anglia, Norwich, UK, July 24-25, 2019.

Annual Historian's Lecture on *Inventing a Christian America*, Minnesota Historical Society, St. Paul, MN, March 9, 2019.

"The Public Funding of Private Religious Schools," American Academy of Religion, Denver, CO, Nov. 19, 2018.

Forum on Religious Liberty Issues, LDS Church, Roseburg, OR, October 14, 2018.

"Religious Liberty and Non-Discrimination," Constitution Day, Willamette University, Salem, OR, September 17, 2018.

Debate on *Masterpiece Cakeshop*, Federalist Society and American Constitution Society, Willamette University, Salem, OR, February 12, 2018.

"The Bible and American Public Life in the Time of Trump," Society for Biblical Literature, Boston, MA, Nov. 19, 2017.

"The Future of 'No-Aid' Separationism and State 'Blaine' Amendments after *Trinity Lutheran Church v. Comer*," Religion and Law Discussion Group, American Academy of Religion, Boston, MA, Nov. 19, 2017.

Debate, "Masterpiece Cakeshop and Religious Discrimination," Linfield College, McMinnville, OR, Nov. 9, 2017.

"Constitution Day Talk," American Constitution Society, Willamette University College of Law, Salem, OR, Sept. 19, 2017.

"The Constitutionality of President Trump's Travel Ban," Federalist Society Debate, Willamette University College of Law, Salem, OR, Aug. 28, 2017.

"Trinity Lutheran and the Future of State Blaine Amendments," Federalist Society Conference, Ronald Reagan Presidential Library, Simi Valley, CA, Jan. 28, 2017.

"The Emerging Imbalance within Separationism," Religion and Law Discussion Group, American Academy of Religion, San Antonio, TX, Nov. 20, 2016.

"A Fine Mess You Left Us," Oregon Law Review Symposium on the Legacy of David Frohnmeyer, Portland, OR, April 1, 2016.

"The Irrelevance of Church-State Separation," Religious Liberty in the Twenty-First Century Conference, Claremont Graduate University, Claremont, CA, March 25-26, 2016.

"The Irrelevance of Disestablishment," The Legitimate Scope of Religious Establishment Conference, Venice, Italy, March 7-9, 2016.

"Magna Carta and Religious Freedom," Magna Carta Conference, Dartmouth University, Hanover, NH, Nov. 7, 2015.

Panelist, "Christian Nationalism," Society of U.S. Intellectual History, Washington, DC, Oct. 17, 2015.

Debate, "Gay Marriage and Religious Liberty," Willamette University College of Law Federalist Society, Sept. 9, 2015.

Keynote, "Religious Liberty in American History," Ashland University, Newport, RI, May 1-3, 2015.

**PREVIOUS LEGAL EMPLOYMENT**

**Legal Director and Special Counsel**, Americans United for Separation of Church and State, Washington, D.C. January, 1992 to June, 2002. Directed legal and legislative programs for national public interest organization committed to preserving religious liberty and separation of church and state; oversaw litigation and appeals; filed party and amicus briefs in U.S. Supreme Court and other appellate courts; reviewed and drafted proposed legislation; testified before Congress, state legislatures, and various government committees, agencies, and boards.

**Trial Court Magistrate**, Alaska Court System, Palmer, Alaska, February 1984 to July 1985. Judicial officer for the District Court for the Matanuska-Susitna Borough. Presided over misdemeanor jury and non-jury trials as well as felony criminal hearings, small claims trials and traffic trials. Also served as Superior Court Master for juvenile, child in need-of-aid, probate, and domestic matters.

**Staff Attorney**, Alaska Legal Services Corporation, Dillingham and Anchorage, Alaska, July 1982 to January 1984. Represented low-income clients in a civil practice consisting of domestic, children's, landlord-tenant, public entitlements, and probate law. Also represented Alaska Natives in land claims, allotments, and fishing rights cases.

**Judicial Law Clerk**, Texas Court of Appeals, Houston, Texas, August 1981 to June 1982. Served as judicial law clerk for Associate Justice George Miller; preformed legal research, wrote legal memoranda and opinions.

**PROFESSIONAL ASSOCIATIONS AND ACTIVITIES**

Bar of the Supreme Court of the United States
Licensed to Practice Law in Texas, Alaska, Minnesota, and Maryland (inactive)
Admitted to Practice Law before the United States Courts of Appeals for the Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits
Association of American Law Schols, Constitutional Law Section
American Society of Church History
American Academy of Religion, Law, Religion, and Culture and Religion and Education Sections
National Council of Churches, Committee on Religious Liberty
*Journal of Church and State*, Editorial Council

Member, Oregon Law Commission Work Group on Standing, 2014-2015
Convener, Oregon Task Force on Religious Attire in the Public Schools, 2010
Author, Oregon Law Commission Study on the Faith-Based Initiative, 2002-2004
Public Policy Board, Ecumenical Ministries of Oregon, 2004-2012