UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CAUSE NO. 1:00-cv-00811-SEB-MKK

INDIANA CIVIL LIBERTIES UNION, )
INC., et al., )
)
Plaintiffs, )
)
-vs- )
)
MIKE BRAUN, in his official )
capacity as Governor of the )
State of Indiana, )
)
Defendant. )

The videoconference deposition upon oral examination of JUSTIN SHUBOW, a witness produced and sworn before me, Dana S. Miller, RPR, CRR, a Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Plaintiffs, appearing remotely from Kensington, Montgomery County, Maryland, on the 2nd day of September, 2026, at 9:04 a.m., pursuant to the Federal Rules of Civil Procedure.

CIRCLE CITY REPORTING
1099 North Meridian Street
Suite 920
Indianapolis, IN 46204
(317) 635-7857

PLAINTIFF'S EXHIBIT 8

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

Kenneth J. Falk, Esq.
ACLU OF INDIANA
1031 East Washington Street
Indianapolis, IN 46202
kfalk@aclu-in.org

FOR THE DEFENDANT(S):

Joseph Charles Tucker Davis, Esq.
Amanda Leigh Salz, Esq.
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
jdavis@becketfund.org
asalz@becketfund.org

I N D E X O F E X A M I N A T I O N

PAGES

DIRECT EXAMINATION ....................................3
QUESTIONS BY KENNETH J. FALK

CROSS-EXAMINATION ....................................26
QUESTIONS BY AMANDA LEIGH SALZ

REDIRECT EXAMINATION ....................................26
QUESTIONS BY KENNETH J. FALK

I N D E X O F E X H I B I T S

PAGES

Plaintiff(s) Deposition Exhibit No(s).:

1 - Declaration of Justin Shubow ..................5

Pursuant to the Indiana Supreme Court Case 20S-MS-236 signed March 31, 2020,

J U S T I N S H U B O W, having been first duly sworn or affirmed to tell the truth, the whole truth and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION

QUESTIONS BY KENNETH J. FALK:

Q Good morning. Could you state your name for the record, please.
A Justin Shubow.
Q And your business address?
A 300 New Jersey Avenue Northwest, Suite 300, Washington, D.C. 20001.
Q And what is the address?
A The National Civic Art Society.
Q And have you ever been in a deposition before?
A No.
Q And I'm sure you know, because you've talked to your attorneys, that this is just an asking and answering of questions under oath.

There is no court reporter [sic] here, but everything you're saying is being taken down and can be used in our court proceeding.

Do you understand that?

A Yes.
Q Because it's an asking and answering of questions, I need to make sure you understand my questions. If at any point you don't understand them, please ask me to rephrase and I will; otherwise, I'll assume that you understand.
Is that okay?
A Yes.
Q And I will do my best not to interrupt you, and you do your best not to interrupt me, so the court reporter does not get mad at us, because she can only do one thing at a time. Okay?
A Okay.
Q What did you do to prepare for the deposition today?
A I went back and read my report. I spoke with counsel. I went back and looked at some of the sources that I mention or cite in the report. And did additional reading and research to just make sure that, you know, I was in a good position to talk today.
Q Okay. And I don't think this deposition will take very long, lawyers are not the best judge of time, but if at any point you want to take a break, just ask, we'll take a break.

The only rule is you need to answer the question that's before you. Okay?
A Okay.
Q The other rule is you have to answer audibly so the court reporter can take it down.
And we've agreed off record, I mean off before the deposition started, that we would mark your report that we all have -- your declaration, excuse me, as Exhibit 1.
And do you have a copy of that with you?
A Yes, I do.
Q Do you have anything else with you on your desk or any other notes or papers?
A No.
Q And on page 2 of Exhibit 1 -- and you don't need to look at it, but you're welcome to -- you indicate that you were asked to give your expert opinion "on the tradition, meaning, and civic function of American public art and monuments, and the place of the monument at issue in this case within that tradition."
And that is what you're giving an opinion on; is that correct?
A Yes.
Q And that's the full scope of your opinion --

A Yes.
Q -- on that topic?
A Yes.
Q Great. And I looked at your CV attached to your report, to Exhibit 1. And you are a law graduate, you graduated in 2008; is that correct?
A Yes.
Q And when did you take and pass the bar?
A I believe that was in 2010.
Q And where -- you're a member of the bar of what state or states?
A New York and D.C.
Q And your CV -- I was just curious -- indicated that from 2019 to the current time, you occasionally provide contract legal research and writing services to law firms?
A That's correct.
Q And is that in the area of architectural criticism, or is it just in general law area or something --
A It's just general law.
Q And why from 2019 when you were barred in 2010?
A Why?
Q Yeah.
A Because I needed to get a second job to earn more money.

Q Okay. That's a good reason. And do you work with any particular law firms?
A Yes.
Q What law firms are you working with?
A Most recently, the Burke Law Group and Cooper & Kirk.
Q Okay. And I know Cooper & Kirk, we were counsel on a case that involved them.
You said the Burke Law Firm, B-U-R-K?
A Burke Law Group, B-U-R-K-E.
Q Great. And are they both in D.C.?
A Well, it's -- everything's been virtual.
Q Of course, I'm sorry.
A But I think Burke is headquartered in Houston; and Cooper & Kirk is headquartered in Washington, D.C.
Q And you're just doing general legal work for them?
A Right.
Q Okay. Like you are not -- you stress in your report, you're not giving a legal opinion in this case; correct?
A Correct.
Q And how did you become involved in this case?
A The, you know, Joe Davis reached out to me.
Q Okay. And have you ever testified as an expert before in court?

A No.
Q I know you haven't in the last four years, I was just curious.
And have you reviewed the reports submitted by Dr. Chancey or Dr. Green --
A No.
Q -- for the plaintiffs in this case?
A No.
Q Have you reviewed any of the reports submitted by the defendant's experts?
A No.
Q Okay. Now, I looked at your CV, and you do not have a degree in architecture; correct?
A Correct.
Q You did not major or minor at Columbia as an undergrad?
A Correct.
Q And you've never worked as an architect?
A Correct.
Q And I'm not criticizing, I'm just trying to characterize.
You are an architectural critic. Is that fair?
A I am a critic, an advocate, a researcher. I give lectures on architecture and art around the country

including -- and the world, including at various colleges and universities.

I have studied aesthetics, and I've also gained a great deal of knowledge on these subjects through my experience and professional work.

I mean, that experience includes serving on the U.S. Commission of Fine Arts, which is the aesthetic review board for Washington, D.C., and of which I became chairman. I am a Design Peer at the General Services Administration.

In that capacity, I've advised on the design of the forthcoming federal courthouses in Chattanooga, Tennessee, and Hartford, Connecticut. And I am currently Chairman of the U.S. Department of Transportation's Beautifying Transportation Infrastructure Council.

Also, I spent a great deal of time working on the national Dwight D. Eisenhower Memorial and testified in Congress on that. I also testified in Congress on the future of the National Mall.

I've also made a presentation regarding federal architecture to the Senate Steering Committee. I advised on the National World War I Memorial.

Those are some instances of how my, you know,

training and workplace experience has made me an expert in this field.

Q Okay. And one of the things that always happens in these situations with attorneys talking to people who indicate that they are experts is the attorney tries to play expert, and it always goes badly. So I apologize in advance.

But as near as I can tell, from reading some of the stuff you've written, you are a critic of the current -- the American governmental buildings that have been dominated in the recent past by what is described as brutalism as opposed to the classical structures of older buildings. Is that fair?

A Yes.

Q Which is why I thought of Carman Hall, by the way.

And you described these newer buildings, the brutalist buildings, as charmless boxes, which I liked; is that correct?

A Yes.

Q Okay. And the National Civil Art Society, of which you are the President, advances the classical tradition in public architecture; correct?

A Just to be clear, it's the National Civic Art Society.

Q Oh, I'm sorry. Thank you. But that is what it advances; correct?
A Yes.
Q And could you just briefly tell me what is the classical tradition in public architecture?
A Sure. Well, the classical tradition --
THE WITNESS: I'm sorry?
MR. FALK: That wasn't me. I'm sorry, go ahead.
A Okay. So the classical tradition in American public art and architecture goes back to the founders who selected classical architecture as the appropriate style for Washington, D.C., and its core buildings of government, in particular the U.S. Capitol and the White House.
They sought to harken back to ancient Greece and Rome those democratic antecedents. And they, you know, incorporated classical architecture, which is the architecture that goes back to ancient Greece and Rome. You know, you might think of famous buildings like the Parthenon and the Acropolis.
And that tradition returned during the Renaissance, works like Michelangelo -- or architects like Michelangelo. And then it

reappeared around the time of the founders as neoclassicism, and the founders started a tradition of federal classical design that lasted for about 150 years, and also spread far beyond federal architecture to, for instance, state capitols all across the country.
Q Okay. It's my understanding that you view the current administration, President Trump, as turning the government away from brutalism in architecture in his Executive Order 14344 from August of last year, which is entitled, "Making Federal Architecture Beautiful Again"?
A Yes.
Q And that order requires that special attention be made -- be paid to the style and design of federal buildings; correct?
A Yes.
Q And did you contribute to the creation of that executive order?
A Yes.
Q How so?
THE WITNESS: There's an echo.
MR. FALK: Yeah, where did -- is someone else --
Can we go off the record for a second? I'm

sorry.
BY MR. FALK:
Q I'll ask you again, because we had a little technical difficulty.
Did you contribute to the creation of the executive order that we just referred to?
A Yes.
Q How did you contribute?
A I worked with White House staff to draft it.
Q Okay. And the executive order is a direction to the General Services Administration; correct?
A Yes.
Q And the General Services Administration is the federal agency that manages federal real estate; correct?
A Yes.
Q So they would be the ones approving the architecture of any new federal buildings; correct?
A Correct.
Q So with your work on the National Civic Art Society and the Transportation Infrastructure Council, you are attempting to make public buildings beautiful again by advocating for the classical style that you just referred to; is that correct?
A Yes, but I have also advocated for traditional

architecture more generally.
Q Okay. Now, in your report, Exhibit 1, you describe and have pictures of various public works that have religious resonance; is that correct?
A Yes.
Q And, for instance, you describe and have pictures of things that you identify as Moses holding or carrying tablets; correct?
A Correct.
Q And sometimes, like the lawgivers frieze in the U.S. Supreme Court, the Moses figure is with other religious or historical figures; correct?
A Yes.
Q And similarly you talk about Bible quotes in various places. And I know that sometimes those quotes in public buildings are also accompanied by other literary and philosophical quotes, such as in the Library of Congress; is that correct?
A Yes.
Q And you would agree that none of the representations of the Ten Commandments that you refer to in your report -- are you okay?
A Yeah, I know, I just turned off my phone.
Q Okay. You would agree that none of the representations of the Ten Commandments that you

refer to in your report have the full text of the Ten Commandments in them in English; is that correct?
A Yes.
Q In fact, to the best of my knowledge, none of them have any discernible text in English, although some have Roman numerals without text; is that correct?
A Yes.
Q And I know the Supreme Court frieze has four lines, but it's in Hebrew; correct?
A Yes.
Q Some part of the text is obstructed in any event.
Have you seen photographs of the monument that the Governor wants to place on the grounds of the Indiana Statehouse?
A Yes.
Q And have you seen the actual monument itself?
A No.
Q And do you know where it actually is to be located if it is placed on the grounds?
A Yes.
Q And where is it to be located?
A In the southwest portion of the lawn.
Q And do you know -- understand how it will be facing?

A Not exactly, no.
Q Do you know anything about how it will be facing?
A No.
Q Okay. Do you know where it is today, the monument?
A It's -- I believe it's on church grounds.
Q Okay. And you agree that the monument on one side complains -- contains, excuse me, a complete text of a version of the Ten Commandments; is that correct?
A Yes.
Q And in your report, Exhibit 1, you discuss what is present on the lawn of the Statehouse at the current time; is that correct?
A Yes.
Q And have you viewed the lawn?
A No.
Q Have you seen photographs of the lawn?
A Yes.
Q And what have you seen? Have you seen one photograph that is the entire lawn or various photographs of parts of the lawn?
A I've seen photographs of various parts, you know, whether it's plaques or statues. And I've also seen a map of the Statehouse grounds --
Q Okay.

A -- indicating where certain, you know, plaques or pieces of art are.
Q And you have been told that the monument will be on the -- in the southwest corner of the south lawn; is that correct?
A Southwest corner? I've been told that it would be in the approximate location of the one that was removed.
Q Okay. In fact, on the west -- I'm sorry, the south lawn, on the west side of the south lawn; is that correct?
A Yes.
Q Now, in your report at page 25, paragraph 39, you indicate that, "This civic use of the tablet-and-Decalogue form long predates the mid-twentieth-century campaign by the Eagles, that placed Ten Commandments monuments on many public places."
Do you remember that? You can take a look if you want, paragraph 39, page 25 of Exhibit 1.
A I'm just pulling it up here.
Q Sure. And thank you for doing this and not making me do it. It's the second to last sentence of that paragraph at the top of the page.
A Sorry, I'm just trying to find the PDF.

Q If you want, I can put it on the screen. It's your call.
A If you could. I have, like, the Word doc, but I'm looking for the PDF.
Q Okay. Give me a second here.
MR. FALK: Do you see that now on your screen, anyone?
A Yes, I can see the screen.
Q Okay. So see, "This civic use of the tablet-and-Decalogue form" -- see that sentence?
A Uh-huh.
Q And the civic use that you describe refers to the various representations that you refer to in your report of the Ten Commandments and other religious matters in public spaces; correct?
A Yes.
Q And we've agreed that none of these earlier representations that you refer to contain the English text of the Ten Commandments; correct?
A Yes.
Q And you agree that prior to the Eagles' placement of Ten Commandments monuments on courthouses and other public grounds in the 1950s, there was not a history or tradition in the United States of placing monuments with the full text on public

grounds; correct?
A I don't know if I make that claim in the report, but I agree with that statement.
Q Okay. Would you agree there is a greater religious resonance -- I think you used the term resonance at one point -- in the Ten Commandments monument that contains the entire text of a particular version of the Ten Commandments than a representation that contains no text at all?
A No.
Q Why is that?
A Well, I'm not weighing in on the degree of the religious resonance of the monument.
Q Okay. That's fair. And you indicate in your report that the Ten Commandments monument -- you view the Ten Commandments monument, the planned monument, as civic art; correct?
A Yes.
Q And I brought up paragraph 41 of your report. And, again, the third to the last sentence talks about "The overall setting is thus civic-commemorative, not devotional." Do you see that?
A Yes.
Q I'm right here.
A Yes.

Q Okay. And do you agree that there's a line which you -- I guess the devotional line, beyond which something that may be claimed to be civic art can go too far?
A I'm not sure what you mean.
Q Well, you set a standard of civic-commemorative versus devotional. And I'll ask you in a second what devotional means, but is that a line beyond which you think civic art should not cross when it becomes devotional?
A No.
Q Okay. So what do you mean by the setting is -- strike that.
What is devotional?
A I mean, devotional would mean -- to me would mean something like, I mean, a place where you're, you know, praying or practicing some kind of religion.
Q Okay. Well, let's say -- let's hypothesize the exact same monument that the Governor plans to put on the lawn, but in addition to the text of the Ten Commandments, there's a sign saying, "These were given by God and everyone should follow."
Would this be unacceptable as civic art to you?
A I'm not going to speculate about a work of art not

at issue here.
Q Well, I understand that, but you're saying you're an expert, and I get to ask you hypotheticals.
So are you saying you have no opinion as to whether that would go too far?
A Could you repeat your earlier question?
Q Sure.
MR. FALK: Dana, could you read it back just so I say the same thing twice.
(The requested material was read back by the reporter.)
A Would this be unacceptable? No.
Q And would you see a problem with the Government posting that? Again, I'm asking you as a -- in your capacity as an expert, not as a lawyer.
Would this be unacceptable as something to be posted as civic art?
A I mean, civic art can achieve all sorts of things. And, as I've said, there's a, you know, broad and deep history of civic art that has religious resonance.
Q Sure. So even if there was something that viewed this monument -- or used this monument, excuse me, to actively proselytize, that would be -- still fall -- that would still fall within the realm of

civic art for you. Is that fair?
A Yes.
Q Okay. I noted in your report that you refer to the fact that the statue of Mohammed was taken down from the display on top of the New York State Appellate Division in New York City because of the offense that it caused to Muslims who believe that there should not be a representation of the prophet.
Is that an accurate statement of what happened?
A Yes.
Q And do you believe that civic art, even with religious resonance, should attempt to avoid offense to particular religions?
A I'm not sure if -- I mean, I would say -- that's a hard question. Let me think.
Q Okay. That's fair. As you remember, they taught --
A No, I don't believe that.
Q You don't believe that civic art --
A It should attempt to avoid offense.
Q Do you think it was inappropriate to take down the statue?
A I don't have an opinion on that.

Q Okay. Now, you talk about the monument on paragraph 45, that the monument is modest in its artistic ambition and quality.

And that's coming from your standpoint as a critic; is that correct?

A Yes.

Q It's hardly a classical monument. Is that fair?

A Well, it's not classical in the sense of using Greek or Roman architecture or art, but the iconography is quite traditional, the shape of the tablets which -- and there's a long history of that shape being used in classical architecture and art, such as at the U.S. Supreme Court.

Q But, again, without text; correct?

A I believe the tablets on the pediment of the Supreme Court have Roman numerals on them.

Q Right.

A And I do know that the tablets on the frieze in the room have text in Hebrew.

Q It has four lines in Hebrew, and some of the lines are partially obstructed; is that correct?

A Yes.

Q And the text -- the Roman numerals on the door are just Roman numerals without text; correct?

A Correct.

Q Now, believe it or not, I'm almost done. So I should get points for being fast.

You discuss the monument's value through the lens of Alois Riegl's -- A-L-O-I-S R-I-E-G-L -- Riegl's "The Modern Cult of Monuments," beginning at paragraph 45 of your report; is that correct?

A Yes.

Q And it's my understanding -- and, again, I apologize, I'm dipping into waters I know nothing about, but from my limited reading, it's my understanding that Riegl was writing this document as a draft introduction to a legislative proposal concerning the protection of cultural heritage of the Austro-Hungarian Empire; is that correct?

A I believe so, yes.

Q He was actually on a government monument commission examining historical monuments and trying to weigh -- come up with a way of weighing their value in dealing with their conservation or not. Is that fair?

A Yes.

Q And I saw an article that this was designed, in his mind to -- I'm quoting from this article from the International Journal of Conservation and the Built Environment: Change Over Time, was to outline a

method for managing the growing body of antiquities in the charge of the State. Is that fair?
A Yes.
Q And you discuss in there the fact that monuments may have different values, they have memory value, they may have present-day value, and there are subvalues within those large categories; is that correct?
A Yes.
Q And he discussed these in the context of historic preservation, protection, restoration or alteration of monuments that were currently in existence, and had been for some time, on public property; is that correct?
A I'm not sure about some time. Some of them might have been new. I'm not sure about that.
Q Okay. But generally he was charged -- he was thinking about, as I said, a growing body of antiquities and how to conserve them. Is that fair?
A I mean, he was certainly interested in, you know, certain monuments that had long existed, yes.
Q Okay.
MR. FALK: I'm going to go off the record, because I think I'm almost, if not completely,

done. I'd like to take five minutes and talk to myself, there's no one else here to talk to, and I will be back. Is that okay?

(A recess was taken.)

MR. FALK: I have no further questions. Thank you for your time, sir.

THE WITNESS: Thank you.

MS. SALZ: And I just have a couple of brief follow-up questions.

CROSS-EXAMINATION,

QUESTIONS BY AMANDA LEIGH SALZ:

Q So first, Mr. Shubow, is it your opinion that there's a long history and tradition of American civic art with religious resonance?

A Yes.

Q And is it also your opinion that Ten Commandments monuments like the one at issue in this case fits within that tradition and history?

A Yes.

MS. SALZ: Great. Thank you. Nothing further.

MR. FALK: Just on your question -- or on counsel's questions.

REDIRECT EXAMINATION,

QUESTIONS BY KENNETH J. FALK:

Q You agree, however, that focusing solely on monuments that contain the actual complete text in English of the Ten Commandments -- you agree that prior to the Eagles' placement of the Ten Commandments monuments on courthouses and other public grounds beginning in the 1950s, there was not a history or tradition in the United States of using monuments that way?

A That is my understanding, yes. And I do want to add that I am confident that Alois Riegl was also talking about new monuments when he wrote that essay.

MR. FALK: Okay. Thank you. I have no further questions on your questions.

Thank you for your time.

THE WITNESS: Thank you, Mr. Falk.

COURT REPORTER: Signature?

MR. DAVIS: Yes.

AND FURTHER THE DEPONENT SAITH NOT.

* * * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CAUSE NO. 1:00-cv-00811-SEB-MKK

INDIANA CIVIL LIBERTIES UNION, INC., et al., )
)
Plaintiffs, )
)
-vs- )
)
MIKE BRAUN, in his official capacity as Governor of the State of Indiana, )
)
Defendant. )

I, JUSTIN SHUBOW, state that I have read the foregoing transcript of the testimony given by me on September 2, 2026, at my deposition;

That said transcript constitutes a true and correct record of the testimony given by me at said deposition except as so indicated on the errata sheet(s) provided herein.

FURTHER THE DEPONENT SAITH NOT.

______________________________
JUSTIN SHUBOW

Dated:______________________

STATE OF INDIANA )
) SS:
COUNTY OF BOONE )

I, Dana S. Miller, RPR, CRR, a Notary Public in and for the County of Boone, State of Indiana at large, do hereby certify that JUSTIN SHUBOW, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in above-captioned cause.

That the foregoing deposition was taken on behalf of the Plaintiffs, appearing remotely from Kensington, Montgomery County, Maryland, on the 2nd day of September, 2026, pursuant to the Applicable Rules.

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by said deponent; and thereafter presented to said deponent for his/her signature;

That the parties were represented by their aforementioned counsel;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of either party, or otherwise interested in the event of this action, and am not

in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of September, 2026.

**[**

**[sic] (1)** 3:22

**A**

**above-captioned (1)** 29:8
**accompanied (1)** 14:16
**accurate (1)** 22:10
**achieve (1)** 21:18
**Acropolis (1)** 11:22
**across (1)** 12:6
**action (2)** 29:23,25
**actively (1)** 21:24
**actual (2)** 15:17;27:2
**actually (2)** 15:19;24:16
**add (1)** 27:10
**addition (1)** 20:20
**additional (1)** 4:19
**address (2)** 3:12,15
**Administration (4)** 9:10;12:8;13:11,13
**advance (1)** 10:7
**advances (2)** 10:22;11:2
**advised (2)** 9:11,23
**advocate (1)** 8:24
**advocated (1)** 13:25
**advocating (1)** 13:23
**aesthetic (1)** 9:8
**aesthetics (1)** 9:3
**affirmed (1)** 3:4
**affixed (1)** 30:3
**aforementioned (1)** 29:21
**afterwards (1)** 29:15
**Again (7)** 12:12;13:3,23;19:20;21:14;23:14;24:8
**agency (1)** 13:14
**agree (9)** 14:20,24;16:6;18:21;19:3,4;20:1;27:1,3
**agreed (2)** 5:6;18:17
**ahead (1)** 11:9
**almost (2)** 24:1;25:25
**Alois (2)** 24:4;27:10
**A-L-O-I-S (1)** 24:4
**alteration (1)** 25:11
**although (1)** 15:6
**always (2)** 10:3,6
**AMANDA (1)** 26:11
**ambition (1)** 23:3
**American (4)** 5:19;10:10;11:10;26:13
**ancient (2)** 11:16,19
**antecedents (1)** 11:17
**antiquities (2)** 25:1,19
**apologize (2)** 10:7;24:9
**appearing (1)** 29:10
**Appellate (1)** 22:6
**Applicable (1)** 29:12
**appropriate (1)** 11:13
**approving (1)** 13:17
**approximate (1)** 17:7
**architect (1)** 8:18
**architects (1)** 11:25
**architectural (2)** 6:18;8:22
**architecture (16)** 8:13,25;9:22;10:23;11:5,11,12,18,19;12:5,9,12;13:18;14:1;23:9,12
**area (2)** 6:18,19
**around (2)** 8:25;12:1
**Art (22)** 3:16;5:19;8:25;10:21,24;11:11;13:20;17:2;19:17;20:3,9,23,25;21:17,18,20;22:1,13,21;23:9,12;26:14
**article (2)** 24:22,23
**artistic (1)** 23:3
**Arts (1)** 9:7
**assume (1)** 4:6
**attached (1)** 6:4
**attempt (2)** 22:14,22
**attempting (1)** 13:22
**attention (1)** 12:14
**attorney (2)** 10:5;29:24
**attorneys (3)** 3:20;10:4;30:1
**audibly (1)** 5:4
**August (1)** 12:10
**Austro-Hungarian (1)** 24:14
**Avenue (1)** 3:13
**avoid (2)** 22:14,22
**away (1)** 12:9

**B**

**back (8)** 4:16,17;11:11,16,19;21:8,10;26:3
**badly (1)** 10:6
**bar (2)** 6:8,10
**barred (1)** 6:21
**Beautiful (2)** 12:12;13:22
**Beautifying (1)** 9:15
**became (1)** 9:9
**become (1)** 7:22
**becomes (1)** 20:10
**beginning (2)** 24:5;27:6
**behalf (1)** 29:10
**best (4)** 4:9,10,23;15:5
**beyond (3)** 12:4;20:2,8
**Bible (1)** 14:14
**board (1)** 9:8
**body (2)** 25:1,18
**BOONE (2)** 29:2,4
**both (1)** 7:11
**boxes (1)** 10:18
**break (2)** 4:24,25
**brief (1)** 26:8
**briefly (1)** 11:4
**broad (1)** 21:19
**brought (1)** 19:19
**brutalism (2)** 10:12;12:9
**brutalist (1)** 10:18
**buildings (10)** 10:10,13,17,18;11:14,21;12:16;13:18,22;14:16
**Built (1)** 24:24
**B-U-R-K (1)** 7:9
**Burke (4)** 7:5,9,10,14
**B-U-R-K-E (1)** 7:10
**business (1)** 3:12

**C**

**call (1)** 18:2
**campaign (1)** 17:16
**can (10)** 3:24;4:11;5:5;10:8;12:25;17:19;18:1,8;20:3;21:18
**capacity (3)** 9:11;21:15;28:8
**Capitol (1)** 11:15
**capitols (1)** 12:5
**Carman (1)** 10:16
**carrying (1)** 14:8
**Case (7)** 3:1;5:20;7:8,20,22;8:7;26:17
**categories (1)** 25:7
**cause (2)** 29:8,23
**caused (1)** 22:7
**certain (2)** 17:1;25:22
**certainly (1)** 25:21
**certify (2)** 29:5,22
**chairman (2)** 9:9,14
**Chancey (1)** 8:5
**Change (1)** 24:25
**characterize (1)** 8:21
**charge (1)** 25:2
**charged (1)** 25:17
**charmless (1)** 10:18
**Chattanooga (1)** 9:13
**church (1)** 16:5
**cite (1)** 4:18
**City (1)** 22:6
**Civic (18)** 3:16;5:18;10:24;13:20;17:14;18:9,12;19:17;20:3,9,23;21:17,18,20;22:1,13,21;26:14
**civic-commemorative (2)** 19:21;20:6
**Civil (2)** 10:21;28:4
**claim (1)** 19:2
**claimed (1)** 20:3
**classical (12)** 10:13,22;11:5,6,10,12,18;12:3;13:23;23:7,8,12

**clear (1)** 10:24
**colleges (1)** 9:2
**Columbia (1)** 8:15
**coming (1)** 23:4
**Commandments (16)** 14:21,25;15:2; 16:8;17:17;18:14,19, 22;19:6,8,15,16; 20:21;26:16;27:3,5
**Commission (2)** 9:7;24:16
**Committee (1)** 9:23
**complains (1)** 16:7
**complete (2)** 16:7;27:2
**completely (1)** 25:25
**concerning (1)** 24:13
**confident (1)** 27:10
**Congress (3)** 9:19,20;14:18
**Connecticut (1)** 9:13
**conservation (2)** 24:19,24
**conserve (1)** 25:19
**constitutes (1)** 28:13
**contain (2)** 18:18;27:2
**contains (3)** 16:7;19:7,9
**context (1)** 25:10
**contract (1)** 6:15
**contribute (3)** 12:18;13:5,8
**Cooper (3)** 7:5,7,15
**copy (1)** 5:10
**core (1)** 11:14
**corner (2)** 17:4,6
**Council (2)** 9:16;13:21
**counsel (3)** 4:17;7:7;29:21
**counsel's (1)** 26:23
**country (2)** 8:25;12:6
**COUNTY (3)** 29:2,4,11
**couple (1)** 26:8
**course (1)** 7:13
**Court (12)** 3:1,22,24;4:10;5:5; 7:25;14:11;15:9; 23:13,16;27:17;28:1
**courthouses (3)** 9:12;18:22;27:5
**creation (2)** 12:18;13:5
**critic (4)** 8:22,24;10:9;23:5
**criticism (1)** 6:18
**criticizing (1)** 8:20
**cross (1)** 20:9
**CROSS-EXAMINATION (1)** 26:10
**CRR (1)** 29:3
**Cult (1)** 24:5
**cultural (1)** 24:13
**curious (2)** 6:13;8:3
**current (4)** 6:14;10:10;12:8; 16:13
**currently (2)** 9:14;25:12
**CV (3)** 6:4,13;8:12

**D**

**Dana (2)** 21:8;29:3
**Davis (2)** 7:23;27:18
**day (2)** 29:12;30:3
**DC (6)** 3:14;6:12;7:11,15; 9:8;11:13
**deal (2)** 9:4,17
**dealing (1)** 24:19
**Decalogue (2)** 17:15;18:10
**declaration (1)** 5:8
**deep (1)** 21:20
**defendant's (1)** 8:10
**degree (2)** 8:13;19:12
**democratic (1)** 11:17
**Department (1)** 9:14
**DEPONENT (5)** 27:19;28:16;29:6, 18,19
**deposition (8)** 3:17;4:14,22;5:7; 28:12,14;29:9,14
**describe (3)** 14:2,6;18:12
**described (2)** 10:12,17
**Design (4)** 9:9,11;12:3,15
**designed (1)** 24:22
**desk (1)** 5:12
**devotional (7)** 19:22;20:2,7,8,10, 14,15
**different (1)** 25:5
**difficulty (1)** 13:4
**dipping (1)** 24:9
**DIRECT (1)** 3:7
**direction (2)** 13:10;29:16
**discernible (1)** 15:6
**discuss (3)** 16:11;24:3;25:4
**discussed (1)** 25:10
**disinterested (1)** 29:22
**display (1)** 22:5
**DISTRICT (1)** 28:1
**Division (2)** 22:6;28:2
**doc (1)** 18:3
**document (1)** 24:11
**dominated (1)** 10:11
**done (2)** 24:1;26:1
**door (1)** 23:23
**down (5)** 3:23;5:5;22:4,23; 29:14
**Dr (2)** 8:5,5
**draft (2)** 13:9;24:12
**duly (2)** 3:3;29:6
**during (1)** 11:23
**Dwight (1)** 9:18

**E**

**Eagles (1)** 17:16
**Eagles' (2)** 18:21;27:4
**earlier (2)** 18:17;21:6
**earn (1)** 6:24
**echo (1)** 12:22
**Eisenhower (1)** 9:18
**either (2)** 29:24;30:1
**else (3)** 5:12;12:24;26:2
**Empire (1)** 24:14
**employ (1)** 30:1
**English (4)** 15:2,6;18:19;27:3
**entire (2)** 16:20;19:7
**entitled (1)** 12:11
**Environment (1)** 24:25
**errata (1)** 28:14
**essay (1)** 27:12
**estate (1)** 13:14
**even (2)** 21:22;22:13
**event (2)** 15:12;29:25
**everyone (1)** 20:22
**everything's (1)** 7:12
**exact (1)** 20:19
**exactly (1)** 16:1
**EXAMINATION (2)** 3:7;26:24
**examined (1)** 3:6
**examining (1)** 24:17
**except (1)** 28:14
**excuse (3)** 5:8;16:7;21:23
**Executive (4)** 12:10,19;13:6,10
**Exhibit (6)** 5:9,15;6:5;14:2; 16:11;17:20
**existed (1)** 25:22
**existence (1)** 25:12
**experience (3)** 9:5,6;10:1
**expert (6)** 5:17;7:24;10:2,6; 21:3,15
**experts (2)** 8:10;10:5

**F**

**facing (2)** 15:25;16:2
**fact (4)** 15:5;17:9;22:4; 25:4
**fair (9)** 8:23;10:14;19:14; 22:1,18;23:7;24:20; 25:2,20
**FALK (12)** 3:8;11:8;12:23; 13:2;18:6;21:8; 25:24;26:5,22,25; 27:13,16
**fall (2)** 21:25,25
**famous (1)** 11:21
**far (3)** 12:4;20:4;21:5
**fast (1)** 24:2
**federal (9)** 9:12,22;12:3,4,11, 15;13:14,14,18
**field (1)** 10:2
**figure (1)** 14:11
**figures (1)** 14:12
**find (1)** 17:25
**Fine (1)** 9:7
**Firm (1)** 7:9
**firms (3)** 6:16;7:2,4

**first (3)** 3:3;26:12;29:6
**fits (1)** 26:17
**five (1)** 26:1
**focusing (1)** 27:1
**follow (1)** 20:22
**follows (1)** 3:6
**follow-up (1)** 26:9
**foregoing (1)** 29:9
**form (2)** 17:15;18:10
**forthcoming (1)** 9:12
**founders (3)** 11:12;12:1,2
**four (3)** 8:2;15:9;23:20
**frieze (3)** 14:10;15:9;23:18
**full (3)** 5:25;15:1;18:25
**function (1)** 5:18
**further (6)** 26:5,21;27:14,19;28:16;29:22
**future (1)** 9:20

**G**

**gained (1)** 9:4
**general (6)** 6:19,20;7:16;9:10;13:11,13
**generally (2)** 14:1;25:17
**given (2)** 20:22;29:18
**giving (2)** 5:22;7:19
**God (1)** 20:22
**goes (3)** 10:6;11:11,19
**Good (3)** 3:9;4:20;7:1
**government (4)** 11:14;12:9;21:13;24:16
**governmental (1)** 10:10
**Governor (3)** 15:14;20:19;28:8
**graduate (1)** 6:5
**graduated (1)** 6:6
**Great (5)** 6:4;7:11;9:4,17;26:20
**greater (1)** 19:4
**Greece (2)** 11:16,20
**Greek (1)** 23:9
**Green (1)** 8:5
**grounds (7)** 15:14,20;16:5,24;18:23;19:1;27:6
**Group (2)** 7:5,10
**growing (2)** 25:1,18
**guess (1)** 20:2

**H**

**Hall (1)** 10:16
**hand (1)** 30:2
**happened (1)** 22:11
**happens (1)** 10:3
**hard (1)** 22:17
**hardly (1)** 23:7
**harken (1)** 11:16
**Hartford (1)** 9:13
**headquartered (2)** 7:14,15
**Hebrew (3)** 15:10;23:19,20
**hereby (1)** 29:5
**herein (1)** 29:6
**hereunto (1)** 30:2
**heritage (1)** 24:13
**his/her (1)** 29:19
**historic (1)** 25:10
**historical (2)** 14:12;24:17
**history (6)** 18:24;21:20;23:11;26:13,18;27:7
**holding (1)** 14:7
**House (2)** 11:15;13:9
**Houston (1)** 7:14
**hypothesize (1)** 20:18
**hypotheticals (1)** 21:3

**I**

**iconography (1)** 23:10
**identify (1)** 14:7
**inappropriate (1)** 22:23
**includes (1)** 9:6
**including (2)** 9:1,1
**incorporated (1)** 11:18
**Indiana (5)** 3:1;15:15;28:4;29:1,4
**INDIANAPOLIS (1)** 28:2
**indicate (4)** 5:16;10:5;17:14;19:14
**indicated (2)** 6:13;28:14
**indicating (1)** 17:1
**Infrastructure (2)** 9:16;13:21
**instance (2)** 12:5;14:6
**instances (1)** 9:25
**interested (2)** 25:21;29:25
**International (1)** 24:24
**interrupt (2)** 4:9,10
**into (1)** 24:9
**introduction (1)** 24:12
**involved (2)** 7:8,22
**issue (3)** 5:20;21:1;26:17

**J**

**Jersey (1)** 3:13
**job (1)** 6:24
**Joe (1)** 7:23
**Journal (1)** 24:24
**judge (1)** 4:23
**Justin (4)** 3:11;28:11,18;29:5

**K**

**KENNETH (2)** 3:8;26:25
**Kensington (1)** 29:11
**kind (1)** 20:17
**Kirk (3)** 7:6,7,15
**knowledge (2)** 9:4;15:5

**L**

**large (2)** 25:7;29:5
**last (4)** 8:2;12:10;17:23;19:20
**lasted (1)** 12:3
**law (9)** 6:5,16,19,20;7:2,4,5,9,10
**lawgivers (1)** 14:10
**lawn (10)** 15:23;16:12,15,17,20,21;17:4,10,10;20:20
**lawyer (1)** 21:15
**lawyers (1)** 4:23
**lectures (1)** 8:25
**legal (3)** 6:15;7:16,19
**legislative (1)** 24:12
**LEIGH (1)** 26:11
**lens (1)** 24:4
**LIBERTIES (1)** 28:4
**Library (1)** 14:18
**liked (1)** 10:19
**limited (1)** 24:10
**line (3)** 20:1,2,8
**lines (3)** 15:9;23:20,20
**literary (1)** 14:17
**little (1)** 13:3
**located (2)** 15:19,22
**location (1)** 17:7
**long (5)** 4:23;17:15;23:11;25:22;26:13
**look (2)** 5:16;17:19
**looked (3)** 4:17;6:4;8:12
**looking (1)** 18:4

**M**

**mad (1)** 4:11
**major (1)** 8:15
**Making (2)** 12:11;17:22
**Mall (1)** 9:20
**manages (1)** 13:14
**managing (1)** 25:1
**many (1)** 17:17
**map (1)** 16:24
**March (1)** 3:2
**mark (1)** 5:7
**Maryland (1)** 29:11
**material (1)** 21:10
**matter (1)** 3:6
**matters (1)** 18:15
**may (3)** 20:3;25:5,6
**mean (11)** 5:6;9:6;20:5,12,15,15,15,16;21:18;22:16;25:21
**meaning (1)** 5:18
**means (1)** 20:8
**member (1)**

6:10
**Memorial (2)** 9:18,24
**memory (1)** 25:5
**mention (1)** 4:18
**method (1)** 25:1
**Michelangelo (2)** 11:24,25
**mid-twentieth-century (1)** 17:16
**might (2)** 11:20;25:15
**Miller (1)** 29:3
**mind (1)** 24:23
**minor (1)** 8:15
**minutes (1)** 26:1
**Modern (1)** 24:5
**modest (1)** 23:2
**Mohammed (1)** 22:4
**money (1)** 6:25
**Montgomery (1)** 29:11
**monument (18)** 5:20;15:13,17;16:4,6;17:3;19:6,13,15,16,17;20:19;21:23,23;23:1,2,7;24:16
**monuments (14)** 5:19;17:17;18:22,25;24:5,17;25:4,12,22;26:17;27:2,5,8,11
**monument's (1)** 24:3
**more (2)** 6:24;14:1
**morning (1)** 3:9
**Moses (2)** 14:7,11
**Most (1)** 7:5
**Muslims (1)** 22:7
**myself (1)** 26:2

**N**

**name (1)** 3:9
**National (7)** 3:16;9:18,20,23;10:21,24;13:20
**near (1)** 10:8
**need (3)** 4:3;5:1,15
**needed (1)** 6:24
**neoclassicism (1)** 12:2
**New (7)** 3:13;6:12;13:18;22:5,6;25:16;27:11
**newer (1)** 10:17
**none (4)** 14:20,24;15:5;18:17
**Northwest (1)** 3:13
**notarial (1)** 30:3
**Notary (1)** 29:3
**noted (1)** 22:3
**notes (2)** 5:13;29:15
**numerals (4)** 15:7;23:16,23,24

**O**

**oath (1)** 3:21
**obstructed (2)** 15:12;23:21
**occasionally (1)** 6:14
**off (5)** 5:6,6;12:25;14:23;25:24
**offense (3)** 22:7,15,22
**older (1)** 10:13
**one (8)** 4:12;10:3;16:6,19;17:7;19:6;26:2,17
**ones (1)** 13:17
**only (2)** 4:12;5:1
**opinion (8)** 5:17,22,25;7:19;21:4;22:25;26:12,16
**opposed (1)** 10:12
**Order (5)** 12:10,14,19;13:6,10
**otherwise (2)** 4:5;29:24
**out (1)** 7:23
**outline (1)** 24:25
**Over (1)** 24:25
**overall (1)** 19:21

**P**

**page (4)** 5:15;17:13,20,24
**paid (1)** 12:15
**papers (1)** 5:13
**paragraph (6)** 17:13,20,24;19:19;23:2;24:6
**part (1)** 15:12
**Parthenon (1)** 11:21
**partially (1)** 23:21
**particular (4)** 7:2;11:14;19:7;22:15
**parties (1)** 29:20
**parts (2)** 16:21,22
**party (2)** 29:24;30:1
**pass (1)** 6:8
**past (1)** 10:11
**PDF (2)** 17:25;18:4
**pediment (1)** 23:15
**Peer (1)** 9:9
**people (1)** 10:4
**person (1)** 29:23
**philosophical (1)** 14:17
**phone (1)** 14:23
**photograph (1)** 16:20
**photographs (4)** 15:13;16:17,21,22
**pictures (2)** 14:3,6
**pieces (1)** 17:2
**place (3)** 5:19;15:14;20:16
**placed (2)** 15:20;17:17
**placement (2)** 18:21;27:4
**places (2)** 14:15;17:18
**placing (1)** 18:25
**plaintiffs (2)** 8:7;29:10
**planned (1)** 19:16
**plans (1)** 20:19
**plaques (2)** 16:23;17:1
**play (1)** 10:6
**please (2)** 3:10;4:4
**point (3)** 4:4,24;19:6
**points (1)** 24:2
**portion (1)** 15:23
**position (1)** 4:20
**posted (1)** 21:17
**posting (1)** 21:14
**practicing (1)** 20:17
**praying (1)** 20:17
**predates (1)** 17:15
**prepare (1)** 4:14
**present (1)** 16:12
**presentation (1)** 9:21
**present-day (1)** 25:6
**presented (1)** 29:19
**preservation (1)** 25:11
**President (2)** 10:22;12:8
**prior (2)** 18:21;27:4
**problem (1)** 21:13
**proceeding (1)** 3:24
**professional (1)** 9:5
**property (1)** 25:13
**prophet (1)** 22:9
**proposal (1)** 24:12
**proselytize (1)** 21:24
**protection (2)** 24:13;25:11
**provide (1)** 6:15
**public (14)** 5:19;10:23;11:5,11;13:22;14:3,16;17:17;18:15,23,25;25:13;27:6;29:3
**pulling (1)** 17:21
**Pursuant (2)** 3:1;29:12
**put (2)** 18:1;20:19

**Q**

**quality (1)** 23:3
**quite (1)** 23:10
**quotes (3)** 14:14,16,17
**quoting (1)** 24:23

**R**

**reached (1)** 7:23
**read (4)** 4:16;21:8,10;28:11
**reading (3)** 4:19;10:8;24:10
**real (1)** 13:14
**realm (1)** 21:25
**reappeared (1)** 12:1
**reason (1)** 7:1
**recent (1)** 10:11
**recently (1)** 7:5
**recess (1)** 26:4
**record (5)** 3:10;5:6;12:25;25:24;29:17
**REDIRECT (1)** 26:24
**reduced (1)** 29:15
**refer (5)** 14:22;15:1;18:13,

18;22:3
**referred (2)** 13:6,24
**refers (1)** 18:12
**regarding (1)** 9:21
**relating (1)** 3:5
**relative (1)** 29:24
**religion (1)** 20:17
**religions (1)** 22:15
**religious (8)** 14:4,12;18:14; 19:4,13;21:20;22:14; 26:14
**remember (2)** 17:19;22:18
**remotely (1)** 29:10
**removed (1)** 17:8
**Renaissance (1)** 11:24
**repeat (1)** 21:6
**rephrase (1)** 4:5
**report (16)** 4:16,18;5:8;6:5; 7:19;14:2,22;15:1; 16:11;17:13;18:14; 19:2,15,19;22:3;24:6
**reporter (5)** 3:22;4:11;5:5; 21:11;27:17
**reports (2)** 8:4,9
**representation (2)** 19:8;22:8
**representations (4)** 14:21,25;18:13,18
**represented (1)** 29:20
**requested (1)** 21:10
**requires (1)** 12:14
**research (2)** 4:19;6:15
**researcher (1)** 8:24
**resonance (7)** 14:4;19:5,5,13; 21:21;22:14;26:14
**restoration (1)** 25:11
**returned (1)** 11:23
**review (1)** 9:8
**reviewed (2)** 8:4,9
**Riegl (2)** 24:11;27:10
**R-I-E-G-L (1)** 24:4
**Riegl's (2)** 24:4,5
**Right (3)** 7:17;19:24;23:17
**Roman (5)** 15:7;23:9,16,23,24
**Rome (2)** 11:17,20
**room (1)** 23:19
**RPR (1)** 29:3
**rule (2)** 5:1,4
**Rules (1)** 29:13

**S**

**SAITH (2)** 27:19;28:16
**SALZ (3)** 26:8,11,20
**same (2)** 20:19;21:9
**saw (1)** 24:22
**saying (4)** 3:23;20:21;21:2,4
**scope (1)** 5:25
**screen (3)** 18:1,6,8
**seal (1)** 30:3
**second (5)** 6:24;12:25;17:23; 18:5;20:7
**selected (1)** 11:12
**Senate (1)** 9:22
**sense (1)** 23:8
**sentence (3)** 17:23;18:10;19:20
**September (3)** 28:12;29:12;30:4
**services (4)** 6:16;9:10;13:11,13
**serving (1)** 9:6
**set (2)** 20:6;30:2
**setting (2)** 19:21;20:12
**shape (2)** 23:10,12
**Shubow (5)** 3:11;26:12;28:11, 18;29:5
**side (2)** 16:6;17:10
**sign (1)** 20:21
**Signature (2)** 27:17;29:19
**signed (1)** 3:2
**similarly (1)** 14:14
**situations (1)** 10:4
**Society (4)** 3:16;10:21,25; 13:20
**solely (1)** 27:1
**someone (1)** 12:23
**sometimes (2)** 14:10,15
**sorry (7)** 7:13;11:1,7,8;13:1; 17:9,25
**sorts (1)** 21:18
**sought (1)** 11:16
**sources (1)** 4:18
**south (3)** 17:4,9,10
**southwest (3)** 15:23;17:4,6
**spaces (1)** 18:15
**special (1)** 12:14
**speculate (1)** 20:25
**spent (1)** 9:17
**spoke (1)** 4:16
**spread (1)** 12:4
**staff (1)** 13:9
**standard (1)** 20:6
**standpoint (1)** 23:4
**started (2)** 5:7;12:2
**state (8)** 3:9;6:11;12:5; 22:5;25:2;28:11; 29:1,4
**Statehouse (3)** 15:15;16:12,24
**statement (2)** 19:3;22:10
**states (4)** 6:11;18:24;27:7; 28:1
**statue (2)** 22:4,24
**statues (1)** 16:23
**Steering (1)** 9:22
**stenograph (1)** 29:15
**still (2)** 21:24,25
**stress (1)** 7:18
**strike (1)** 20:13
**structures (1)** 10:13
**studied (1)** 9:3
**stuff (1)** 10:9
**style (3)** 11:13;12:15;13:23
**subjects (1)** 9:4
**submitted (2)** 8:4,9
**subvalues (1)** 25:7
**Suite (1)** 3:13
**Supreme (5)** 3:1;14:11;15:9; 23:13,16
**sure (11)** 3:19;4:3,20;11:6; 17:22;20:5;21:7,22; 22:16;25:15,16
**sworn (2)** 3:3;29:6

**T**

**tablet-and- (2)** 17:14;18:9
**tablets (4)** 14:8;23:11,15,18
**talk (5)** 4:21;14:14;23:1; 26:1,2
**talked (1)** 3:19
**talking (2)** 10:4;27:11
**talks (1)** 19:20
**taught (1)** 22:19
**technical (1)** 13:4
**Ten (16)** 14:21,25;15:2; 16:8;17:17;18:14,19, 22;19:6,8,15,16; 20:20;26:16;27:3,4
**Tennessee (1)** 9:13
**term (1)** 19:5
**testified (4)** 3:6;7:24;9:19,19
**testimony (1)** 29:18
**thereafter (1)** 29:18
**thinking (1)** 25:18
**third (1)** 19:20
**thought (1)** 10:16
**thus (1)** 19:21
**today (3)** 4:15,21;16:4
**told (2)** 17:3,6
**top (2)** 17:24;22:5
**topic (1)** 6:2
**tradition (12)** 5:18,21;10:23; 11:5,6,10,23;12:2; 18:24;26:13,18;27:7
**traditional (2)** 13:25;23:10
**training (1)** 10:1
**transcript (2)** 28:13;29:17
**Transportation (2)** 9:15;13:21
**Transportation's (1)** 9:15
**tries (1)** 10:6
**true (2)** 28:13;29:17
**Trump (1)** 12:8
**truth (6)** 3:4,4,5;29:7,7,8
**trying (3)** 8:20;17:25;24:17
**turned (1)** 14:23
**turning (1)** 12:8
**twice (1)**

21:9
**typewriting (1)** 29:16
**typewritten (1)** 29:17

**U**

**unacceptable (3)** 20:23;21:12,16
**under (2)** 3:21;29:16
**undergrad (1)** 8:16
**UNION (1)** 28:4
**United (3)** 18:24;27:7;28:1
**universities (1)** 9:2
**up (3)** 17:21;19:19;24:18
**use (3)** 17:14;18:9,12
**used (4)** 3:24;19:5;21:23;23:12
**using (2)** 23:8;27:8

**V**

**value (4)** 24:3,18;25:5,6
**values (1)** 25:5
**various (6)** 9:1;14:3,15;16:20,22;18:13
**version (2)** 16:8;19:7
**versus (1)** 20:7
**view (2)** 12:7;19:16
**viewed (2)** 16:15;21:22
**virtual (1)** 7:12

**W**

**wants (1)** 15:14
**War (1)** 9:23
**Washington (4)** 3:14;7:15;9:8;11:13
**waters (1)** 24:9
**way (3)** 10:16;24:18;27:8
**weigh (1)** 24:18
**weighing (2)** 19:12;24:18
**welcome (1)** 5:16
**west (2)** 17:9,10
**WHEREOF (1)** 30:2
**White (2)** 11:15;13:9
**whole (2)** 3:4;29:7
**within (4)** 5:20;21:25;25:7;26:18
**without (3)** 15:7;23:14,24
**WITNESS (5)** 11:7;12:22;26:7;27:16;30:2
**Word (1)** 18:3
**work (5)** 7:1,16;9:5;13:20;20:25
**worked (2)** 8:18;13:9
**working (2)** 7:4;9:17
**workplace (1)** 10:1
**works (2)** 11:24;14:3
**world (2)** 9:1,23
**writing (2)** 6:15;24:11
**written (1)** 10:9
**wrote (1)** 27:11

**Y**

**year (1)** 12:11
**years (2)** 8:2;12:4
**York (3)** 6:12;22:5,6

**1**

**1 (6)** 5:9,15;6:5;14:2;16:11;17:20
**14344 (1)** 12:10
**150 (1)** 12:4
**17th (1)** 30:3
**1950s (2)** 18:23;27:6

**2**

**2 (2)** 5:15;28:12
**20001 (1)** 3:14
**2008 (1)** 6:6
**2010 (2)** 6:9,21
**2019 (2)** 6:14,21
**2020 (1)** 3:2
**2026 (3)** 28:12;29:12;30:4
**20S-MS-236 (1)** 3:2
**25 (2)** 17:13,20
**2nd (1)** 29:11

**3**

**300 (2)** 3:13,13
**31 (1)** 3:2
**39 (2)** 17:13,20

**4**

**41 (1)** 19:19
**45 (2)** 23:2;24:6

**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| INDIANA CIVIL LIBERTIES UNION, INC., INDIANA CIVIL LIBERTIES UNION FOUNDATION, INC., together d/b/a the American Civil Liberties Union of Indiana; JAMES A. TANFORD; REV. KEVIN ARMSTRONG; PATRICE MUUMBA ABDUALLAH, | |
| Plaintiffs, | |
| v. | No. 1:00-cv-00811-SEB-MKK |
| MIKE BRAUN, in his official capacity as the Governor of the State of Indiana, | |
| Defendant. | |

**Declaration of Justin Shubow**

I, Justin Shubow, pursuant to 28 U.S.C. § 1746, declare the following:

1. I am over the age of 18 and competent to make this declaration.
2. I have personal knowledge of the matters stated in this declaration, and could and would so testify if called as a witness.
3. I am the President of the National Civic Art Society, Chairman of the U.S. Department of Transportation's Beautifying Transportation Infrastructure Council, and a former chairman of the U.S. Commission of Fine Arts, on which I served from 2018 to 2021. Over the past fifteen years I have directed and participated in numerous public efforts concerning the design and meaning of American civic art, monuments, and memorials, and I lecture regularly across the country on monuments, memorials, and civic architecture. A copy of my



EXHIBIT 1

curriculum vitae ("CV") is attached as **Exhibit A** to the Expert Report of Justin Shubow, which is in turn attached as **Exhibit 1** to this declaration.

4. I was asked to give my expert opinions on the tradition, meaning, and civic function of American public art and monuments, and the place of the monument at issue in this case within that tradition.
5. My opinions on these topics are set forth in Exhibit 1, which is a true and correct copy of the Expert Report that I prepared for the Defendant in this case. If called as a witness I could and would competently testify as to the facts and opinions set forth in my report.
6. I am being compensated at a rate of $350 per hour for the preparation of this report and all other expert witness work in this case. My compensation does not depend on the substance of my opinions or the outcome of this case.
7. My CV, attached as Exhibit A to the Expert Report, includes a list of the publications that I have authored in the last ten years.
8. I have not testified as an expert witness at trial or by deposition in any case during the previous four years.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 14, 2026.

[signature]

# Exhibit 1

**Expert Report of**
**Justin Shubow**

***ICLU v. Braun***
**United States District Court**
**Southern District of Indiana**

## I. Introduction and Qualifications

1. I am the President of the National Civic Art Society, a nonprofit organization based in Washington, D.C., that promotes the classical tradition in public art and architecture, with particular attention to government projects, including national monuments and memorials. I have led the organization since 2011, first as a volunteer and chairman and, since 2014, as its full-time President. A copy of my curriculum vitae ("CV") is attached to this report as **Exhibit A**.

2. From 2018 to 2021, I served as a member of the U.S. Commission of Fine Arts, an independent federal agency established by Congress in 1910 that reviews matters of design and aesthetics affecting the nation's capital, including the design of monuments, memorials, and public buildings, to which I was appointed by President Donald Trump. In January 2021, I was elected the Commission's eleventh Chairman. In that role I served *ex officio* on the National Capital Memorial Advisory Commission, the Board of Trustees of the John F. Kennedy Center for the Performing Arts, and the Committee for the Preservation of the White House.

3. I currently serve as Chairman of the U.S. Department of Transportation's Beautifying Transportation Infrastructure Council, to which I was appointed by Secretary of Transportation Sean Duffy in 2026. I also serve as a National Design Peer of the U.S. General Services Administration, in which capacity I am advising on the design of two new federal courthouses. I have also been invited by the U.S. Department of State's Bureau of Overseas Buildings Operations to advise on the design of American embassies and consulates.

4. Over the past fifteen years I have directed and participated in numerous public efforts concerning the design and meaning of American civic art, monuments, and memorials. Among other work, I advised the National Endowment for the Humanities on the Garden of American

Heroes, helping write the sculpture competition brief, and serving as a panelist selecting sculptors. I led a campaign for a classical sculpture as the centerpiece of the National World War I Memorial. I directed a nationally prominent review of the design of the National Eisenhower Memorial, publishing a report that was quoted in a front-page story in *The New York Times.* I twice testified before the United States House of Representatives: once on the Eisenhower Memorial, and once on the future of the National Mall. I have also led a campaign to build a new classical Pennsylvania Station in New York City. I lecture regularly across the country on monuments, memorials, and civic architecture. A list of my publications and lectures is included in my CV.

5. I hold a J.D. from Yale Law School, where I was a Senior Editor of the *Yale Law & Policy Review*. I received a master's degree from the doctoral program in philosophy at the University of Michigan, and a B.A. *magna cum laude* from Columbia University, where I majored in philosophy. I have taught undergraduate courses in philosophy at Yale College and the University of Michigan.

6. The opinions in this report concern the tradition, meaning, and civic function of American public art and monuments—the field of my professional experience and sustained study. The opinions are my own and do not represent the views of the National Civic Art Society or of any other institution.

7. In the past four years I have not testified as an expert witness at trial or by deposition in any other matter.

8. I am being compensated at a rate of $350 per hour for the preparation of this report and all other expert witness work, including deposition or trial testimony. My compensation does not depend on the substance of my opinions or the outcome of this case.

## II. Basis and Methodology

9. The opinions in this report are based on my training and experience in the field of civic art and public design; my study of the American tradition of public monuments and architecture; my service reviewing the design and meaning of public monuments, memorials, and buildings; and my examination of the specific monument at issue and the materials identified in this report.

10. In forming my opinions, I applied the mode of analysis customary in the study of civic art and public monuments. I considered the monument at issue as a work of civic art—its form, inscriptions, and its physical and civic setting—and I situated it within the broader tradition of American public art and architecture, comparing it with other established works of civic art that employ related forms and symbols. I drew on recognized scholarship in the history and theory of architecture, civic art, and monuments; materials received from counsel regarding the case (including photographs of the monument at issue) and a related case; and on examples of American civic art, some of which are identified in this report.

11. My opinions concern the tradition, meaning, and function of monuments and other civic art. They do not address, and should not be understood to address, the legal question of the constitutionality of the monument at issue, which is a matter for the Court.

12. In carrying out this analysis I applied the same standards of care and judgment that I apply in my professional work reviewing and evaluating public art and monuments.

## III. Civic art communicates using symbols that speak to a community's ideals and aspirations.

13. Found throughout American history, civic art encompasses works created for public spaces that encapsulate and communicate the shared ideals, history, values, and/or aspirations of a community, nation, or society. Civic art includes monuments, memorials, sculptures, architecture, murals, landscaping, parks, and related decorative and symbolic elements. Inscriptions—whether carved, cast, or painted—function as one of the most direct and traditional means of that communication.

14. Civic art can be didactic, exhortatory, and commemorative, among other things. Civic art can be grand and ambitious, as in the design of Washington, D.C. and the Statue of Liberty, or it can be modest and humble, as in the cornerstone of a building, a plaque, a gravestone, or a war memorial that is merely a list of the names of casualties. Modest civic art, however, can grow in meaning and value given its siting and context, which, for example, could include location relative to other works of civic art.

15. One of the greatest forces for civic art in American history was the City Beautiful movement, a Progressive Era urban reform and planning effort, lasting from roughly the 1890s to the 1920s, that sought to make cities more orderly, healthy, beautiful, and inspiring through monumental classical architecture and art, grand boulevards, civic centers, and parks. The 1901-1902 McMillan Plan for Washington, D.C., which created the National Mall and Monumental Core as we know them, was the capstone of that movement.

16. The City Beautiful movement's foremost publicist and advocate was Charles Mulford Robinson, who provided a definition of civic art that applies generally, not just to the movement:

> [C]ivic art properly stands for more than beauty in the city. It represents a moral, intellectual, and administrative progress as surely as it does the purely physical. . . . This art, which serves so many social ends, is municipal, in the sense of communal.

> It is municipal first of all. If men seek it they seek it not for art's sake, but for the city's; they are first citizens and then, in their own way, artists jealous of the city's looks because they are citizens. . . . They are not asking the town to help art, but art to help the town; the artists, not to glorify their art, but by their art to glorify the city. . . .
>
> The provision of this ideal, the setting before all the people of a tangible vision of their own possible city beautiful, will have other value than merely that of popular education. It will offer them inspiration. Nor will this inspiration be material only, but as clearly moral and political and intellectual. The pride that enables a man to proclaim himself "a citizen of no mean city" awakens in his heart high desires that had before been dormant. "To make us love our city we must make our city lovely" was taken as its motto by the Municipal Art Society of New York when it was organized, and he who loves his city is a better citizen and a better man.[1]

17. As the historian William H. Wilson summarized the City Beautiful movement, "The goal of the City Beautiful system was what Edward A. Ross, in *Social Control* (1901), termed the inculcation of 'social religion,' the idealized transcendental bond among members of a community and among members of a nation or society."[2] Likewise, writing about American sculptors of public art and architecture around the turn of the twentieth century, historian Michele H. Bogart explained, "They hoped to inspire observers with edifying thoughts and, through elaborate emblematic and allegorical renderings of 'Great Ideas,' a knowledge of historical and ethical issues. The renderings of great ideas signified the moral, political, and cultural forces and activities that artists, sculptors, and others believed to be the foundations of a progressive, evolutionary path toward a more civilized society."[3]

18. While the proponents of the City Beautiful movement advocated for classical design, later modernist designers and theorists nonetheless had a similar view of the significance and value of civic art. In 1943, in "Nine Points on Monumentality," architect Josep Lluís Sert, artist Fernand

---

[1] Charles Mulford Robinson, *Modern Civic Art; or, The City Made Beautiful* (New York: G. P. Putnam's Sons, 1903), 17–36.
[2] William H. Wilson, *The City Beautiful Movement* (Baltimore: Johns Hopkins University Press, 1989), 81.
[3] Michele H. Bogart, "In Search of a United Front: American Architectural Sculpture at the Turn of the Century," *Winterthur Portfolio* 19, no. 2/3 (1984): 151, 163–64.

Léger, and historian and theorist Sigfried Giedion made claims about monuments in the sense of both physical objects and works of architecture: "Monuments are human landmarks, which men have created as symbols for their ideals, for their aims, and for their actions. They are intended to outlive the period which originated them . . . . Monuments are the expression of man's highest cultural needs. They have to satisfy the eternal demand of the people for translation of their collective force into symbols. The most vital monuments are those which express the feeling and thinking of this collective force—the people."[4]

## IV. Unsurprisingly, the symbols of American civic art often have religious resonance for some.

19. Given that civic art translates a community's ideals and aspirations into enduring symbols, it is unsurprising that such symbols frequently come freighted with meaning. Among the deepest and longest lasting sources of such meaning in Western civilization is religion—above all, Judaism, Christianity, and Greco-Roman religion.[5] As one would expect, American civic art is replete with religious symbolism and resonance. There are too many examples to count, but to identify a few in the nation's capital:

### A. U.S. Capitol Building

20. The U.S. Capitol Building, the most important government building in the United States, and an icon of its democracy, possesses a striking mixture of religious and quasi-religious

[4] Josep Lluís Sert, Fernand Léger, and Sigfried Giedion, "Nine Points on Monumentality," in Sigfried Giedion, *Architecture, You and Me: The Diary of a Development* (Cambridge, MA: Harvard University Press, 1958), 48.

[5] Benjamin Franklin and Thomas Jefferson—among the most Enlightenment-minded of the Founders, and no friends of theocracy—each proposed biblical imagery for the national seal. Franklin's design showed Moses parting the Red Sea to overwhelm Pharaoh, over the motto "Rebellion to Tyrants Is Obedience to God." Jefferson proposed the children of Israel led through the wilderness by a cloud by day and a pillar of fire by night. Neither device was adopted. The final version of the seal contains the motto Annuit Coeptis ("He [God] approved their undertakings"). Jeffrey F. Meyer, *Myths in Stone: Religious Dimensions of Washington, D.C.* (Berkeley: University of California Press, 2001), 30–31.

symbolism drawn primarily from Greco-Roman religion, Christian imagery, and American civic ideals. The form of the classical building—with its steps, Corinthian columns, and pediments—is itself based on a Greco-Roman temple—i.e., a building for worshiping a god.[6] The Capitol's rotunda recalls the dome of the Pantheon, the ancient Roman temple to all the gods, later converted to a Catholic basilica.[7] Indeed, classical architecture draws its most prestigious forms—above all the temple front—from the religious buildings of ancient Greece and Rome, and it carries forward the sacred associations of those sources even as it has been put to secular civic use.[8]

21. The most prominent and symbolically dense work in the U.S. Capitol is *The Apotheosis of Washington*, a fresco by Constantino Brumidi on the dome of the rotunda, which is the heart of the building—"the Hall of the People" in the words of architect Benjamin Henry Latrobe. "Apotheosis" means the elevation of a person to divine or god-like status—a concept taken directly from the ancient Roman imperial practice of deifying emperors after death. In the painting, George Washington rises into the heavens (a Christian image), seated in glory and flanked by the classical goddesses Liberty and Victory/Fame. The perimeter of the fresco depicts various Roman gods. The walls of the rotunda feature historical paintings: *Baptism of Pocahontas* (depicting a Christian conversion ceremony), *Embarkation of the Pilgrims* (showing Pilgrims in prayer with an open

---

[6] Thomas Jefferson described the building as "the first temple dedicated to the sovereignty of the people; embellishing with Athenian taste the course of a nation looking far beyond the range of Athenian destinies." Thomas Jefferson to Benjamin Henry Latrobe, July 12, 1812, in *The Papers of Thomas Jefferson, Retirement Series*, vol. 5, ed. J. Jefferson Looney (Princeton, NJ: Princeton University Press, 2008), 238–39; also available at https://tjrs.monticello.org/letter/286.

[7] The current cast-iron dome, built 1855-1866, was strongly influenced by St. Peter's Basilica in Rome.

[8] The nineteenth century critic John Ruskin, a Christian proponent of neo-Gothic architecture, opposed classicism due to its pagan roots: "[L]et us cast out utterly whatever is connected with the Greek, Roman, or Renaissance architecture, in principle or in form. We have seen above, that the whole mass of the architecture . . . [is] [p]agan in its origin . . . ." John Ruskin, *The Stones of Venice*, Vol. III (New York: National Library Association, 1853), 194; also available at https://www.gutenberg.org/files/30756/30756-h/30756-h.htm.

Bible), and *Landing of Columbus* and *Discovery of the Mississippi* (including priests, raised crosses, and crucifixes).



*The Apotheosis of Washington* in the U.S. Capitol Rotunda

22. In addition, above and behind the Speaker's rostrum in the chamber of the House of Representatives, one reads in large golden letters "In God We Trust." The motto is also inscribed in the Senate chamber. In addition, the House chamber includes a relief portrait of Moses (1950).

B. U.S. Supreme Court

23. Like the Capitol, the U.S. Supreme Court building—with its steps, Corinthian columns, and pediments—is in the classical form of a Greco-Roman temple. Its imagery draws heavily on Greco-Roman traditions of law and justice while also incorporating historical lawgivers from Jewish, Chinese, Islamic, and other traditions. On the building's East Pediment, Moses, holding tablets inscribed with Roman numerals (I-X) (i.e., the Ten Commandments), stands flanked by Confucius and Solon. Inside the Supreme Court Chamber, sculptor Adolph A. Weinman placed Moses at the center of the south frieze of historical lawgivers. Moses holds two large stone tablets carved with the Ten Commandments written in Hebrew characters. Muhammad appears in the north frieze, holding a Koran. The Ten Commandments also appear on the metal gates on the north and south sides of the courtroom as well as on the doors leading into the courtroom.



U.S. Supreme Court East Pediment



U.S. Supreme Court South Frieze

C. <u>U.S. Library of Congress, Thomas Jefferson Building</u>

24. The Thomas Jefferson Building of the U.S. Library of Congress is richly decorated with Beaux-Arts neoclassical art, murals, mosaics, sculptures, and inscriptions. Religious symbolism includes portrayals of Greek and Roman gods—most prominently Minerva in a large mosaic. In the Main Reading Room, there are bronze portrait statues of Moses and St. Paul (under the category Religion). In the room's dome, one of the figures representing civilizations is Judea (for Religion).

The room includes a Hebrew inscription of the commandment "Thou shalt love thy neighbor as thyself." (Leviticus 19:18). There are biblical inscriptions in the room: Above the figure of Religion: "What doth the Lord require of thee, but to do justly, and to love mercy, and to walk humbly with thy God?" (Micah 6:8). Above the figure of Science: "The heavens declare the glory of God; and the firmament sheweth his handiwork." (Psalm 19:1).




St. Paul in the Library of Congress Reading Room

D. <u>Washington Monument</u>

25. The Washington Monument is a pure Egyptian-style obelisk. In the ancient Egyptian religion, obelisks were symbols associated with the sun god Ra. The pyramid-shaped top of an obelisk (the pyramidion), also seen in the monument, was styled after the Benben, the primordial mound of creation in Egyptian religion. The Washington Monument's aluminum capstone (apex) is inscribed on its east face with the Latin words "Laus Deo" ("Praise be to God"). The monument's interior stairwell is lined with nearly 200 commemorative stones. Several of the stones donated by churches and Sunday schools carry explicit Jewish and Christian content, including biblical quotations such as Proverbs 10:7 ("The memory of the just is blessed"), Luke 18:16, and Proverbs 22:6; phrases such as "A Preached Gospel," "Search the Scriptures," and depictions of an open Bible; and other religious mottos (e.g., "Holiness to the Lord," "In God We Trust").

E. Jefferson Memorial

26. The Jefferson Memorial is a classical rotunda modeled on the Roman Pantheon. Jefferson's own writings, carved on the interior walls and frieze, contain repeated references to God and divine authority. For instance: "I have sworn upon the altar of God eternal hostility against every form of tyranny over the mind of man"; "Almighty God hath created the mind free"; "God who gave us life gave us liberty. Can the liberties of a nation be secure when we have removed a conviction that these liberties are the gift of God?" There is also an inscription including the religious language from the Declaration of Independence: "all men are created equal, that they are endowed by their Creator with certain inalienable rights . . . . with a firm reliance on the protection of divine providence."




Inscription in the Jefferson Memorial

F. <u>Martin Luther King, Jr. Memorial</u>

27. The Martin Luther King, Jr. Memorial (dedicated 2011) features a giant, 30-foot-tall stone statue of the eponymous Baptist minister, who was fundamentally a religious figure. The inscription wall includes an excerpt from one of King's sermon-like speeches, in which he quotes the Bible (essentially the King James Version of Amos 5:24): "We are determined here in Montgomery to work and fight until justice runs 'down like water, and righteousness like a mighty stream.'"

G. <u>Barrett Prettyman United States Courthouse</u>

28. The E. Barrett Prettyman United States Courthouse features four marble sculptures (1951) in the ceremonial courthouse: Moses, Hammurabi, Solon, and Justinian. Moses is holding the Ten Commandments.

* * *

29. There are many, many more examples outside of Washington, D.C. In New York City, the Appellate Division Courthouse of New York State (completed 1899-1900) features a parapet around the roof that originally held ten freestanding heroic-scaled white marble statues of historical, religious, and legendary lawgivers. Nine of them remain. One is a statue of Moses holding the Ten Commandments. Other lawgivers portrayed are Manu, a semi-divine figure in Hindu religion and the reputed author of ancient legal and moral texts; Zoroaster, the founder of the Zoroastrian religion; and Louis IX (St. Louis), King of France and later a Catholic saint. A statue of Mohammed was removed in 1955 at the request of Muslim representatives due to Islamic prohibitions on depictions of him. Other statues include Solon and Justinian. Lower on the facades are other notable works, including seated figures of Wisdom and Force flanking the main entrance.



Appellate Division Courthouse of New York State

30. Also in New York City, the monument to Father Francis P. Duffy (1937), a World War I military chaplain, is a prominent bronze sculpture located in the northern triangular section of Times Square. The over-life-size bronze figure of Duffy holds a Bible in both hands. Behind him rises a large Celtic cross of green granite, more than 17 feet tall overall.




Monument to Father Francis P. Duffy

31. In Brooklyn, New York, the Kings County Supreme Court (1957) features a huge relief of Moses holding the Ten Commandments inscribed with Roman numerals I-X.





Kings County Supreme Court

32. The Nebraska State Capitol (1932) features exterior limestone reliefs by Lee Lawrie including “Moses Bringing the Law from Sinai” (Moses descending with the tablets while the people face the Golden Calf). Moses also appears among engaged sculptures of great lawgivers on the south pavilion (with figures such as Hammurabi and Solomon).

33. In Jackson, Mississippi, the rooftop of the Hinds County Courthouse (1930) features two statues: one of Moses on the north side of the building (holding a tablet with Roman numerals I–X), one of Socrates on the south.





Moses on the Hinds County Courthouse

34. In Boston, Massachusetts, the John Adams Courthouse (1894) has a statue in the interior labeled "Legislation" that strongly resembles Moses. It is a bearded figure wearing a garment that looks like a Jewish prayer shawl and holding a scroll bearing Roman numerals I–X.[9]

35. In Worcester, Massachusetts, the Worcester Trial Court contains an 8-foot-4-inch-tall hollow plaster cast replica of Michelangelo's sculpture of Moses, which depicts him holding the

[9] Some ancient and medieval Jewish depictions of the Ten Commandments portray them as a scroll. See Dan Rabinowitz, "Ten Commandment Representations in Hebrew Manuscripts and Books: Artistic Approaches to Theological Issues in Judaism," *The Seforim Blog*, May 29, 2025, https://seforimblog.com/2025/05/ten-commandment-representations-in-hebrew-manuscripts-books-artistic-approaches-to-theological-issues-in-judaism/.

tablets of the Law. The statue was installed in 1910 and moved to the new courthouse, outside the jury pool area, around 2007.



Worcester County Courthouse

36. In St. Paul, Minnesota, the Supreme Court chamber in the Minnesota State Capitol (1905) features a mural by John La Farge titled *The Moral and Divine Law* that depicts Moses on Mount Sinai. The room also features murals containing Confucius and Socrates.

37. In Harrisburg, Pennsylvania, the Pennsylvania State Capitol includes a series of 14 murals (completed 1911) by William Brantley Van Ingen illustrating the history of religious groups and

tolerance in the state. Scenes include Mennonite foot-washing, Scotch-Irish teaching theology, a Rosicrucian monk before the cave of Kelpius on the Wissahickon Creek, and Brothers of Ephrata transcribing the Declaration of Independence.



*Brothers of Ephrata Transcribing the Declaration of Independence*

in the Pennsylvania State Capitol

38. The U.S. Merchant Marine Academy in Kings Point, New York features the 1944 painting *Christ on the Water* (also known as *Jesus and Lifeboat*), which shows a group of weary merchant seamen adrift in a lifeboat on stormy seas—presumed survivors of a torpedo attack during World War II.




Christ on the Water in the U.S. Merchant Marine Academy

## V. **<u>The Ten Commandments monument at issue in this case falls well within this commonplace practice.</u>**

39. The monument at issue in this case is a "a foursided tablet-shaped limestone monument containing two large sides and two small sides. On one of the monument's large sides, measuring seven feet tall and slightly more than three and a half feet wide, [is] displayed the full text of the Ten Commandments; other sides of the monument [are] inscribed with the Bill of Rights and the Preamble to the Indiana Constitution."[10] The monument, which is large in size but aesthetically

[10] Order on Defendant's Motion for Relief from the Final Judgment and Permanent Injunction, *Indiana Civil Liberties Union v. Braun*, No. 1:00-cv-00811-SEB-MKK (S.D. Ind. 5/28/26), 1.

restrained in its design, is thus a combination of easily recognizable simple iconography (the tablet form) and an assemblage of inscriptions of venerated historic and legal texts. Two of those texts, the Ten Commandments and Bill of Rights, are among the most widely known, influential, and revered texts in American society. The pairing of all three inscriptions frames the Decalogue civically as one source in a lineage of law, rather than devotionally. Even from a distance, the form of the monument is immediately recognizable as a symbol of the Ten Commandments as well as law itself. The monument is a historical-moral-legal ensemble that fits within the commonplace American practice of religiously resonant civic art. In particular, the monument's two defining features—the tablet form and the depiction of the Decalogue as one of the historical sources of law—often recur in and around both courthouses and state capitols, as seen above. This civic use of the tablet-and-Decalogue form long predates the mid-twentieth-century campaign, associated with the Fraternal Order of Eagles, that placed Ten Commandments monuments on many public grounds nationwide.[11] As the examples above show, it was already well established in American courthouses and capitols.

40. The design of the monument at issue parallels the above examples regarding the U.S. Supreme Court and courthouse lawgiver displays, where Moses, sometimes holding the tablets of the law, appears *alongside* such other lawgivers as Solon, Confucius, Hammurabi, and Justinian. Moses rarely appears alone, but rather as one lawgiver among the several sources of Western law and sometimes law generally. The Ten Commandments monument here does in the three inscribed panels what those programs do in sculpture: situate the Decalogue within the history of law.

[11] *See*, *e.g.*, Jenna Weissman Joselit, *Set in Stone: America's Embrace of the Ten Commandments* (New York: Oxford University Press, 2017).

41. The monument's siting on the statehouse grounds is highly significant. The site situates the work as part of an ensemble of other works of civic art, both other monuments and memorials, and the statehouse itself. In the surrounding park-like space are monuments honoring the national road and coal miners, a memorial commemorating the September 11, 2001 attacks, as well as statues of the historic figures George Washington, Christopher Columbus, Vice President Thomas A. Hendricks, and Governor Oliver P. Morton. There are also a number of ornamental trees that are marked with placards that honor former governors. The overall setting is thus civic-commemorative, not devotional. That is the context in which to interpret the monument at issue. To be clear, I am analyzing the monument as a matter of civic-art practice and tradition, not opining on its legal status.

## VI. **To seek to eradicate civic art because it might have religious meaning for some viewers would impoverish our public realm and entail a loss of value.**

42. As discussed above, the Ten Commandments monument at issue is an ordinary member of a common, pervasive class of American civic art. What distinguishes the monument from an otherwise unremarkable work of civic art is that an aspect of it possesses religious resonance for some viewers. It follows that any call for removing the monument—whether based in law, morality, religion, or some other basis—rests on that religious resonance as its operative ground. The question is: if such resonance were treated as sufficient grounds to remove a work from public space, what follows for the public realm?

43. It is obvious that what follows is a reductio ad absurdum: the principle would require removing numerous works of civic art of high aesthetic and/or symbolic value—some of them iconic, widely cherished aesthetic masterpieces such as the *Apotheosis of George Washington* and the frieze in the Supreme Court depicting Moses and the tablets.

44. Furthermore, significant works of civic art are not just valuable in themselves. A monument lends identity and symbolic meaning to the space around it.

45. There can be little doubt that the monument at issue is modest in its artistic ambition and quality. Some might object that regardless of what is true of the *category* of religiously resonant civic art, the removal of *this* monument would entail merely a small loss. Such an objection misunderstands the value of a monument. The foundational theory for understanding the value of monuments and their historic preservation is Alois Riegl's 1903 "The Modern Cult of Monuments: Its Character and Its Origin."[12] As Riegl, an art historian, defines it, "A monument in its oldest and most original, sense is a human creation, erected for the specific purpose of keeping single human deeds or events (or a combination thereof) alive in the minds of future generations."[13] Monuments include both buildings and artifacts. He provides a seminal typology of values according to which we characterize monuments—a typology that is the foundational framework for the theory and practice of historic preservation today.[14] The first three values fall under the scope of *memory-value*. One of those values is *intentional commemorative value*, which "aims to preserve a moment in the consciousness of later generations, and therefore to remain alive and present in perpetuity."[15]

[12] Alois Riegl, "The Modern Cult of Monuments: Its Character and Its Origin," trans. Kurt W. Forster and Diane Ghirardo, *Oppositions* 25 (Fall 1982): 21–51, at 21.
[13] *Ibid*.
[14] On Riegl's foundational influence on preservation doctrine, see Carolyn Ahmer, "Riegl's 'Modern Cult of Monuments' as a Theory Underpinning Practical Conservation and Restoration Work," *Journal of Architectural Conservation* 26, no. 2 (2020): 150–65, at 150; also available at https://www.tandfonline.com/doi/full/10.1080/13556207.2020.1738727 ("Riegl's heritage values and concepts became fundamental principles of both the Athens Charter [on urban planning] (1931) and the Venice Charter [for the Conservation and Restoration of Monuments and Sites] (1964)."); Michele Lamprakos, "Riegl's 'Modern Cult of Monuments' and The Problem of Value." *Change Over Time* 4, no. 2 (2014): 418–435, at 419; also available at https://dx.doi.org/10.1353/cot.2014.0011 ("Alois Riegl's classic essay 'The Modern Cult of Monuments: Its Character and Origin' (1903) is often cited as the first, and most profound, formulation of values-based preservation."); Sebastiano Barassi, "The Modern Cult of Replicas: A Rieglian Analysis of Values in Replication," *Tate Papers* no. 8 (Autumn 2007); also available at https://www.tate.org.uk/research/tate-papers/08/the-modern-cult-of-replicas-a-rieglian-analysis-of-values-in-replication ("Although it was written over a century ago, Alois Riegl's 'The Modern Cult of Monuments' still provides a valid analytical framework for the study of key theoretical issues surrounding the transmission to the future of works of art.").
[15] Riegl, "Modern Cult of Monuments," 38.

This value applies to monuments that were deliberately created to commemorate a specific person, event, or idea. Riegl notes that "Laws have always protected intentional monuments from human destruction and this indicates how close commemorative values are to present-day values."[16] Distinct from intentional commemorative value is *historical value*, which "arises from the particular, individual stage it represents in the development of human activity in a certain field."[17] "[H]istorical value singles out one moment in the developmental continuum of the past and places it before our eyes as if it belonged to the present." [18] Under this value, a monument is valued as a unique, irreplaceable artifact of a particular stage in human history. The third memory-value of monuments is their *age-value*. This is the appreciation of the visible evidence of the passage of time. Age-value appears in "the corrosion of surfaces, in their patina, in the wear and tear of buildings and objects."[19]

46. As distinct from memory-values are what Riegl terms *present-day values*, which respond to the practical and aesthetic needs of today. One such value is *use-value*, the practical function or utility of a monument (for instance, a church that is used for religious services). The other such value is *art-value*, which he subdivides into *newness-value* and *relative art-value*. Newness-value is the preference for the new, the complete, the absence of evidence of age or deterioration. The relative art-value, by contrast, is the appreciation of a monument's *aesthetics* according to the artistic taste or will (*Kunstswollen*) of the present age.[20]

[16] *Ibid*.
[17] *Ibid*. 34.
[18] *Ibid*. 38.
[19] *Ibid*. 32.
[20] I cite Riegl for his analytical distinction among the kinds of value a monument possesses, not as an endorsement of his theory of artistic will. I am not claiming that Riegl is correct that a *Kunstwollen* (a term theorists have long struggled with) exists or that aesthetic value is solely relative—a controversial claim. All that matters for this report is that monuments possess an art-value, whether relative or also objective.

47. In discussing the arguments for and against historic preservation, protection, restoration, or alteration of different kinds of monuments, Riegl makes clear how these various values compete with each other. (He also claims that in his time the "cult" of monuments increasingly privileges age-value and historical-value over other values.) For our purposes what is most important is his observation that a monument can embody a *number* of distinct irreducible values; it is significant that a monument's worth is not reducible to a single meaning or intent. If a monument is removed, destroyed, or radically altered, a multiplicity of values are diminished or lost. Furthermore, a monument can have significant value even if its relative aesthetic value is minor.

## VII. Conclusion

48. Civic art uses symbols to communicate a society's values, principles, and ambitions. Such art can educate, urge action, and commemorate. The symbols found in civic art naturally carry deep layers of meaning. In Western civilization, religion—especially Judaism, Christianity, and Greco-Roman religion—has long been one of the most profound and enduring sources of such meaning. It is therefore unsurprising that American civic art is rich with religious resonance. Such resonance is found in the U.S. Capitol, U.S. Supreme Court, Washington Monument, Jefferson Memorial, and many more of the nation's icons, as well as in and around courthouses and state capitols around the country. Many of these works of civic art incorporate Moses and the Ten Commandments as symbols of lawgiving, history, and law itself. The Ten Commandments monument in question is a typical example of a widespread form of American civic art. What sets it apart from otherwise ordinary civic works is that it carries religious meaning for some viewers. It follows that any argument for removing the monument ultimately rests on that religious resonance. If religious resonance were treated as sufficient grounds for removal—a question of art and preservation, not of law (which I do not opine on here)—the principle results in a reductio ad

absurdum: it would logically require removing numerous works of civic art of high aesthetic and/or symbolic value, such as the monument to Father Francis P. Duffy in New York City, a relief on the Nebraska State Capitol, and murals in the Minnesota State Capitol and Pennsylvania State Capitol. The monument at issue is of modest artistic quality, but arguments that its removal would represent only a minor loss misunderstand the nature of monuments. As discussed above, Alois Riegl's framework establishes that monuments embody multiple irreducible values—including intentional commemorative, historical, and age-related memory values, as well as present-day use and aesthetic values. A monument's significance is therefore not limited to high artistic merit or a single original intent; removing a monument, including the one in question here, would diminish or destroy several distinct forms of value.

49. In sum, removing civic art because it carries religious resonance for some viewers would impoverish the public realm, stripping it of a commonplace idiom of American public life—from the humblest marker to grand masterpieces.

Respectfully submitted,

Justin Shubow
August 14, 2026

# Exhibit A

# JUSTIN SHUBOW

National Civic Art Society, 300 New Jersey Ave. NW, Ste. 300, Washington, DC 20001
jshubow@civicart.org | 202-670-1776

## EXPERIENCE

**National Civic Art Society**, Washington, D.C., *President and Former Chairman* (volunteer Jun. 2011 – Aug. 2014; paid full-time staff Aug. 2014 – present)

- Lead a 501(c)(3) nonprofit organization that advances the classical tradition in public art and architecture with special focus on government policy and projects, including national monuments and memorials. Meet with Senators, Representatives, and congressional and White House staff.

Public Art

- Advised the National Endowment for the Humanities on the building of the Garden of American Heroes, a sculpture garden to be built in West Potomac Park in Washington, D.C. Helped write key parts of the sculpture competition brief, and served as a panelist choosing sculptors.
- Led a pressure campaign for the building of a heroic classical sculpture for the National World War I Memorial in Washington, D.C.
- Led the national fight against Frank Gehry's proposal for the National Eisenhower Memorial that forced changes to the design. Published a 150-page report critiquing the memorial that was quoted in a front-page *New York Times* story and relied upon in a House Oversight report.
- Testified at the U.S. House of Representatives regarding a bill to reboot the Eisenhower Memorial. Testified in a separate House hearing on the Future of the National Mall.

Public Architecture

- Have been invited by the U.S. Department of State's Bureau of Overseas Buildings Operations to advise on the design of American embassies and consulates.
- Instigated, helped draft, and promoted an Executive Order issued by President Trump ("Promoting Beautiful Federal Civic Architecture") during his first term that dramatically re-oriented federal architecture in a classical and traditional direction. Helped draft his similar second-term EO.
- Delivered a talk promoting the first-term Executive Order at the U.S. Senate Steering Committee Luncheon to the dozens of Senators in attendance.
- Instigated, helped draft, and promote legislation in the U.S. House and Senate that would effectively codify the Executive Order.
- Serve as a General Service Administration National Design Peer directly advising on the architecture of the forthcoming federal courthouses in Chattanooga and Hartford.
- Lead a campaign to build a new classical Pennsylvania Station in New York City.

**Beautifying Transportation Infrastructure Council**, U.S. Department of Transportation, Washington, D.C., *Chairman* (Jan. 2026 – present)

- Appointed by Secretary of Transportation Sean Duffy.
- Lead a federal advisory committee that advises the Secretary of Transportation as to how enhance the aesthetic value of the nation's transportation systems. The Council provides recommendations on policies, designs, and funding priorities to beautify infrastructure such as highways, bridges, and transit hubs while maintaining safety and efficiency, and it identifies best practices and develops aesthetic performance metrics.

**U.S. Commission of Fine Arts**, Washington, D.C., *Chairman* (appointed by President Trump in Oct. 2018; elected Chairman in Jan. 2021; removed by President Biden in May 2021)

- Served as the 11th Chairman of an independent federal agency established in 1910 that is the aesthetic review board for Washington, D.C.
- The Commission reviews matters of design and aesthetics as they affect the nation's capital, including the design of monuments, memorials, and public buildings.
- Served *ex officio* on National Capital Memorial Advisory Commission, the Kennedy Center Board of Trustees, and the Committee for the Preservation of the White House.

**Legal Research and Writing** (part-time) (Nov. 2019 – present).

- Provide contract legal research and writing services to law firms.

## EDUCATION

**Yale Law School**, J.D., 2008, Senior Editor, *Yale Law & Policy Review*
**University of Michigan, Ph.D. Program in Philosophy**, M.A., 2004
**Columbia University**, B.A., *Magna cum Laude*; ΦΒΚ; Philosophy Major, Physics Minor, 1999

## COURSES TAUGHT

**Yale College**

- What Is Conservatism? (seminar)

**University of Michigan at Ann Arbor**

- Ethics 361
- Introduction to Philosophy 202

## HONORS, MEMBERSHIPS, AND AFFILIATIONS

**General Services Administration,** National Design Peer.
**Roger Scruton Legacy Foundation**, Board of Advisors.
**Alexander Hamilton Institute for the Study of Western Civilization**, Academic Board of Advisors.
**Robert Novak Journalism Fellowship from the Fund for American Studies**, 2015.
**Member,** New York and D.C. Bars.

## INTERVIEWS AND PROFILES

CBS Saturday Morning, Ben Shapiro Show, Newsmax, The Untold Story with Martha MacCallum (Fox News Radio), *Fast Company*, *Le Figaro*, *Politiken* (Denmark), *Le Point*, *Dezeen*, *Sivilisasjonen* (Norway), *Man & Culture*, *Epoch Times*, ARTE, Victor Davis Hanson, Andrew Klavan, Blaze News Tonight, Eric Metaxas Radio Show, Ricochet, The Federalist Radio Hour, Charles C. W. Cooke (*National Review*), Who Versus, Federal Drive, Breitbart News Daily, *First Things*, Daily Signal Sitdown, Vince Coglianese Show, *City Journal*, Aaron Renn, Intercollegiate Studies Institute with Johnny Burtka, Moment of Truth (American Moment) with Saurabh Sharma, DC EKG, Architecture and Innovation, Liberty Law Talk, *Athenaeum Review*, Modern Architect Radio Show, and U.S. Modernist Radio.

## CONGRESSIONAL AND OTHER TESTIMONIES

"H.R.1126: Dwight D. Eisenhower Memorial Completion Act," testimony to the U.S. House Subcommittee on National Parks, Forests, and Public Lands. Mar. 19, 2013.

"The Future of the National Mall," testimony to the U.S. House Subcommittee on National Parks, Forests, and Public Lands, Jun. 1, 2012. Broadcast on C-SPAN.

Six testimonies on the National Eisenhower Memorial presented to the U.S. Commission of Fine Arts, Jul. 18, 2013; Nov. 21, 2013; Feb. 2, 2014; Oct. 16, 2014; May 18, 2017; Sept. 20, 2017.

Six testimonies on the National Eisenhower Memorial presented to the National Capital Planning Commission, Apr. 3, 2014; Sept. 4, 2014; Oct. 2, 2014; Nov. 20, 2014; Feb. 2, 2017; Oct. 5, 2017.

## PUBLICATIONS

"Not Every Smithsonian Has to Be on the National Mall." *Washington Post*. 15 Jun. 2026.

"Washington Needs a Stadium as Grand as Harvard's." *Wall Street Journal*. 21 Jan. 2026.

"The Complicated Legacy of Frank Gehry's Work." *National Review*. 13 Dec. 2025.

"Building Citizens." *Civics Magazine*, Fall 2025.

(with Senator Jim Banks) "How We Realize Trump's Vision to Make Federal Architecture Beautiful Again." Fox *News*. 19 Sept. 2025.

"Jefferson Is the President's American Architecture Idol." *Financial Times*. 12 Sept. 2025.

"Here's One Federal Building We Could—and Should Scrap." *Washington Post*. 12 Mar. 2025.

"Trump Is Right: America's New Buildings Are Ugly." *City Journal*. 31 Jan. 2025.

"Make America Beautiful Again." *TomKlingenstein.com*. 21 Aug. 2024.

"Trump's Right: Americans Deserve Nice Public Buildings—Even if Elites Sneer." *New York Post*. 24 Oct. 2020.

"Monument to Failure: The Federal Government's Misguided Historic Preservation Agenda." *First Things*. Mar. 2016: 17-19.

"It's Time to Rebuild New York's Original Penn Station." *Forbes online*. 27 Jan. 2016.

"Towering Infernal: The Trouble with Two World Trade Center." *The Weekly Standard*. 21 Sep. 2015.

"Bob Dole Is Wrong: The Eisenhower Memorial Needs to Be Right, Not Rushed." *Roll Call*. 6 Aug. 2015.

"A First Look at the WWI Memorial Competition: The Best Entries Are All Classical." *Forbes online*. 4 Aug. 2015.

"Why Can't the New Urbanists Get a Fair Shake?" *Forbes online*. 21 May 2015.

"The American Institute of Architects' Outreach Campaign Is Doomed to Fail." *Forbes online*. 18 Mar. 2015.

"Architecture Continues to Implode: More Insiders Admit the Profession Is Failing." *Forbes online*. 6 Jan. 2015.

"Frank Gehry Is Right: 98% Of Architecture Today 'Has No Respect for Humanity'." *Forbes online*. 13 Dec. 2014.

"Opposition to Gehry's Controversial Eisenhower Memorial Is Clearly Bipartisan." *Roll Call*. 11 Mar. 2014: 20.

"It's Time to Bury Frank Gehry's Eisenhower Memorial." *Roll Call online*. 3 Feb. 2014.

"Why Congress Should Support a New Eisenhower Memorial." *Public Discourse*. 8 May 2013.

"We Must Preserve the Founders' Classical Vision for Our Nation's Capital." *Public Discourse*. 17 Jan. 2013.

"A Video-Game Eisenhower Memorial?" *Daily Caller*. 24 Oct. 2012.

"The Debate over Classical vs. Contemporary Architecture Needs to Continue." *The Washington Post online*. 24 May 2012.

"Let's Not Politicize the Eisenhower Memorial." *Huffington Post*. 1 Mar. 2012.

"Oakeshott on the Rule of Law." *Library of Law and Liberty*. 2 Sept. 2012.

*The Gehry Towers Over Eisenhower: The National Civic Art Society Report on the Eisenhower Memorial*. Jan. 2012.

"Frank Gehry's 'Eisen Curtain' Must Not Descend Upon the National Mall." *Daily Caller*. 12 Oct. 2011.

## TALKS

"The Architecture of Democracy: The Return of Classicism in the Design of U.S. Courthouses and Federal Office Buildings," Yale Law School (Federalist Society chapter), New Haven, Conn., January 22, 2026.

"Classicism Now"—panel discussion with Edwin Heathcote and Kate Wagner, moderated by Carlo Ratti, Venice Biennale (livestreamed), Nov. 22, 2025.

"The Demise of Public Architecture," Hillsdale College's Blake Center for Faith & Freedom, Somers, Conn., Nov. 7, 2025.

Panelist, "Golden Age Mindset: How to Restore Western Civilization," Intercollegiate Studies Institute Homecoming Roundtable Discussion, Wilmington, Del., Sept. 20, 2025.

"The Architect as Nation-Builder," National Conservatism Conference, Washington, D.C., Sept. 3, 2025.

"The City Beautiful Movement and Washington, D.C.," Teófilo Victoria Lecture Series, sponsored by the Florida chapter of the Institute of Classical Architecture & Art in collaboration with the Coral Gables Museum and National Civic Art Society, Coral Gables, Fla. Apr. 24, 2025.

"How Classical Architecture Can Unite Americans in an Otherwise Divided Time," sponsored by the Roger Scruton Legacy Foundation, Cambridge University, Cambridge, UK, Sept. 7, 2024.

"Citizenship and Public Architecture," *First Things* Intellectual Retreat, New York, NY, Aug. 9, 2024.

"How We Turned the Tables on Modern Architecture," National Conservatism Conference, Washington, D.C., July 10, 2024.

"Roger Scruton's Philosophy of Beauty," sponsored by the Center for American Culture and Ideas, the American Enterprise Institute, and the Ethics & Public Policy Center, Washington, D.C. May 19, 2024.

"Ordinary People's Aesthetic Preferences in Architecture," Beauty and Ugliness in Architecture conference, Oslo, Norway, May 4, 2024.

"Ordinary People's Aesthetic Preferences in Architecture," International Making Cities Livable Conference, Dorchester, UK, Sept. 12, 2023.

Debate: Should Washington, D.C. Raise Its Height Limit?, Congress for the New Urbanism Conference, Washington, D.C., Apr. 2, 2023.

"American Monuments," Common Sense Society Teachers' Seminar Conference, Boca Raton, Fla., July 20, 2022.

"The Architecture of the Nation's Capital," Common Sense Society Teachers' Seminar, Boca Raton, Fla., July 20, 2022.

"Building Dystopia: What Went Wrong in Modern Architecture," Keynote Address at the Academy of Philosophy and Letters Conference, College Park, Md., June 3, 2022.

"The Decline of American Monuments and Memorials: From Unity to Fragmentation," Intercollegiate Studies Institute Conference, Indianapolis, In., Apr. 2, 2022.

"The Return of Classicism in Federal Architecture," Luncheon Address, Philadelphia Society Conference, Dallas, Tx., Mar. 26, 2022.

Panelist at "Architecture in Transition: Toward a New Urban Agenda," Habitat Forum (livestreamed), Nov. 21, 2021.

Interview at Matthias Corvinus Collegium, Debrecen, Hungary, Oct. 29, 2021.

Interview at Matthias Corvinus Collegium, Budapest, Hungary, Oct. 27, 2021.

"Making Federal Buildings Beautiful Again," American Enterprise Institute (livestream), Oct. 19, 2020.

"Making Federal Buildings Beautiful Again," U.S. Senate Steering Committee Luncheon, U.S. Capitol, Washington, D.C., Feb. 12, 2020.

"Building Dystopia: What Went Wrong in Modern Architecture," Dallas Museum of Art, sponsored by the Edith O'Donnell Institute of Art History at the University of Texas at Dallas, Oct. 10, 2019.

"The Eisenhower Memorial: A Monumental Failure," Celebration of Bruce Cole co-sponsored by the National Civic Art Society, Ethics and Public Policy Center, and Encounter Books, Washington, D.C., Jan. 14, 2019.

"Biophilia and Design: How Human Nature Should Shape Architecture." U.S. Department of State Bureau of Overseas Buildings Operations, Arlington, Va., Jul. 17, 2018.

"Populism and Elitism at American Art Museums – Response to Eric Gibson," Conference on "Culture and Art in a Populist Age" sponsored by the Ethics and Public Policy Center and the University of Arizona American Culture and Ideas Initiative, Washington, D.C., Oct. 30, 2017.

"The End of Beauty in Architecture," Hildebrand Project Summer Seminar, Franciscan University of Steubenville, June 26, 2017.

"The History and Decline of Federal Courthouse Architecture," Federalist Society National Convention, Federal Judges Luncheon, Washington, D.C., Nov. 18, 2016.

"On the Preservation of the Historic Old Post Office," Trump International Hotel, Washington, D.C., Oct. 6, 2016.

"The Future of Federal Architecture," Institute of Classical Architecture & Art Bulfinch Awards Keynote Address, Boston, Mass., Apr. 23, 2016.

"Federal Architecture and American Values: From the Founders to Today," *First Things*, New York, NY, Dec. 17, 2014.

"The Architecture of Democracy," National Arts Club, New York, NY, Dec. 17, 2014.

"Keynote Address: The Tower of Wreckage: The Triumph of Nihilism in Architecture," Siena Heights University, Sept. 16, 2014.

"The Tower of Wreckage: The Triumph of Nihilism in Architecture," The Alexander Hamilton Institute for the Study of Western Civilization, Hamilton College, Clinton, NY, Feb. 10, 2014.

"The Tower of Wreckage: The Triumph of Nihilism in Architecture," Michael Oakeshott Association Conference, Colorado College, Colorado Springs, Col. Sept. 18, 2013.

"What Is a Monument?," Jefferson Literary and Debating Society, University of Virginia, Charlottesville, Va., Feb. 1, 2013.

"A Monumental Fight: The Eisenhower Memorial and America's Historical Memory," Baylor University Honors Program, Baylor University, Waco, Tx., Oct. 13, 2012.