UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA CIVIL LIBERTIES UNION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MIKE BRAUN, in his official capacity as the Governor of the State of Indiana,<br><br>Defendant. | ) | No. 1:00-cv-00811-SEB-MKK |

**Memorandum in Support of Motion for Summary Judgment**

**Introduction**

As this Court noted in its Order granting the Governor's Motion for Relief from the Final Judgment and Permanent Injunction (Dkt. 92), much has changed in Establishment Clause jurisprudence since this case was first heard and decided in the early years of the 21st century. Even though a new test of constitutionality must be applied to the proposed Ten Commandments monument, the result is the same. Erecting the proposed monument on the grounds of the Statehouse lawn would violate the First Amendment. There are no contested of issues of material fact and Plaintiffs are entitled to summary judgment and a permanent injunction preventing the placement.

**Statement of Material Facts Not in Dispute**

**I. The Indiana Statehouse and the plans to place the Ten Commandments monument on its grounds**

The Indiana Statehouse is the seat of the Indiana's state government and contains the offices of the Governor, other members of the Executive Branch, the Indiana General Assembly, and the Indiana Supreme Court and Court of Appeals. (Answer to Amended Complaint, Dkt. 102 at 4 ¶ 13).[1]

[1] All page numbers in exhibits are those assigned by the Court's ECF system.

The Statehouse is located in downtown Indianapolis on land that is bounded by Washington Street to the south, Ohio Street to the north, Capitol Avenue to the east, and Senate Avenue to the west. (*Id.* ¶ 14). Washington Street is also known as U.S. 40. (*Id.* at 5 ¶ 18).

On the plot of land that contains the Capitol building, from the south entrance of the building stretching toward Washington Street, there is a 1.93-acre grassy area. (*Id.* at 4 ¶¶ 14-16). On this south lawn there are a number of trees planted by former governors. (Dkt. 59-3 at 10). There are also some small plaques. (*Id.*). On the sidewalks leading to the south entrance there are four larger monuments or statues. (*Id.*; Dkt. 59-8 at 4). In the southwest corner of the lawn, near Senate Avenue, is a monument commemorating September 11 that measures approximately 22 inches in height that sits on an uneven base that is 6" to 9" in height. (Dkt. 59-8 at 4[2]; Declaration of Chad Blackwelder, Dkt. 114-1 at 1 ¶ 3). The 9/11 monument is 5 feet wide and its base is 6 feet wide. (*Id.* ¶ 4). Near Washington Street, on the south lawn, there is also a memorial to the National Road that is 4 feet high and 2 feet wide. (Dkt. 59-3 at 10; Dkt. 59-8 at 4).

From 1958 to 1991 there was a monument containing the text of the Ten Commandments that had been donated by the Fraternal Order of Eagles and was located on the southwest portion of the Statehouse lawn. (Dkt. 59-3 at 6 ¶ 24). It was in the triangular portion of the lawn that contains a tree planted by Governor Schricker in 1944, and was about 113 feet from the Washington Street sidewalk. (*Id.* at 6-7 ¶¶ 34-35, 10). The monument was vandalized in 1991. (*Id.* at 6 ¶ 24). It was repaired after it was vandalized and taken to the Eagles lodge in Anderson. (*Id.* at 102 at 6 ¶ 22).

In March 2000, then-Governor O'Bannon announced that Indiana would place a new monument containing a version of the Ten Commandments near the former monument's location on

---

[2] The exhibit notes Washington and Ohio Streets, but not Senate Avenue. However, "[t]he Court may take judicial notice of geographical locations, including the locations of streets and highways." *Roeber v. Hilton Worldwide Holdings, Inc.*, No. 25-cv-04908, 2026 WL 891865, at *5 n.6 (N.D. Ill. Mar. 31, 2026). The exhibit also notes that the monument honors "September 1, 2001." Counsel assumes that is a mistake.

the western portion of the Statehouse lawn. (Dkt. 59-3 at 6 ¶ 28; Dkt. 102 at 5 ¶ 19). The monument was constructed, but due to the prior orders of this Court, was never placed onto the Statehouse grounds. (Dkt. 102 at 6 ¶ 23).

The monument, designed by the Indiana Limestone Institute, is seven feet tall, including its base, with two large sides and two smaller ones. (*Id.* at 6 ¶¶ 23-24). It is six feet and seven inches wide at its widest point and is more than four feet deep. (*Id.* at 6 ¶ 24). With its base, the monument weighs approximately 11,500 pounds. (*Id.* at 6 ¶ 26). One of the large sides of the monument announces that it is a version of the Ten Commandments and is as follows:



(Dkt. 59-7 at 3; Dkt. 80-1 at 1). The other large side of the monument contains the Bill of Rights as follows:



(Dkt. 59-7 at 4; Dkt. 80-1 at 1). One of the small sides of the monument states that it contains the Preamble of the Indiana Constitution as follows:




(Dkt. 59-7 at 6; Dkt. 80-1 at 1). The other small side is as follows:



(Dkt. 59-7 at 4; Dkt. 80-1 at 1).

Due to the earlier preliminary, then permanent, injunctions entered in this case, the monument was not placed on the Statehouse lawn and is currently located on the property of a church in Bedford. (Dkt. 102 at 10-11 ¶¶ 36-39).

Governor Braun has announced that he intends to move the monument to the Statehouse grounds. (*Id.* at 11 ¶ 40). The monument will be placed near where it was originally intended to be placed – on the southwest corner of the Statehouse lawn. (Dkt. 59-3 at 6 ¶ 28; Dkt. 80-1 at 2; Dkt. 102 at 5 ¶ 19). In announcing his plans to place the monument on the grounds, Governor Braun stated that "[t]his monument reflects foundational texts that have shaped our Nation's laws, liberties, and civic life for generations." (Dkt. 80-1 at 2).

## II. The Ten Commandments and the version on the Governor's monument

The Bible teaches that God gave the Ten Commandments to Moses on Mt. Sinai. (Declaration of Rabbi Justin Kerber ["Kerber Dec."], Dkt. 114-2 at 2 ¶ 8). The commandments can be found, in slightly different versions, in the books of Exodus and Deuteronomy in the Bible. (*Id.*). The Ten Commandments is a profoundly religious document for both Jews and Christians. (*Id.* at 2-3 ¶¶ 9, 14; Declaration of Rev. William Grainger Lesesne, Jr. ["Lesesne Dec."], Dkt. 114-3 at 2 ¶ 9).[3] However, many religions do not accept the Ten Commandments as authoritative and/or do not consider the document as part of their religious traditions including Eastern religions, such as Hinduism, Buddhism, Taoism, Jainism, and Sikhism, as well as earth-based and humanistic religions. (Green, Dkt. 114-5 at 25-26 ¶ 43).

[3] "The Ten Commandments are not traditionally a part of Islamic teaching. While the Qur'an refers to the revelation of 'tablets' to Moses, it does not describe the instruction found on the tablets, and classical Islamic sources do not interpret them as the Ten Commandments of Jewish and Christian tradition." (Expert Report of Mark A. Chancey ["Chancey"], Dkt. 114-4 at 15-16 n. 38). Although there are parallels between some of the commands in the Qur'an and those in the Ten Commandments, there are differences as well. (Expert Report of Steven K. Green, J.D., Ph. D ["Green"] Dkt. 114-5 at 25-26 ¶ 43 and n.45).

There are various translations from the original Hebrew text of the Ten Commandments and there are theological differences among the Jewish, Catholic, and Protestant traditions concerning the translations. (Green, Dkt. 114-5 at 27 ¶ 45; Chancey, Dkt. 114-4 at 17-19). The Ten Commandments monument at issue here is an abbreviated version of the Ten Commandments taken from the King James Bible's Version's translation of the Decalogue in the book of Exodus. (Chancey, Dkt. 114-4 at 20; Green, Dkt. 114-5 at 27 ¶ 45 and 32).

The monument's version of the Ten Commandments omits the statement, "I the LORD am your God who brought you out of the land of Egypt, the house of bondage," which "[f]or many Jews . . . is a critical recognition of their special relationship and covenant with God, and erasing this text may be considered deeply offensive to them as a spiritual matter." (Green, Dkt. 114-5 at 27 ¶ 46). "That is the premise by which all of the rest of the commandments flow." (Deposition of Rev. William Grainger Lesesne, Jr. ["Lesesne Dep."], Dkt. 114-6 at 14:25-15:2). Therefore, many Jews believe this statement to be essential to the meaning of the Ten Commandments. (Chancey, Dkt. 114-4 at 22). Additionally, the monument notes the Sixth Commandment as prohibiting killing. However, most, although not all, modern Jewish translations render the Hebrew phrase "*lo Tirzah*" as prohibiting murder. (*Id.*; Kerber Dec., Dkt. 114-2 at 2-3 ¶¶ 12-13). Moreover, the monument misrepresents Jewish belief by implying that these Ten Commandments have an independent and superior status compared to the 603 other commandments by which Jewish law commands persons to live. (Deposition of Rabbi Justin Kerber ["Kerber Dep."], Dkt 114-7 at 22:5-17; 24:6-9). And the monument the Governor wants to install displays the Second Commandment as prohibiting graven images. (Dkt. 102 at 7 ¶ 27). "[W]hile some Catholic Bibles may include some language related to idols or graven 'things,' abridged versions of the Ten Commandments commonly omit that prohibition." (Green, Dkt. 114-5 at 29 ¶ 48).

But, regardless of translation and denominational preference, for believers, the Ten Commandments are held together by a faith community's covenant with God, and they make sense as a coherent document only as a statement given by God. (Lesesne Dec., Dkt. 114-3 at 2-3 ¶¶ 10-13; Kerber Dec., Dkt. 114-2 at 2 ¶ 9).

## III. The Ten Commandments and Ten Commandments monuments in American history and tradition

### A. There is no evidence that the Ten Commandments directly influenced English common law

There are numerous sources for the law of the American colonies and the United States. (Green, Dkt. 114-5 at 17 ¶ 30). The principal early sources were the common and statutory law of England, although English non-common law courts like equity, chancery, admiralty, and ecclesiastic were also influential. (*Id.*).

Most legal historians view Magna Carta as a seminal source of modern American and English law. (*Id.*). "Magna Carta addressed various legal subjects, including: inheritance land ownership and sale; taxation; jury trials and trial procedure; proportionality in punishment; and the taking of property without compensation." (*Id.*). It contains principles that remain of central importance in American law today. (*Id.*). "Magna Carta made no reference to either the Ten Commandments as a whole or any particular one of the Commandments." (*Id.*).

Following the "Glorious Revolution" of 1688-89, the 1689 English Bill of Rights was created and established basic rights for English citizens such as those pertaining to freedom of speech, jury trial, excessive bail and fines, and cruel and unusual punishments. (*Id.* at 17-18 ¶ 31, 19 ¶ 33). It was highly influential in the American colonies, many of which incorporated these rights and those created by Magna Carta, directly into colonial law and other governing documents. (*Id.* at 18 ¶ 31). The English Bill of Rights made no reference to the Ten Commandments and only highly formalistic references to God. (*Id.*).

Another highly influential source for late-colonial and early-American law was Sir William Blackstone's 1769 *Commentaries*. (*Id.* at 18 ¶ 32). "Despite his discussions about ecclesiastical and religious influences on British law, which of course were based on the integration of the canon law of the established Church of England, Blackstone did not claim that the Ten Commandments served as a basis for the law." (*Id.*).

**B. Although the Founders were well versed in the Bible and frequently utilized Biblical references, there is no evidence that the Ten Commandments directly influenced the development of American law**

"Scholars from across the ideological spectrum acknowledge the prevalence of religious rhetoric during the founding period, often appearing in the form of references to scripture, allusions to Old Testament Israel, and assertions of interposing Providence, among others." (*Id.* at 10 ¶ 22). The Bible was the most common and widely read book in colonial America, and regardless of their religious viewpoints, "[m]embers of the founding generation were biblically literate—particularly by today's standards—and religious imagery infused public discussions about revolution, politics and cultural norms." (*Id.*) (footnote omitted). During the American Revolution, Great Britain was widely compared to Egypt and the fleeing colonists as the Children of Israel. (*Id.* at 10-11 ¶ 23).

However, the central legal documents creating the United States contain few religious references. (*Id.* at 19-20 ¶ 34). "[T]he Declaration of Independence contains four natural law / rights allusions to God, but no reference to the Bible or biblical law." (*Id.* at 20 ¶ 34). It insists that "Governments are instituted among Men, deriving their just powers from the consent of the governed." (*Id.* at 20 ¶ 34) (footnote omitted). And there are no references to God in either the Constitution or the Bill of Rights. (*Id.*). There is no reference in any of these documents to the Ten Commandments. (*Id*). Although Roman law, European continental law, British law, and various legal systems were mentioned during the debates and publications concerning the founding documents,

there is no mention of the Ten Commandments or Biblical law as authoritative sources. (*Id.* at 20 ¶ 35). And there is no mention of the Ten Commandments in the *Federalist* papers. (*Id.*).

Justice Joseph Story, the writer of influential legal treatises, wrote that God was "our Lawgiver and Judge," but he never mentioned the Ten Commandments in his three-volume treatise, published in 1836, *Commentaries on the Constitution.* (*Id.* at 21 ¶ 36).[4] Law professor David Hoffman wrote in *A Course of Legal Study* in 1836 that the Bible "is the foundation of the common law of every christian nation," but he did not claim that "Anglo-American law was derived from the Decalogue or Pentateuch." (*Id.*).

A review of early American caselaw discloses that there was no significant reliance on the Ten Commandments. (*Id.* at 22-24 ¶¶ 37-39). There are a small number of cases that refer to the fourth commandment in discussing Sunday-closing laws and a smaller number of cases that mention the seventh commandment in lawsuits concerning adultery. (*Id.* at 22 ¶ 37). However, the biblical references were largely hortatory with the holdings resting on secular, not religious, grounds. (*Id.*).[5]

---

4 According to Justice Souter in the Court's opinion in *McCreary Co., Ky. v. ACLU of Ky,*, Justice Story "wrote in his Commentaries that the purpose of the [Establishment] Clause was 'not to countenance, must less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects." 545 U.S. 844, 880 (2005) (quoting R. Cord, Separation of Church and State: Historical Fact and Current Fiction 13 (1988)).

5 In a 2009 article in the *Liberty University Law Review*, John Eidsmoe asserted that he had identified roughly 1,000 judicial citations to the Ten Commandments over the last two centuries. (Green 114-5 at 22 ¶ 37 n. 40). This was the product of a Lexis word search of the words "Commandments" and "Decalogue" in judicial decisions. (*Id.*). But

> he acknowledges the unreliability of those figures. The figures include multiple uses of the terms within the same case and do not account for uses of the common, non-biblical term "commandment." Then, as the article also acknowledges, when judges referred to one of the Ten Commandments, it was often done figuratively or allegorically, not as binding on the judicial decision. In other instances, judges referred to one of the Commandments to distinguish it from the *civil* basis of statutory or common law offenses such as murder, theft, or Sunday work (or were merely repeating the religious-based claims of one party before rejecting those claims).

### C. Although symbolic representations of the Ten Commandments, without any discernable text, are not uncommon in public places in the United States, the first organized posting of Ten Commandment monuments, with text, did not occur until the 1950s

All of the above is not to deny, however, that there are displays of religious figures or Biblical quotations on the outside or inside of public buildings throughout the United States. (Deposition of Justin Shubow ("Shubow"), Dkt. 114-8 at 46-63 ¶¶ 13-38). Some of the representations include the Ten Commandments, but none of these representations have any discernible English text (though they sometimes show a limited number of Hebrew letters), and they are frequently placed in a context with other figures. (*Id.* at 14:2 – 15:11; 23:14-23). For example, the frieze of the great lawgivers in history that graces the courtroom in the United States Supreme Court includes a figure of Moses, and he is holding a tablet with four lines of partially obscured Hebrew. (*Id.* at 23:18-22; Dkt. 114-9).[6] However, the Moses figure is joined by Menes (the first king of the first Egyptian dynasty), Hammurabi, Lycurgus of Sparta, and numerous other lawgivers from history. (Dkt. 114-9). The East Pediment of the U.S. Supreme Court building has carved into it a figure holding tablets inscribed only with Roman numerals (I-X), flanked by Confucius and Solon. (Shubow, Dkt. 114-8 at 49 ¶ 23). Elsewhere in the building, there are representations of the Ten Commandments without text. (*Id.* at 23:23-25, 49 ¶ 23).

Similarly, there are representations of the Ten Commandments in other courthouses, where the Moses figure is often situated with other lawgivers. The E. Barrett Prettyman United States Courthouse, dating from 1951, features four marble sculptures of Moses, Hammurabi, Solon, and

---

(*Id.*) (emphasis in original) (citation omitted). And, obviously, many of the citations would be located withing cases challenging displays of the Ten Commandments where the term "Ten Commandments" is mentioned multiple times.

[6] Dkt 114-9 can be found at *Courtroom Friezes: South and North Walls – Information Sheet*, *available at* South and North Courtroom Frieze- Read More, https://www.supremecourt.gov/about/infosheets/SouthAndNorthFriezes.html – (last visited Sept. 11, 2026).

Justinian, with Moses holding a tablet, without text. (*Id.* at 14:24 – 15:11; 55 ¶ 28**;** Dkt. 114-10).[7] And, the Appellate Division's courthouse in New York features a parapet around the roof that originally contained ten statutes of historical, religious, and legendary lawgivers, including Moses holding the Ten Commandments, again without text. (Shubow, Dkt. 114-8 at 14:24 – 15:11, 55-56 ¶ 29). The Kings County courthouse in Brooklyn has a relief of a figure, presumably Moses, holding tablets inscribed only with Roman numerals I-X. (*Id.* at 57-58 ¶ 31**).**

The practice of placing Ten Commandments monuments with the complete text of the Decalogue on the exterior of courthouses and government buildings in the United States originated with the Fraternal Order of Eagles beginning in the mid-1950s. (Chancey, Dkt. 114-4 at 9-13). As one of the State's experts has noted:

> Q. And you agree that prior to the Eagles' placement of Ten Commandments monuments on courthouses and other public grounds in the 1950s, there was not a history or tradition in the United States of placing monuments with the full text on public grounds: correct?
>
> A. I don't know if I make that claim in the report, but I agree with that statement.

(Shubow, Dkt. 114-8 at 18:21 – 19:3).

The idea of posting the Ten Commandments in courthouses originated with Judge E.J. Ruegemer, a Minnesota juvenile judge who was troubled that the text of a version of the Ten Commandments was not in his courtroom. (Chancey, Dkt. 114-4 at 9). He set out to introduce a copy of the Ten Commandments into every courtroom in the United States to allow judges to point out the transgressions that had been committed by youthful offenders. (*Id.* at 9). The Fraternal Order of Eagles ("Eagles") adopted the project and determined that the Ten Commandments should be spread to public places, as in their view, for "too long the Commandments have slumbered in the national

[7] Dkt. 114-10 can be found in archives maintained by the Library of Congress at https://www.loc.gov /pictures/collection/highsm/item/2017656627/resource/ (last visited September 11, 2026).

conscience." (*Id.* at 10 [quoting from an Eagles publication]). Originally paper copies of the Ten Commandments were printed that clearly set out the Eagles' religious purpose. (*Id.* at 11). An essay was printed on the back of the copies that stated, "[p]resented to Moses on Mount Sinai by the hand of God as two stone tablets, the Ten Commandments stand today after more than 3500 years as God's law to the human race." (*Id.* at 11) (quotation and citation omitted). It further provided the Commandments set out "our obligations to God" and "our obligations to fellow men" as "the original program presented by God." (*Id.*) (quotation and citation omitted). The hope was that the Ten Commandments would "inspire in all who see it renewed respect for the Law of God, which is our greatest strength against the forces that threaten our way of life." (*Id.*) (quotation and citation omitted).

In 1954 the Eagles began to create granite Ten Commandments monuments at the same time that it continued to distribute prints of the Decalogue. (*Id.* a 10). The organization used the publicity around the 1956 *The Ten Commandments* film "to better sell the Ten Commandments to the public." (*Id.* at 10-11) (quotation and citation omitted). It is unclear when the Eagles ceased its campaign of mass distribution of the printed version of the Ten Commandments. (*Id.* at 13). However, it ultimately created approximately 200 monuments, which were installed at parks, city halls, courthouses, and on the grounds of seven state capitols, including Indiana's, in 1958. (*Id.*).

## IV. The plaintiffs

### A. The individual plaintiffs

#### 1. Professor James A. Tanford

James A. Tanford is an emeritus professor of law who joined the faculty of the Indiana University Maurer School of law in 1979 and retired four years ago. (Deposition of James A. Tanford, Dkt. 114-11 at 8:13-22). He is an attorney, continues to practice law, and is of counsel to an Indianapolis law firm. (*Id.* at 7:10 – 8:5). He practices in both state and federal court. (*Id.* at 8:4-5). He is a past member and president of the Board of Directors of what is popularly referred to as the ACLU

of Indiana. (*Id.* at 9:5-18). He has not been on the Board for at least 25 years, but is a current member of the organization. (*Id.* at 9:22-24, 18:9-11). He noted that issues of church and state are "at the core" of what the ACLU is interested in. (*Id.* at 27:14-16).

Although Professor Tanford lives in Bloomington, Indiana, he frequently travels to Indianapolis for various reasons, including to the downtown Indianapolis law firm he is associated with, to go to sporting events, to see friends, and to appear in court. (*Id.* at 19:13-14, 19:19 – 20:15; 91:6-8). He goes to the Indianapolis law firm at least a couple of times a month, and will continue to do so, and leaves Indianapolis by taking Washington Street past the Statehouse. (*Id.* at 91:2 – 92:22; 93:5-16). He also visits the Statehouse to see the stained glass that his step-father worked on that is in the building's rotunda and ceiling. (*Id.* at 21:14 – 22:22). He enters the Statehouse either through the Capitol Avenue entrance or the accessible entrance on the west side of the building. (*Id.* at 22:23 – 23:13). He parks on streets around the Capitol, including on Washington Street. (*Id.* at 24:3-15). He goes to the Statehouse on legal business or to observe others in court and plans to do so in future. (*Id.* at 87:111 – 90:9). Also, he goes to Indianapolis Colts games, generally three times a year, and will walk from the stadium past the Statehouse on Washington Street to the law school where he parks. (*Id.* at 24:23-25:21, 28:3-13).

Professor Tanford has seen the monument on the church property in Bedford. (*Id.* at 28:25 – 29:10). It does not bother him to see the Ten Commandments on the property of a church, nor would it bother him if it was on private property. (*Id.* at 43:18-24, 44:24 – 45:18). He is aware that the version of the Ten Commandments monument is the Protestant, not Catholic, version as he is Catholic. (*Id.* 32:11-19). He objects to its placement on the Statehouse grounds as it is sectarian, and because it is a religious monument that honors a Protestant version of the Decalogue. (*Id.* at 32:24 – 33:3; 35:2-18; 35:24 – 36:21). Regardless of the version of the Ten Commandments that is used, the State has no business erecting a religious monument. (*Id.* at 37:24 – 38:2). "[W]hatever version you put up is going

to be offensive to people of different religions and that's the problem." (*Id.* at 38:20-22). He believes the government should not be involved in religion. (*Id.* at 40:13-20). Therefore, it would bother him to see any version of the Ten Commandments on public property. (*Id.* at 51:5-7). It also upsets him, as the monument is contrary to everything his stepfather believed and valued, and has impacted his previous practice to spiritually connect with his late-stepfather in a location that was important to him. (*Id.* at 35:2-18). As is clear, the monument hurts and offends him on multiple levels. (*Id.* at 37:24 – 38:2).

**2. Reverend Kevin Armstrong**

Rev. Kevin Armstrong is a retired United Methodist pastor who served in a number of pastoral settings from 1985 to 2004 and then served as executive Vice-President of Mission and Values and Chief of Staff for IU Health until his retirement in 2024. (Deposition of Rev. Kevin Armstrong, Dkt. 114-12 at 10:15 – 11:9). He lives a short distance from the Statehouse and regularly runs by it. (*Id.* at 12:8-13). He is not a member of the ACLU. (*Id.* at 12:14-15).

Rev. Armstrong will travel by the Statehouse at least twice a week, not including when there are activities within the Statehouse. (*Id.* at 15:6-12). As a resident of Indianapolis's downtown, he is frequently in the area. (*Id.* at 42:4-9). At least twice a week, he runs on the sidewalk on Washington Street that is adjacent to the Statehouse and uses the street between the State Government Building and the Statehouse lawn to get to the downtown canal. (*Id.* at 18:3-20, 43:8-14). As he is a member of the Board of Directors of the University of Indianapolis, the Methodist Health Group (one of the two governing bodies of IU Health), and the Calvin Fletcher Coffee House Foundation, he attends legislative committee meetings of interest to him in those roles. (*Id.* at 15:23 – 16:21). When he goes to the Statehouse he often uses its western entrance. (*Id.* at 19:8-20, 48:19 – 49:5).

Rev. Armstrong believes that the Ten Commandments are profoundly sacred. (*Id.* at 22:1-11). He believes that the monument should not be displayed on the grounds of the Statehouse, as it

represents an establishment of religion and religious belief by the State. (*Id.*). It is a sacred text and it is not appropriate for Indiana to put a monument with such a religious meaning on the Statehouse grounds. (*Id.*; 24:7-8). He finds it offensive. (*Id.* at 23:5-7).[8] He would similarly object to the display of the holy texts of other religions. (*Id.* at 37:12 – 38:3).

**3. Patrice Muumba Abduallah**

Patrice Muumba Abduallah is a former city councilperson who lives in Indianapolis. (Deposition of Patrice Muumba Abduallah, Dkt. 114-13 at 6:19-20, 17:17-22, 38:24 – 39:15). He is recently retired. (*Id.* at 11:13-14). He frequently travels past the area where the Governor plans to place the Monument, including traveling by car on Washington Street, among other streets. (*Id.* at 18:12-22, 19:9-13). He will see the lawn of the Statehouse and the monument as he drives. (*Id.* at 19:19-23; 34: 9-17). He would have to change how he travels to avoid seeing it. (*Id.* at 35:22 – 36:8).

He goes to the State Office Building to pay taxes or retrieve information for his business. (*Id.* at 20:16-21). When he goes to the State Office Building or to the nearby Convention Center he parks in one of the accessible parking spaces on Washington Street in front of the Statehouse and towards the Senate Avenue entrance into the building. (*Id.* at 21:3-9, 40:25 – 41:16). He has gone into the Statehouse in the past to talk to legislators and see what is going on. (*Id.* at 21:16-22). And when he goes into the Statehouse he uses the Senate Avenue entrance, as it is ADA accessible. (*Id.* at 36:25 – 37:6).

Mr. Abduallah is Muslim. (*Id.* at 14:6-7). He has served as a volunteer chaplain for prisoners in the Marion County Jail. (*Id.* at 14:19 – 16:8, 38:11-23). What is inscribed on the planned Statehouse monument is offensive to him. (*Id.* at 24:11-14). It does not include his religious beliefs. (*Id.* at 25:5-

[8] As does Professor Tanford, Rev. Armstrong recognizes that the planned Ten Commandments monument contains the Protestant version of the text. (*Id.* at 34:9-13).

11). He would object to any religion's belief system, including Islam's, being placed on the Statehouse grounds, as it directs people as to what they must believe. (*Id.* at 31:16 – 32:21).

**B. The Indiana Civil Liberties Union, Inc. and the Indiana Civil Liberties Union Foundation, Inc.**

The organization that is popularly known as the ACLU of Indiana actually consists of two separate non-profit organizations, a 501(c)(3) and a 501(c)(4) organization. (Deposition of William Harrington, Dkt. 114-14 at 23:5-12; 26:16-23).[9] It has been in existence since 1953 and is devoted to the protection of constitutional rights of Hoosiers through litigation, advocacy, and education. (*Id.* at 23:7-16, 29:6-9, 46:16-20). It is affiliated with the national ACLU, but is a separate organization. (*Id.* at 24:19 – 25:24). It has approximately 14,000 members in Indiana and 2,500 members in Marion County. (*Id.* at 36:1-10). One becomes a member by making an annual contribution to the 501(c)(4) entity. (*Id.* at 35:21-25, 36:21 – 37:2).

The ACLU of Indiana believes that placing the Ten Commandments monument on the Statehouse lawn would violate the Establishment Clause. (*Id.* at 53:4-10). It is a fundamental position of the ACLU of Indiana that the State and religion should have nothing to do with each other. (*Id.* at 73:5-8). This is consistent with the views of its members who strongly believe that Indiana should not be establishing support for religious beliefs and that placement of the monument of the Statehouse lawn violates the First Amendment. (*Id.* at 55:7-10, 75:14-16). It is also consistent with the position of the other ACLU affiliates in the United States and the national ACLU. (*Id.* at 89:10-22).

The ACLU of Indiana has identified four members whom the organization believes have standing in their own right to challenge the planned display: Professor Alex Tanford; the Very Reverend William Grainger Lesesne, Jr.; McKenzie Conrad; and Danielle Drake. (*Id.* at 66:16 – 67:6).

[9] Mr. Harrington was designated pursuant to Fed. R. Civ. P. 30(b)(6) as the deposition designee of the ACLU of Indiana. (Dkt. 114-14 at 14:18-21, 20:14 – 21:10).

*Professor Alex Tanford*: *See supra* at 13.

*The Very Reverend William Grainger Lesesne, Jr.*: Rev. Lesesne is a member of the ACLU of Indiana. (Lesesne Dep., Dkt. 114-6 at 7:6-9). He objects to the publication of the Ten Commandments on state property in any form, as it is an inherently religious document. (*Id.* at 14:4-7, 17:4-10). The commandments were not intended to be a list of civic maxims. (*Id.* at 21:17-18). Putting the monument on state property is a direct affront to his faith. (*Id.* at 36:13-18). He considers this to be a psychosocial injury. (*Id.* at 38:4-8). The monument does a grave disservice to the Ten Commandments and its holistic religious nature. (*Id.* at 45:6-8).

Rev. Lesesne frequently travels to the Statehouse. (*Id.* at 28:6-18). During the legislative session, he is there at least once a week for committee testimony and advocacy work. (*Id.*). He goes to the Statehouse to engage in advocacy designed to promote justice and peace as those are central to his faith—including offering testimony on legislation, speaking with legislators and lobbyists, advocating and gathering with other groups, engaging with his parishioners, and engaging in public acts of witness. (*Id.* at 28:19 – 29:6). He walks to the Statehouse from his church, Christ Church Cathedral, and enters either the east or west doors of the Statehouse. (*Id.* at 30:9-23). He has been on the Statehouse grounds for protests, and he often runs down Washington Street past the lawn of the Statehouse and may rest on the Statehouse grounds. (*Id.* at 31:8-16, 58:22 – 59:4). The placement of the Ten Commandments on the Statehouse lawn will require him to spend additional pastoral and teaching efforts to correct what would be a gross misrepresentation of a text central to his ministry. (*Id.* at 38:19-25, 46:3-11, 48:11-12).

*McKenzie Conrad*: Ms. Conrad is currently employed by the ACLU of Indiana as the senior communications specialist. (Deposition of McKenzie Conrad, Dkt. 114-15 at 9:24 – 10:1). She is also a member of the organization and intends to renew her membership annually. (*Id.* at 12:14-17, 23:9-11). The planned monument goes against her beliefs as it is "uninclusive." (*Id.* at 16:3-14). She

believes that there should be no religion associated with any monument at the Statehouse. (*Id.* at 17:11-12).

Ms. Conrad is frequently at the Statehouse during the legislative session and at other times as part of her job, and she plans to continue to do so. (*Id.* at 17:1 – 18:2, 24:1-4). In addition to going to the Statehouse for committee hearings and testimony, she also attends rallies, protests, and other public events, some of which are held on the south lawn of the Statehouse, and she will continue to be present at the Statehouse for similar reasons. (*Id.* at 23:12-25). Ms. Conrad estimates that in the next year she will visit the Statehouse up to two dozen times. (*Id.* at 24:5-10).

When she travels to the Statehouse she drives on Washington Street, tries to park in front of the Statehouse, and will use the accessible entrance when she is carrying items. (*Id.* at 21:3-18). She would not be able to avoid seeing the monument if she used this entrance. (*Id.* at 22:4-9).

*Danielle Drake*: Ms. Drake is employed as the ACLU of Indiana's advocacy manager. (Deposition of Danielle Drake, Dkt. 114-16 at 9:9-14). She is a member of the ACLU of Indiana and intends to continue her membership. (*Id.* at 16:6-8; 30:11-13). She does not feel that it is appropriate to have any religious monument on State property. (*Id.* at 17:7-11; 22:16 – 23:5). She finds it offensive that there is a religious monument in a location that she frequents and that she will see when she passes. (*Id.* at 18:20 – 19:2).

Ms. Drake is frequently in the Statehouse, and will continue to be there frequently, as when the legislature is in session she is there three to four times a week. (*Id.* at 25:1 – 26:6). During these Statehouse visits, she sits in on legislative sessions, provides testimony, and organizes events around the issues that the ACLU of Indiana works on. (*Id.* at 26:7-12). The events are held on various floors of the Statehouse. (*Id.* at 28:5-17). She also has participated in dozens of demonstrations that take place outside on the south lawn of the Statehouse and anticipates participating in future demonstrations. (*Id.* at 30:14 – 31:8).

Ms. Drake travels to the Statehouse on Washington Street to the south end of the Statehouse property and parks either on the street or in a nearby parking garage that is opposite the south end of the Statehouse. (*Id.* at 26:13 – 27:25). She enters the Statehouse through the accessible entrance off of Senate Avenue on the west side of the Statehouse, as she often has materials with her. (*Id.* at 28:2-4, 28:9-11, 31:9-15). To avoid seeing the monument, she would have to park in a different location, take a different route, and go to the east entrance, which would require her to carry her materials up a set of stairs. (*Id.* at 28:18 – 29:1).

**The summary judgment standard**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party is so entitled if no reasonable fact-finder could return a verdict for the non-moving party." *Patton v. MFS/Sun Life Financial Distributors, Inc.* 480 F.3d 478, 485 (7th Cir. 2007) (citations omitted). The court is to "consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276-77 (7th Cir. 1996).

**Argument**

In its decision granting the Governor's Motion for Relief from the Final Judgment and Permanent Injunction, this Court noted that since final judgment was entered in this case "[i]t is indisputable here that Establishment Clause jurisprudence has changed significantly since 2002." (Dkt. 92 at 8). Plaintiffs agree that the Supreme Court has radically altered Establishment Clause jurisprudence over the last quarter of a century. However, this change in the law does not change the result that must be reached in this case—the Governor's placement of the monument on the grounds of the Statehouse would violate the Establishment Clause.

At the outset it is important to stress that focus must be on the fact that this is a Ten Commandments monument. Plaintiffs, of course, acknowledge that that the other large side of the monument contains the Bill of Rights (in much smaller font than the Decalogue) and the smaller sides contain the Preamble to the Indiana Constitution and a dedication. This Court previously properly recognized, however, that the other sides of the monument made no difference in assessing the monument's constitutionality as they "are not physically linked to the other texts on the display, appearing by themselves on one side of the large tablet shaped block. . . . Rather, the Ten Commandments will be displayed in such a way that a person looking at them will see only the Ten Commandments, as they are set out on a seven-foot tall limestone block." *Indiana Civil Liberties Union Inc. v. O'Bannon*, 110 F. Supp. 2d 842, 852 (S.D. Ind. 2000), *aff'd*, 259 F.3d 766 (7th Cir. 2001). The change in the Establishment Clause jurisprudence since 2000 does not alter the fact that this is a Ten Commandments monument.

## I. In order to determine if a display violates the Establishment Clause, a court must look to history and tradition of the display or similar displays

As the Supreme Court has noted, the Ten Commandments "are undeniably a sacred text in the Jewish and Christian faiths." *Stone v. Graham*, 449 U.S. 39, 41 (1980). However, this undeniable fact does not answer the question of whether the planned monument is constitutional.

In administering the *coup de grâce* to *Lemon v. Kurtzman,* 403 U.S. 602 (1971), and its companion endorsement analysis[10] in *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022), the Court noted that it had "long ago" abandoned the earlier tests. *Id.* at 534. Instead, the Court stated that "[i]n place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings. The line that courts and

---

[10] *See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 593 (1989). As noted immediately above, this Court previously found that the other texts on the other side of the monument were not relevant in assessing its constitutionality. It is even less relevant now given the demise of the endorsement analysis and the necessary focus on history and tradition.

governments must draw between the permissible and impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* at 535-36 (cleaned up) (quoting *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576-77 (2014) and citing *American Legion v. American Humanist Ass'n*, 588 U.S. 29, 60-61 (2019) (plurality)).

In *Town of Greece* the Court found that sectarian prayer prior to a town board meeting did not offend the Establishment Clause as it "fit[ ] the tradition long followed in Congress and the state legislatures." 572 U.S. at 577. That tradition had been "practiced by Congress since the framing of the Constitution." *Id.* at 575. This long "history supported the conclusion that legislative invocations are compatible with the Establishment Clause." *Id.* There was no constitutional violation as "history shows that the specific practice is permitted." *Id.* at 577.

The focus in *Town of Greece* on the history and tradition of the specific practice at issue echoed the approach the Court took earlier in *Lynch v. Donnelly*, 465 U.S. 668 (1984), where the Court upheld the constitutionality of a Christmas holiday display in a city park that in addition to containing a Santa Clause house, reindeer, candy-striped poles, a Christmas tree, lights, and cutout figures of an elephant and teddy bear, also contained a crèche. *Id.* at 672. The Court stressed that its "interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees." *Id.* at 673. Of relevance for the nativity scene was that presidents had long recognized Christmas as a national holiday. *Id.* at 676. The display itself merely took "note of a significant historical religious event long celebrated in the Western World. The crèche in the display depicts the historical origins of this traditional event long recognized as a National Holiday." *Id.* at 680.

In *American Legion* the Court concluded that a Latin cross honoring soldiers killed in World War I, which had been standing for nearly 100 years, did not offend the Establishment Clause as it was a "monument[ ] . . . with a longstanding history." 588 U.S. at 63 (plurality). The Court concluded

that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones. The passage of time gives rise to a strong presumption of constitutionality." *Id.* at 56. This presumption can be rebutted if the monument, symbol, or practice is deliberately sectarian. *Id.* at 64. Justice Breyer, concurring with Justice Kagan, stressed that "[t]he case would be different, in my view, if there were evidence that . . . the Cross had been erected only recently, rather than in the aftermath of World War I." *Id.* at 67 (Breyer, J., concurring).[11]

In *Woodring v. Jackson County, Indiana*, 986 F.3d 979 (7th Cir. 2021), the court upheld a nativity display that had adorned the lawn of a county courthouse for 15 holiday seasons prior to the case being brought. *Id.* at 984, 997. Although the case was decided before *Kennedy*, the court recognized that the proper test, as enunciated in *American Legion*, looked at whether the specific challenged display was itself longstanding or fit into a longstanding historical tradition. *Id.* at 994. The court concluded that the 15-year history of placing the nativity scene in front of the courthouse did not make the specific display longstanding or established. *Id.* Nevertheless, the court found that there was "a long national tradition of using the nativity scene in broader holiday displays to 'depict[ ] the historical origins' of Christmas—a 'traditional event long recognized as a National Holiday.'" *Id.* at 996 (quoting Lynch, 465 U.S. at 680). It fit into a "broader pattern of government recognition of public holidays, Christian and non-Christian alike." *Id.* (citation omitted).

## II. The specific display here is obviously not of "longstanding history," nor is it part of a longstanding historic tradition

There are therefore two questions that must be answered in analyzing the constitutionality of the planned monument. First, does the specific monument itself have a "longstanding history"? *American Legion*, 588 U.S. at 63 (plurality). And, even if there is not this specific history, as in *Woodring*,

---

11 As the narrowest opinion necessary to the Court's judgment, Justice Breyer's opinion controls. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

the question is whether the monument fits within the historical tradition of "categories of monuments, symbols, and practices with a longstanding history." *Id.* This has to be a history that "faithfully reflect the understanding of the Founding Fathers." *Kennedy*, 597 U.S. at 536 (cleaned up). The uncontested facts here demonstrate that the proper answer to both of these questions is in the negative and therefore erection of the planned monument would violate the Establishment Clause.

**A. The yet-to-be erected monument has no longstanding history**

It should not require a lengthy argument to demonstrate that a monument that has not yet been placed on the Statehouse lawn has no history, let alone a longstanding one. It is true that the monument would replace a similar one that had been present from 1958 to 1991, but this does not change the fact that the lawn has been empty for more than three decades and that the placement of the new monument would be exactly that: a new monument.

The contrast, of course, is presented in *Van Orden v. Perry*, 545 U.S. 677 (2005) (plurality). In that case an Eagles monument had been on the Texas statehouse lawn for 40 years and the plaintiff waited six years after confronting it to bring suit. *Id.* at 682. It was placed among 16 other historical monuments and 21 historical markers. *Id.* at 681. In finding the monument to be constitutional, the plurality commented on the Ten Commandments being part of our Nation's heritage, without citing specific historical evidence to that effect. *Id.* at 688-89. Instead, the Court referred to various sculptural representations of the Ten Commandments that contain no English text, including the frieze of the lawgivers in the courtroom of the Supreme Court. *Id.* However, Justice Breyer, who concurred in the judgment, focused on the fact that the monument had been in place for 40 years. *Id.* at 702 (Breyer, J., concurring). He agreed that its context, with 16 other monuments and 21 historical markers in a park-like setting, minimized the religiosity of the monument. *Id.*[12] But the determinative factor was

[12] The lawn of the Statehouse is not comparably populated, as can be seen by the map of the Texas Statehouse grounds reprinted in *Van Orden*, 545 U.S. at 706, which demonstrates a number of monuments in

that it had been in place for 40 years, a contrast to the "short (and stormy) history," *id.* at 703, of a Ten Commandments courthouse display found to evince a religious purpose and found likely unconstitutional in *McCreary County*, 545 U.S. at 880, decided the same day as *Van Orden.*

The monument in *Van Orden* had stood "uncontested for nearly two generations." 545 U.S. at 704 (Breyer, J., concurring). The contrast here is clear as the planned monument would be a new monument with no history, let alone a longstanding one.

### B. There is not a longstanding tradition of placing Ten Commandment monuments on public property and there is not the required historical support justifying the posting of the Ten Commandments

The second question is whether placement of a Ten Commandments monument is "consistent with a historically sensitive understanding of the Establishment Clause" that "faithfully reflect[s] the understanding of the Founding Fathers. *Kennedy*, 597 U.S. at 536-537 (cleaned up). There must be a "focus[ ] on original meaning and history. *Id.* at 536.

There is obviously some uncertainty in the test articulated by the Supreme Court. However, it is uncontested that the posting of Ten Commandments monuments did not begin until the Eagles began to make the monuments available in the mid-1950s. There is no similar tradition or pattern of erecting such monuments at the time of the founding or thereafter until the Eagles began to do so. And to the extent that the test requires a focus on the understanding of the Founders and the experience in our country's history, it is clear that regardless of religious sentiments expressed by the Founders or other early Americans, there is no reference to the Ten Commandments in our founding documents and little substantive reference to the Decalogue in early American case law. (*Supra* at 9-10). Posting a Ten Commandments monument with its complete text, simply does not comport with "historical practices and understandings" concerning the Ten Commandments. *Town of Greece*, 572

---

close proximity to the Ten Commandments monument, as compared with the planned location of Indiana's Ten Commandments monument on the west side of the Statehouse lawn. (*See* Dkt. 59-8 at 4).

U.S. at 576 (quotation and citation omitted). That is, it is not "a governmental practice with historical support" that fits "within a long national tradition." *Woodring*, 986 F.3d at 996.

The State may argue that the "historically sensitive understanding" here refers to the general history of the use of religious texts and symbolism in various public places as noted above. (*Supra* at 11-12). This appears to ignore the focus required by the Supreme Court. Nevertheless, in *Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576 (5th Cir. 2026) (en banc), *petition for cert. filed*, No. 26-257 (Aug. 17, 2026), a 9-8 decision, the court held that a Texas statute requiring the posting of a version of the Ten Commandments in public school classrooms is constitutional. In doing so, the court did not focus on any lengthy history of posting Ten Commandment monuments, as there is none. The court explicitly rejected the argument that a new practice must 'fit within some historical tradition" to satisfy the Establishment Clause. *Id.* at 606. It stated that "[n]o precedent supports [the] bizarre view" that there must be proof that the specific practice existed in the founding era. *Id.* at 606-07. Instead the court believed its only task was to "sift[ ] the historical record to discern the original public meaning of 'an establishment of religion.'" *Id.* at 607.[13] This archeological approach led it to rely, not on historical evidence of Ten Commandments' postings at the time of the founding or in the distant past, or a claimed direct or even indirect influence of the Ten Commandments on American law. Instead it appeared to rely on the most general evidence of religiosity in public settings: the text-less Ten Commandments representations in the Supreme Court and other public places as noted above (*supra* at 11-12), as well as the fact that "In God We Trust" is on our money and "religious placenames dot the landscape and religious mottos, symbols, and flags adorn countless public buildings." *Nathan*, 173 F.4th at 603. Indeed, the court criticized the plaintiffs for failing to identify any evidence "equating

---

13 Paradoxically, having stated this, the court in *Nathan* rejected the significance of evidence offered by experts as "[w]e . . . review the historical sources ourselves." *Id.* at 607.

the government's use of religious text, displays, or symbols with an establishment of religion." *Id.* at 602.

Not only does the *Nathan* majority engage in an analysis at odds with the Seventh Circuit's in *Woodring,* but it renders the historical analysis demanded by the Supreme Court virtually meaningless. If "historically sensitive understanding" is defined so broadly that any manner of unrelated, past religious references may justify a fundamentally different reference at the current time, there is no need to consult history or tradition. The breadth of that definition would render analysis unnecessary, and it is hard to discern a limiting principle as to *any* religious displays. As noted, the Seventh Circuit in *Woodring* has demanded a more focused inquiry. It is not enough to allude to our money containing "In God We Trust" or the degree of religiosity of those who founded the country. What *Woodring* properly gleaned from the Supreme Court was that a court must determine if the challenged practice of a Christmas display comported with the broader pattern of the government's historic recognition of public holidays. 986 F.3d at 996. "'Where categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional.'" *Id.* (quoting *American Legion*, 588 U.S. at 63 (plurality decision)).

So, the Seventh Circuit rejects the idea that a court must "participate in the longstanding scholarly debate over the original understanding of religious disestablishment at the state and federal levels and the meaning of the Establishment Clause." (Green, Dkt. 114-5 at 9 ¶ 21).[14] Instead, given that there is not currently a Ten Commandments monument on the Statehouse lawn, the question is whether placing the monument on the lawn "comports with a broader pattern" of similar government action. *Woodring*, 986 F.3d at 996.

---

14 Dr. Green's report provides ample ammunition for the plaintiffs to engage in this debate as does at least one of the yet-to-be filed reports of one of the Governor's witnesses. But even if the scholarly debate presents contested facts, they are immaterial.

This is not a difficult question to answer as there is no history of Ten Commandments monuments until the 1950s and no history of the Ten Commandments in either monumental or other form exerting an influence on the development of American law. Of course, depictions of Moses holding tablets without discernible writing exist in public places, including in the frieze in the courtroom of the United States Supreme Court. But the monument that the Governor proposes to put on the Statehouse lawn does not contain blank tablets, but words that are holy to some, and not to others. In its preliminary injunction decision this Court recognized that this made a difference. *O'Bannon*, 110 F. Supp. 2d at 854. Although this Court was analyzing the monument under Establishment Clause tests that are no longer utilized, this does not change the fact that "we do not think it can be said that the Ten Commandments, standing by themselves, can be stripped of their religious, indeed sacred, significance and characterized as a moral or ethical document." *Books v. City of Elkhart*, 235 F.3d 292, 302 (7th Cir. 2000). Regardless of purpose, effect, or endorsement, a representation of a blank tablet shape is not analogous either as a matter of history or common sense, to the text of the Decalogue. And there simply is no broad historical pattern of posting these words, holy to some, on the Statehouse lawn:

TEN COMMANDMENTS

I. THOU SHALT HAVE NO OTHER GODS BEFORE ME

II. THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE

III. THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN

IV. REMEMBER THE SABBATH DAY TO KEEP IT HOLY

V. HONOR THY FATHER AND THY MOTHER THAT THY DAYS MAY BE LONG IN THE LAND WHICH THE LORD THY GOD GIVETH THEE

VI. THOU SHALT NOT KILL

VII. THOU SHALT NOT COMMIT ADULTERY

VIII. THOU SHALT NOT STEAL

IX. THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR

X. THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE OR WIFE OR ANYTHING THAT IS THY NEIGHBORS

(Dkt. 102 at 7 ¶ 27).

Given that the placement of this monument is not "a governmental practice with historical support," *Woodring*, 986 F.3d at 996, it will still violate the Establishment Clause, despite the demise of *Lemon* and the endorsement test.

**III. A permanent injunction should be entered**

In order to issue a permanent injunction a court must determine whether a plaintiff has succeeded on the merits, "whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue," "whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant," and "whether the granting of the injunction will harm the public interest." *Plummer v. American Institute of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). The requirements for a permanent injunction are easily met here.

As noted above, the plaintiffs will succeed on the merits of their claim that placement of the Ten Commandments on the Statehouse lawn will violate the First Amendment. The Supreme Court has stressed that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Given this, "money damages are therefore inadequate." *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (citation omitted). "[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages." *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (citation omitted).

When the government is a party, the balance of equities and the public interest merge. *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009). A governmental entity cannot claim that requiring it to comply with the Constitution is harmful. As the Seventh Circuit has noted, if the government is threatening to violate the First Amendment the government's "claimed harm is no harm at all." *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). The balance of harms therefore favors issuance of equitable relief. Similarly, "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. These factors also favor an injunction.

**Conclusion**

The material facts in this case are uncontested. Placement of the Ten Commandments monument would violate the First Amendment. The plaintiffs are therefore entitled to summary judgment to that effect and a corresponding permanent injunction.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
Joshua T. Bleisch
Grace C. Wenstrom
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org
jbleisch@aclu-in.org
gwenstrom@aclu-in.org

Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that on September 25, 2026, I electronically filed the foregoing document using the Court's CM/ECF System and served it on all ECF-registered counsel. I also certify that on

September 25, 2026, the foregoing document was served upon the following persons using U.S. mail, first-class postage.

Stephen Schroeder
112 S. Beatty St.
Columbus, IN 47201

Kenneth J. Falk
Attorney at Law